No. 25-1492

# In the United States Court of Appeals for the Fourth Circuit

STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER, ON BEHALF OF THE EMPLOYEES RETIREMENT SYSTEM OF THE STATE OF RHODE ISLAND; LOCAL #817 IBT PENSION FUND,

*Plaintiffs-Appellees*,

v.

THE BOEING COMPANY; DAVID L. CALHOUN; DENNIS A. MUILENBURG; BRIAN J. WEST; GREGORY D. SMITH,

*Defendants-Appellants*.

On Appeal from the U.S. District Court
for the Eastern District of Virginia, Alexandria Division
No. 1:24-cv-151 (Hon. Leonie M. Brinkema)

## BRIEF OF APPELLANTS

Benjamin L. Hatch
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
(757) 640-3727

Jeffrey B. Wall
Judson O. Littleton
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
(202) 956-7500

Richard C. Pepperman II
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendants-Appellants The Boeing Company, David L. Calhoun, Dennis A. Muilenburg, Brian J. West, and Gregory D. Smith*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Defendant-Appellant The Boeing Company makes the following disclosure:

| | | |
|---|---|---|
| 1. | Is party a publicly held corporation or other publicly held entity? | Yes |
| 2. | Does party have any parent corporations? | No |
| 3. | Is 10% or more of the stock of a party owned by a publicly held corporation or other publicly held entity? | No |
| 4. | Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? | No |
| 5. | Is any party a trade association? | No |
| 6. | Does this case arise out of a bankruptcy proceeding? | No |
| 7. | Is this a criminal case in which there was an organizational victim? | No |

/s/ Jeffrey B. Wall
Jeffrey B. Wall

Dated: July 18, 2025
Counsel for The Boeing Company

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ......................................................5

STATEMENT OF THE ISSUE ..............................................................5

STATEMENT OF THE CASE ...............................................................6

    A.    Factual Background ...........................................................6

    B.    Procedural Background ......................................................8

            1.    The district court's summary denial of Boeing's
                 motion to dismiss .....................................................9

            2.    Plaintiffs' motion for class certification................11

            3.    The district court's class-certification decision ...................18

SUMMARY OF ARGUMENT ..............................................................19

STANDARD OF REVIEW ...................................................................24

ARGUMENT ........................................................................................24

I.    THE DISTRICT COURT ERRED BY CERTIFYING A
    CLASS WITHOUT ANY EVIDENCE OF A CLASSWIDE
    DAMAGES METHODOLOGY ......................................................25

    A.    *Comcast* Requires Evidentiary Proof Of A Case-Specific
          Damages Methodology ....................................................26

    B.    Plaintiffs Cannot Evade *Comcast*'s Requirement Of
          Evidentiary Proof............................................................34

II.   PLAINTIFFS' APPROACHES TO MEASURING
      DAMAGES ARE INCONSISTENT WITH THEIR
      LIABILITY CASE AND DEEPLY FLAWED .....................................38

      A.    Mr. Coffman's Constant-Inflation Approaches Are
            Inconsistent With Plaintiffs' Materiality-Through-
            Repetition Theory Of Liability .......................................39

            1.    Plaintiffs' liability theory is that Boeing's alleged
                  misstatements became material through repetition
                  over the class period ...............................................39

            2.    Mr. Coffman's constant-inflation approaches
                  assume full materiality and inflationary effect from
                  the start of the class period ...................................43

      B.    Mr. Coffman's Constant-Inflation Approaches Are
            Inconsistent With Public Reports Of Quality Issues
            During The Class Period...................................................47

      C.    Mr. Coffman's Use Of The Full Price Decline After The
            Accident As The Measure Of Inflation Is Inconsistent
            With Plaintiffs' Materialization-Of-The-Risk Theory Of
            Loss Causation .................................................................52

CONCLUSION....................................................................................60

# TABLE OF AUTHORITIES

Page(s)

C ASES

*Ark. Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.,*
   77 F.4th 74 (2d Cir. 2023) .................................................................58

*In re BHP Billiton Ltd. Sec. Litig.,*
   276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................43

*In re Boeing Co. Aircraft Sec. Litig.,*
   2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ....................................41

*Bondali* v. *Yum! Brands, Inc.,*
   620 F. App'x 483 (6th Cir. 2015) ........................................................9

*In re BP p.l.c. Sec. Litig.,*
   843 F. Supp. 2d 712 (S.D. Tex. 2012) ...............................................45

*In re BP p.l.c. Sec. Litig.,*
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ....................4, 22, 45, 54

*In re BP p.l.c. Sec. Litig.,*
   2014 WL 2112823 (S.D. Tex. May 20, 2014) ......................23, 53, 54

*Career Counseling, Inc.* v. *AmeriFactors Fin. Grp., LLC,*
   91 F.4th 202 (4th Cir. 2024) .............................................................24

*City of Monroe Emps.' Ret. Sys.* v. *Bridgestone Corp.,*
   399 F.3d 651 (6th Cir. 2005) ........................................................10, 40

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG,*
   752 F.3d 173 (2d Cir. 2014) ..............................................................10

*Coll. Ret. Equities Fund* v. *Boeing Co.,*
   2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ...................................41

*Comcast Corp.* v. *Behrend,*
   569 U.S. 27 (2013) ....................................................................*passim*

iv

*Dura Pharms., Inc.* v. *Broudo,*
    544 U.S. 336 (2005)................................................35

*ECA* v. *JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) ....................................41

*Emps.' Ret. Sys.* v. *Whole Foods Mkt., Inc.,*
    905 F.3d 892 (5th Cir. 2018)....................................40

*Erica P. John Fund, Inc.* v. *Halliburton Co.,*
    563 U.S. 804 (2011)................................................36

*Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.,*
    594 U.S. 113 (2021)...........................................35, 37

*Jaroslawicz* v. *M&T Bank Corp.,*
    2024 WL 2975766 (D. Del. June 13, 2024)..............51

*In re Level 3 Commc'ns, Inc. Sec. Litig.,*
    667 F.3d 1331 (10th Cir. 2012).................................47

*Lloyd* v. *CVB Fin. Corp.,*
    811 F.3d 1200 (9th Cir. 2016)..................................40

*Ludlow* v. *BP, PLC,*
    800 F.3d 674 (5th Cir. 2015)....................................55

*Lytle* v. *Nutramax Labs., Inc.,*
    114 F.4th 1011 (9th Cir. 2024) ................................33

*In re Marriott Int'l, Inc.,*
    78 F.4th 677 (4th Cir. 2023) ....................................37

*Miller* v. *Asensio & Co.,*
    364 F.3d 223 (4th Cir. 2004)................................34, 35

*Newton* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    259 F.3d 154 (3d Cir. 2001) ....................................28

*In re NII Holdings, Inc. Sec. Litig.,*
    311 F.R.D. 401 (E.D. Va. 2015) ...............................18

*In re Nissan N. Am., Inc. Litig.*,
 122 F.4th 239 (6th Cir. 2024) ...........................................................28

*Or. Pub. Emps.' Ret. Fund* v. *Apollo Grp. Inc.*,
 774 F.3d 598 (9th Cir. 2014)...........................................................40

*Parko* v. *Shell Oil Co.*,
 739 F.3d 1083 (7th Cir. 2014)...........................................................28

*Raab* v. *Gen. Physics Corp.*,
 4 F.3d 286 (4th Cir. 1993).........................................................10, 46

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 725 F.3d 244 (D.C. Cir. 2013)......................................................33, 34

*Randall* v. *Loftsgaarden*,
 478 U.S. 647 (1986)...........................................................29

*Speerly* v. *Gen. Motors, LLC*,
 ___ F.4th ___, 2025 WL 1775640
 (6th Cir. June 27, 2025) (en banc) ....................................37, 38, 51

*Stafford* v. *Bojangles' Rest., Inc.*,
 123 F.4th 671 (4th Cir. 2024) ....................................................24, 29

*In re Synchrony Fin. Sec. Litig.*,
 988 F.3d 157 (2d Cir. 2021) ...........................................................40

*In re Vale S.A. Sec. Litig.*,
 2020 WL 2610979 (E.D.N.Y. May 20, 2020)...............................43

*Wal-Mart Stores, Inc.* v. *Dukes*,
 564 U.S. 338 (2011)...........................................................36

*Ward* v. *Apple Inc.*,
 784 F. App'x 539 (9th Cir. 2019).................................................28, 33

*Windham* v. *Am. Brands, Inc.*,
 565 F.2d 59 (4th Cir. 1977) (en banc)...........................................27

*In re Zetia (Ezetimibe) Antitrust Litig.*,
 7 F.4th 227 (4th Cir. 2021) ...........................................................24

*Zhou* v. *Desktop Metal, Inc.*,
 120 F.4th 278 (1st Cir. 2024)...............................................................9

STATUTES, REGULATION, AND RULES

15 U.S.C. § 78aa ...................................................................................5

28 U.S.C. § 1331 ...................................................................................5

15 U.S.C. § 78j(b) ..................................................................................5

15 U.S.C. § 78t(a) ..................................................................................5

17 C.F.R. § 240.10b-5 ...........................................................................5

Fed. R. Civ. P. 23(a)...........................................................................26

Fed. R. Civ. P. 23(b) ..................................................................*passim*

Fed. R. Civ. P. 23(f) .......................................................................5, 42

OTHER AUTHORITIES

*F.A.A. Grounds Some Boeing Max 9s After Scare*,
 N.Y. TIMES (Jan. 7, 2024)..................................................................6

Restatement (Second) of Contracts § 347 (1981) ...............................30

**INTRODUCTION**

In January 2024, a door plug detached from a Boeing 737 MAX 9 airplane during an Alaska Airlines flight shortly after takeoff. Fortunately, the crew landed the plane safely, and no one was seriously injured. Boeing later traced the accident to an error in the process of manufacturing that particular airplane: the door plug had been opened to replace damaged rivets and then not properly reinstalled. That oversight might have been expected to yield a tort claim. What it should *not* have inspired is a claim for securities fraud. But when Boeing's stock price declined 8% after the accident, plaintiffs here pounced and brought this stock-drop suit several weeks later.

Plaintiffs could not point to any specific factual representations about the 737 MAX 9 or Boeing's manufacturing process, so they came up with a different fraud theory. They claim that virtually every statement Boeing or its senior officers made about safety or quality for three years before the accident—for example, that safety or quality is a corporate "priority" or "value"—defrauded stockholders. Taken individually, each of those statements is too general to be actionable as securities fraud. But plaintiffs managed to survive Boeing's motion to dismiss by arguing that the whole is more than the sum of its parts: that Boeing's repetition of generic statements

about safety and quality eventually misled investors, who were harmed when the understated risk of an accident materialized and Boeing's stock price dropped.

That theory of liability left plaintiffs with a predominance problem at the class-certification stage. In *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-35 (2013), the Supreme Court held that a plaintiff seeking class certification cannot satisfy Rule 23(b)(3)'s predominance requirement without "evidentiary proof" that "damages are capable of measurement on a classwide basis" in a manner "consistent with its liability case." Here, because plaintiffs allege that hundreds of misstatements gradually inflated Boeing's stock price over the three-year class period, they need a way to determine how much inflation was present at any particular time. Otherwise they cannot show how much each individual class member was harmed—and thus how much each stands to recover in damages. Under *Comcast*, if plaintiffs have failed to provide the required evidentiary proof of a classwide damages methodology that is consistent with their liability theory, they may not proceed as a class.

Plaintiffs' economic expert, Chad Coffman, came nowhere close to satisfying that burden of proof. In a template report that he submits in 10 to 15 different securities-fraud cases each year, Mr. Coffman simply recited the

general standard for damages in securities cases: "out of pocket" damages. He then promised that he would figure out how to apply that general standard to the particular facts of this case at a later date. At his deposition, Mr. Coffman acknowledged that the brief discussion of damages in his report is not at all specific to the allegations in this case.

Needless to say, if that cursory effort satisfies *Comcast*, then the requirement of "evidentiary proof" of a classwide damages methodology is meaningless. Saying that investors should receive out-of-pocket damages is true in virtually *every* securities case. It describes the general legal standard for damages in securities cases rather than a methodology for calculating them. Mr. Coffman's reference to the out-of-pocket standard tells a court nothing about whether plaintiffs have an actual damages methodology capable of measuring the alleged inflation in Boeing's stock price throughout the class period in a manner consistent with their liability theory.

This is not the first time that Mr. Coffman has failed to provide the evidentiary proof required by *Comcast* for this reason. In the wake of the Deepwater Horizon explosion and resulting oil spill in the Gulf of Mexico, some plaintiffs brought a securities-fraud action against BP on the same theory of liability as here: that BP's repetition of safety statements over time had

inflated its stock price, harming investors when the understated risk materialized. There too, Mr. Coffman lacked any methodology for determining how the inflation had crept into the stock price—and so the district court properly denied class certification. *See In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16-17 (S.D. Tex. Dec. 6, 2013). The same result is warranted here. If plaintiffs want to claim that Boeing's general safety statements became material as they were repeated over time, then *Comcast* requires that they have a means of measuring the statements' supposed gradual and cumulative effect on Boeing's stock price.

Simply put, the district court erred in holding that *Comcast* is satisfied merely by invoking the generally applicable out-of-pocket standard for damages in securities cases. Of course, defrauded investors should recover the amounts they are out of pocket, but plaintiffs need a methodology for determining *how much* that is for each investor—and the methodology must be consistent with their liability theory that the inflation in the stock price increased over time. Plaintiffs and Mr. Coffman have never proposed any such methodology for calculating damages on a classwide basis, which means they have not shown that common questions predominate over individual ones.

This Court therefore should reverse the district court's certification order and decertify the class.

## STATEMENT OF JURISDICTION

The district court has federal-question jurisdiction over this action under 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because plaintiffs' claims arise under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. On March 7, 2025, the district court granted plaintiffs' motion for class certification. JA1693. On March 21, 2025, defendants timely petitioned for leave to appeal under Federal Rule of Civil Procedure 23(f). JA1725. On May 2, 2025, this Court granted defendants' petition. JA1797.

## STATEMENT OF THE ISSUE

Whether securities plaintiffs can satisfy their evidentiary burden under *Comcast* by having their expert recite the generally applicable standard for measuring damages in securities-fraud actions and promise to develop a methodology for applying that standard to the particular facts of the case at a later date.

## STATEMENT OF THE CASE

### A.    Factual Background

On January 5, 2024, Alaska Airlines Flight 1282, a Boeing 737 MAX 9 airplane, made an emergency landing after a door plug in the fuselage detached shortly after takeoff.  JA140-141.  Boeing later determined that during the process of manufacturing that particular airplane, the door plug had been opened to replace damaged rivets nearby and then not properly bolted back in place.  JA103-104, JA112-113, JA150-151, JA162.  Although the crew landed the plane safely and no one was seriously injured, the accident was front-page news.  *See, e.g.*, *F.A.A. Grounds Some Boeing Max 9s After Scare*, N.Y. TIMES (Jan. 7, 2024).  Boeing's stock price declined 8% on January 8, which was the next trading day after the accident, and the Federal Aviation Administration (FAA) grounded the 737 MAX 9 pending inspections of the airplanes.  JA143.  Plaintiffs filed this action shortly thereafter, claiming that Boeing stockholders "have suffered billions of dollars in losses and damages under the federal securities laws."  JA45.

To support their claim for securities fraud, plaintiffs rummaged through Boeing's statements over the previous several years in various public filings, press releases, earnings calls, investor conferences, media appearances, and

other public documents and reports, principally to find all references to "safety" or "quality."[1]  The complaint here thus challenges literally *hundreds* of different statements by Boeing over a three-year period from January 2021 to January 2024.  JA194-370, JA383-452, JA534.  Plaintiffs' theory of the case is that, after two earlier crashes involving the 737 MAX in 2018 and 2019, Boeing misled the investing public by repeatedly saying that safety was its "highest priority"—when in plaintiffs' view that was not true.  JA37.

Consistent with that theory, the bulk of the challenged statements in this case are general comments emphasizing the importance of safety and quality to Boeing's business as a manufacturer of commercial aircraft.  Here are only a few examples:

- "Safety, quality and integrity are at the core of how Boeing operates."  JA257-258.

- "Safety is, simply put, our highest priority."  JA259.

- "[W]e remain steadfast in our commitment to quality, safety, integrity, and transparency."  JA266.

- "We remain committed to safety, quality, transparency."  JA275.

- "[W]e focused on our core values of safety, quality, integrity and sustainability."  JA297.

---

[1]  The defendants here are Boeing and several of its former senior officers. This brief henceforth refers to the defendants as Boeing for convenience.

- "Safety dominates Boeing." JA318.

- "Safety is at the heart of everything that we do." JA323.

- "Safety, quality, integrity and sustainability are at the core of how Boeing operates." JA330.

In addition to general statements about Boeing's corporate values, plaintiffs also rely on statements of opinion or future intention, such as "we're confident in the safety of our [737 MAX] airplane," JA252; "[w]e will continue to take the necessary time to ensure Boeing airplanes meet the highest quality prior to delivery," JA272; and "[w]e are ramping up in the 737 MAX program at 16 per month now, … [a]nd we intend to go higher," JA276. Plaintiffs also rely on factual statements that are not alleged to be false, such as that Boeing was "currently producing 16 airplanes per month," JA275; or that pursuant to the terms of Boeing's January 2021 deferred prosecution agreement (DPA) with the Department of Justice, "the criminal information will be dismissed after three years, provided that we comply with our obligations under the agreement," JA271.

## B.    Procedural Background

Plaintiffs filed this putative class action on January 30, 2024, less than a month after the Alaska Airlines accident. JA9. After lead plaintiffs and lead counsel were appointed under the Private Securities Litigation Reform Act of

1995 (PSLRA), JA24, plaintiffs filed an amended complaint, JA27, which Boeing moved to dismiss.

### 1. The district court's summary denial of Boeing's motion to dismiss

The district court denied Boeing's motion to dismiss without subjecting plaintiffs' complaint to the "statement by statement" analysis required by the PSLRA. *Zhou* v. *Desktop Metal, Inc.*, 120 F.4th 278, 293 (1st Cir. 2024) ("When a plaintiff alleges multiple false or misleading statements, we perform our analysis statement by statement, considering each statement in turn."); *see Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (Courts must "undertake a statement-by-statement analysis" rather than "analyz[e] the overall impression made by a set of statements."). Instead, the district court denied Boeing's motion in its entirety in an oral ruling from the bench, citing the complaint's "extensive amount of detail" but not mentioning any particular statements. JA518-519. Notwithstanding that plaintiffs challenge hundreds of different statements, the court's reasoning was limited to two short paragraphs in the transcript. JA518-519.

In so ruling, the district court did not address that most of the alleged misstatements are highly general statements about the importance of safety and quality to Boeing or vague predictions about the future. As numerous

courts (including this one) have held in other securities cases involving similar statements, such general statements are immaterial as a matter of law. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("general statements about reputation, integrity, and compliance" not material); *City of Monroe Emps.' Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (same for general statements about "a product in terms of 'quality'"); *Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("'Soft,' 'puffing' statements," such as "[we are] poised to carry the growth and success of 1991 well into the future," "generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.").

To get around that problem, plaintiffs opposed dismissal by arguing that Boeing's general statements "bec[a]me material to investors" and had an impact on Boeing's stock price because of their "repetition" over time. JA460, JA466-467, JA475-476. Plaintiffs contended that "[w]hile certain statements, viewed in isolation, may be mere puffery, *when the statements are made repeatedly*," they "*may become material to investors*." JA467 (quotation omitted). Plaintiffs thus distinguished two prior cases holding that similarly "vague affirmations of safety" by Boeing were "nonactionable" by asserting

that "[t]his case, by contrast, concerns Defendants' *years* of representations that Boeing had turned a new page … by prioritizing safety." JA476. Although the complaint should not have survived defendants' motion, under the liability theory articulated by plaintiffs, whatever inflation was introduced into Boeing's stock price occurred gradually as the alleged misstatements were repeated—not immediately when the first statement was made on the first day of the class period.

## 2. Plaintiffs' motion for class certification

Plaintiffs moved to certify a class running from September 30, 2019 to May 14, 2024. In support of their motion, plaintiffs offered an expert report from Chad Coffman, a frequent expert for securities plaintiffs at class certification. In response, Boeing offered expert economic testimony from Dr. René Stulz, whom Mr. Coffman acknowledges is a "well-respected" economist. JA756.

a. <u>Mr. Coffman's opening report</u>. Although plaintiffs allege that the class in this case is entitled to "billions of dollars" in damages, JA45, Mr. Coffman's opening report devotes only three pages to the discussion of damages for purchasers of Boeing common stock. JA589-592. At his deposition, Mr. Coffman acknowledged that he copied this brief damages

11

discussion nearly verbatim from a "template" he uses for all his class-certification reports in securities cases, totaling 10 to 15 reports per year since 2020. JA718-723. He also admitted that he made no effort to devise an actual damages model that would fit plaintiffs' liability theory in this particular case, conceding that no part of his damages discussion is "specific to this case." JA726. Rather, he testified that before dropping his template damages discussion into a class-certification report, he simply confirms that the plaintiffs' claims are "economically coherent" and that they allege "an inflated stock price as a result of misrepresentations and omissions"—the basis for every securities-fraud class action. JA720.

In its three-page discussion of damages, Mr. Coffman's opening report states that damages in securities cases typically are calculated using the "out-of-pocket" measure. JA589-590, JA592; *see* JA1437 (out-of-pocket measure "is applied in virtually every securities fraud class action"). Under that formula, "damages are equal to the artificial inflation per share at the time of purchase minus the artificial inflation per share at the time of sale (or if the share is not sold prior to the full revelation of the fraud, just the artificial inflation at the time of purchase)." JA589-590. Mr. Coffman's report acknowledges that the out-of-pocket standard cannot be applied without first calculating the artificial

inflation in the stock price over the class period.  JA590.  But his report does not explain how he intends to calculate the alleged inflation in Boeing's stock price attributable to Boeing's statements over the hundreds of trading days included in the class period here.

Instead, Mr. Coffman avers that he will develop a methodology for measuring artificial inflation at a later date after class certification.  JA590-592.  He concedes that developing a methodology to calculate "how inflation per share may have evolved over a class period" will require a "case-specific" analysis that he has not yet performed, JA591-592, and that constructing such a model will require "a lot of work" in this case, JA791-792, but he promises to "do the best" he can, JA812-813.

Beyond his reference to the out-of-pocket standard, Mr. Coffman identifies only two potential approaches for calculating per-share artificial inflation:  "constant dollar" inflation and "constant percentage" inflation. JA591-592; *see* JA1439, JA1444-1445.  Both approaches assume that the inflation in Boeing's stock price remained constant from the first alleged misstatement at the beginning of the class period through the end of the class period (on either a dollar or a percentage basis) and can be calculated based

on the decline in Boeing's stock price after the Alaska Airlines accident on January 5, 2024. *See* JA591-592, JA774-776.[2]

Mr. Coffman's two potential approaches for measuring inflation thus both begin with the first alleged misstatement—here, the unremarkable statement by Boeing's CEO when the DPA was announced in January 2021 that "[t]his resolution is a serious reminder to all of us of how critical our obligation of transparency to regulators is." JA250-251. Under both approaches, Mr. Coffman assumes that this statement by the CEO produced the full amount of claimed inflation. In other words, by Mr. Coffman's calculations, that one general statement introduced between $20 and $56 of inflation into Boeing's stock price (propping up the company's approximately $124 billion market capitalization by as much as 26.5%) on the day that it was made in January 2021. *See* JA1937, JA1977, JA2094. Mr. Coffman's determination that this generic statement—which is unrelated to safety or quality—inflated Boeing's stock price by such a large amount is illustrative of

---

[2] To be sure, Mr. Coffman acknowledges that "another approach may be necessary," JA592, and that "[i]t is not unusual to utilize another approach when there is reason to believe that the amount of artificial inflation varied over time," JA1439, but he never says what that other approach might be in this case. The only actual approaches he offers for calculating plaintiffs' alleged damages are constant-dollar and constant-percentage inflation.

the illogical results produced by his constant-inflation approaches. Then in Mr. Coffman's opinion, similarly generic statements made after January 2021 maintained that same amount of inflation for three years until the Alaska Airlines accident in January 2024. *See* JA1979.

b.    <u>Dr. Stulz's rebuttal report</u>. Boeing's economic expert, Dr. Stulz, explained that Mr. Coffman's constant-inflation approaches are inconsistent with plaintiffs' liability theory that the inflation in Boeing's stock price crept in gradually over time as the alleged misstatements about safety and quality were repeated. JA944, JA1014. According to Dr. Stulz, "[w]hat Mr. Coffman has not done is present a methodology that could be used for estimating class-wide damages arising from the repetition of the Alleged Misrepresentations or other aspects of evolving inflation during the Putative Class Period." JA944.

Relatedly, Dr. Stulz explained that Mr. Coffman's constant-inflation approaches fail to take into account that the market's perception of Boeing's general statements about safety and quality would have changed over the class period as reports of quality issues became public. JA934-938, JA942-944. The class period was a time of profound change at Boeing. The 737 MAX returned to service in December 2020, after being grounded worldwide since

March 2019. JA54, JA59. In connection with the DPA announced a month later in January 2021, Boeing instituted significant changes to address safety issues going forward. JA982-983. The obvious challenges of implementing those changes at an organization the size and complexity of Boeing were amplified by the ongoing effects of the COVID-19 pandemic, which resulted in unprecedented disruption to the aerospace industry and put extreme stress on Boeing's complex global supply chain and caused significant changes to its workforce. JA950-951, JA963-964, JA992-998. In the face of those headwinds, many securities analysts "were skeptical about Boeing's ability to successfully implement substantial changes in its culture and organization." JA952-953; *see* JA950-951, JA954-955, JA960.

At various points during the class period, reports of manufacturing issues at Boeing involving both the 787 Dreamliner and the 737 MAX also surfaced. *See* JA954-955, JA979-980, JA1100-1101, JA1103 (manufacturing quality issues with 787 Dreamliner); JA1009, JA1100-1101 (manufacturing quality issues with 737 MAX fuselage). Dr. Stulz opined that those reports of quality issues would have affected the market's perception of Boeing's general statements about safety and quality and thus any inflation in Boeing's stock price created by those statements. JA934-936.

Dr. Stulz further explained that the full decline in Boeing's stock price after the Alaska Airlines accident cannot be used as a proxy for the inflation supposedly introduced by Boeing's earlier alleged misstatements. That decline reflected at least in part, and likely in large part, the fact that a high-profile accident had occurred. JA1012-1017, JA1021-1024, JA1687-1688. Dr. Stulz observed that even in the absence of any alleged misstatements, Boeing's stock price still would have fallen following reports that a door plug had detached from a Boeing airplane during flight. JA1017.

c. <u>Mr. Coffman's reply report</u>. In his reply report, Mr. Coffman dismissed Dr. Stulz's criticisms as loss-causation questions that are not relevant to class certification. JA1433, JA1440, JA1444-1445, JA1448-1449. He also asserted that Dr. Stulz's criticisms "rest[] on a flawed claim that I would assume a constant inflation methodology when I have made no such assumption." JA1444-1445. As soon as class certification was decided, however, Mr. Coffman made the exact assumption that he had disavowed in his reply report. In his merits expert report served after class certification, Mr. Coffman adopted the same "constant percentage" inflation approach mentioned in his class-certification reports. JA1893. Mr. Coffman thus continues to assume that all the inflation created by the challenged statements

was embedded in Boeing's stock price on the date of the first alleged misstatement (which had nothing to do with safety or manufacturing quality) and then remained constant throughout the class period as a percentage of Boeing's stock price. *See* JA1979.

### 3. The district court's class-certification decision

The district court granted plaintiffs' class-certification motion in part. JA1693-1698. The court rejected plaintiffs' attempt to add options traders to the class and also shortened the class period from almost five years (September 30, 2019 to May 14, 2024) to three years (January 7, 2021 to January 8, 2024). JA1696-1698. The court otherwise rejected Boeing's arguments under *Comcast*.

In certifying the class, the district court held that plaintiffs had satisfied their evidentiary burden under *Comcast* because "[t]he out-of-pocket methodology for calculating per-share inflation is … 'widely accepted as the traditional measure of damages for Rule 10b-5 actions' and fits plaintiffs' theory of liability: that investors were damaged by purchasing Boeing stock at inflated prices due to defendants' fraud." JA1695 (quoting *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413-414 (E.D. Va. 2015)). The court rejected Boeing's criticism of Mr. Coffman's recitation of the out-of-pocket

rule on the ground that "the caselaw in this Circuit does not require plaintiffs to conduct detailed damages modeling … at the class certification stage." JA1695.

## SUMMARY OF ARGUMENT

I.     The district court misapplied *Comcast*. In *Comcast*, the Supreme Court held that a plaintiff seeking class certification cannot satisfy Rule 23(b)(3)'s predominance requirement without "evidentiary proof" that "damages are capable of measurement on a classwide basis" in a manner "consistent with its liability case." 569 U.S. at 33-35. Here, plaintiffs allege that investors were misled because hundreds of different statements about safety and quality at Boeing understated the risk of an accident, and that investors then were injured when that risk materialized in January 2024 and Boeing's stock price dropped. At class certification, however, plaintiffs' expert never explained how he intends to quantify the alleged inflation in Boeing's stock price throughout the putative class period supposedly created by the purported misstatements—even though a methodology to measure inflation is required to calculate out-of-pocket damages. *See* JA590. Plaintiffs' expert simply said that he would "do the best" he could to develop such a methodology

later after a class is certified. JA812-813. That is not enough to satisfy *Comcast*.

The district court held that plaintiffs had satisfied their evidentiary burden under *Comcast* merely by invoking the damages standard that applies in virtually every securities-fraud action—namely, out-of-pocket damages. But that is the general legal standard for damages in securities cases, not a methodology for calculating *how much* investors are actually out of pocket. Here, plaintiffs claim that investors were harmed by purchasing Boeing stock on various different dates over the three-year period from January 2021 to January 2024, as the level of alleged inflation in the stock price was supposedly increasing with each new general statement about safety or quality and also changing as new information about quality issues at Boeing was becoming public. Plaintiffs thus need a method for calculating how inflated the stock price was at the time of each purchase. Without such a damages methodology, "Rule 23(b)(3)'s predominance requirement" would be reduced "to a nullity" in securities cases. *Comcast*, 569 U.S. at 36.

II. In his class-certification reports, Mr. Coffman identified two potential approaches for measuring inflation: "constant dollar" inflation and "constant percentage" inflation. Both approaches assume that the alleged

inflation in Boeing's stock price remained constant on either a dollar or a percentage basis from the first alleged misstatement through the end of the class period. They also assume that the amount of alleged inflation can be calculated based on the decline in Boeing's stock price after the Alaska Airlines accident occurred in January 2024. JA591-592. Those approaches are inconsistent with plaintiffs' liability theories in this case for at least three reasons—each of which, standing alone, should have been fatal to class certification. The district court, however, failed to grapple with any of these inconsistencies.

A.    Mr. Coffman's "constant inflation" approaches are inconsistent with plaintiffs' materiality-through-repetition theory of liability. In opposing Boeing's motion to dismiss, plaintiffs argued that the company's general statements about safety and quality became material to investors as Boeing *repeated* them numerous times over the years. JA460, JA466-467, JA475-476. This theory enabled plaintiffs to distinguish their complaint from the large body of cases holding that such general statements are immaterial as a matter of law. Under plaintiffs' materiality-through-repetition theory, inflation cannot be constant: any alleged inflation in Boeing's stock price created by the earliest alleged misstatements must be less than the cumulative inflation

created by the later repetition of the same or similar statements. That is precisely why the district court denied class certification in the securities litigation filed against BP after the Deepwater Horizon explosion, where Mr. Coffman also was the plaintiffs' expert at class certification. *See BP*, 2013 WL 6388408, at *16-17. That same reasoning applies here because Mr. Coffman again assumes that the inflation in Boeing's stock price remained constant over the entire class period.

B.    Mr. Coffman's "constant inflation" approaches also are inconsistent with plaintiffs' case because they fail to account for the recurring reports of quality issues at Boeing throughout the three-year class period, including many disclosed by Boeing itself. To take just one example, Boeing disclosed in May 2021 that it was halting all deliveries of the 787 Dreamliner after identifying quality issues with the airplane's fuselage. This delivery halt ultimately lasted until July 2022. While 787 deliveries were still on hold, the FAA announced in February 2022 that it had revoked Boeing's ability to self-certify new Dreamliners. These announcements caused securities analysts to express concern about Boeing's manufacturing quality. Because these and other negative reports about quality and supply-chain challenges in Boeing's production system would have affected the market's perceptions of Boeing's

alleged misstatements about safety and quality, any alleged inflation in Boeing's stock price could not have remained constant throughout the entire class period. But Mr. Coffman never explained how he intends to factor the evolving information in the market about Boeing's manufacturing quality over the class period into his calculation of inflation.

C.     Mr. Coffman's proposal to calculate the constant level of inflation using the full decline in Boeing's stock price after the Alaska Airlines accident is also inconsistent with plaintiffs' reliance on a materialization-of-the-risk theory of loss causation. The litigation brought against BP is again instructive. There, the *BP* court held that Mr. Coffman's calculation of inflation using the full price decline after an accident would provide an "impermissible windfall" for class members because the price decline that occurred after the materialization of a risk reflected not just the correction of the defendants' prior statements about safety, but also the occurrence of a high-profile accident with negative consequences for BP's business. *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10 (S.D. Tex. May 20, 2014). Mr. Coffman has made the same mistake again here: he continues to use the full decline in Boeing's stock price after the Alaska Airlines accident as his measure of constant inflation throughout the entire class period.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to certify a class for abuse of discretion." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 233 (4th Cir. 2021). A district court "*per se* abuses its discretion when it makes an error of law," *id.* (quotation omitted), or "materially misapplies the requirements of Rule 23," *Career Counseling, Inc.* v. *AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 206 (4th Cir. 2024). As discussed below, the district court erred as a matter of law by failing to require "evidentiary proof" that "damages are capable of measurement on a classwide basis" in a manner "consistent with [plaintiffs'] liability case." *Comcast*, 569 U.S. at 33-35. That error of law is *per se* an abuse of discretion.

## ARGUMENT

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. Because "class-action lawsuits can ratchet liability to potentially ruinous levels and force companies to settle or bet the store," *Stafford* v. *Bojangles' Rest., Inc.*, 123 F.4th 671, 678 (4th Cir. 2024), "[t]o come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23," *Comcast*, 569 U.S.

at 33 (quotation omitted). As part of that burden, plaintiffs must submit "evidentiary proof" of a classwide damages methodology that is consistent with their theory of liability. *Id.* at 33, 35. Because plaintiffs here offered no such evidentiary proof, the district court erred in certifying a class.

## I. THE DISTRICT COURT ERRED BY CERTIFYING A CLASS WITHOUT ANY EVIDENCE OF A CLASSWIDE DAMAGES METHODOLOGY.

The district court erred by certifying a class without evidentiary proof of an actual damages methodology for measuring the alleged inflation in Boeing's stock price created by Boeing's purported misstatements. Plaintiffs assert that investors were misled because hundreds of different statements about safety and quality at Boeing understated the risk of an accident, and that investors then were injured when that risk materialized in January 2024 and Boeing's stock price dropped. At class certification, however, plaintiffs' expert never explained how he intends to quantify the alleged inflation in Boeing's stock price throughout the three-year class period supposedly created by the purported misstatements, which he admits is necessary to calculate out-of-pocket damages. *See* JA590. He simply said that he would "do the best" he could to develop an actual methodology to calculate the

alleged inflation later after a class is certified.  JA812-813.  *Comcast* requires more.

**A.    *Comcast* Requires Evidentiary Proof Of A Case-Specific Damages Methodology.**

1.    In *Comcast*, millions of Comcast subscribers sought damages for violations of the federal antitrust laws.  The lower courts had certified the subscribers as a class, but the Supreme Court reversed.   It began by recognizing that, in addition to proving numerosity, commonality, typicality, and adequacy of representation under Rule 23(a), class plaintiffs must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33 (quotation omitted); *id.* (emphasizing that Rule 23(b) "does not set forth a mere pleading standard").  The particular provision at issue in *Comcast* was the same one at issue here:  Rule 23(b)(3), which requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.*

The Supreme Court held that the *Comcast* plaintiffs failed to establish predominance.  The plaintiffs there had four different theories of antitrust impact, but the district court had accepted only one for class treatment. 569 U.S. at 36-37.  The problem for the plaintiffs was that their damages expert had relied on all four theories, without allocating damages per theory.  *Id.* at

37-38. As a result, "the model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability [was] premised." *Id.* at 36. The *Comcast* plaintiffs' model thus fell "far short of establishing that damages are capable of measurement on a classwide basis." *Id.* at 34. And "[w]ithout presenting another methodology," the plaintiffs could not show "Rule 23(b)(3) predominance"—*i.e.*, that "questions common to the class" would predominate over "[q]uestions of individual damage calculations." *Id.*

2. If *Comcast*'s requirement of "evidentiary proof" means anything, it is that plaintiffs cannot offer an expert at class certification who pledges to develop a classwide damages methodology *after* the class is certified. The existence of a classwide damages methodology is what permits plaintiffs to establish predominance and certify a class in the first place. In truth, that was clear long before *Comcast*. More than 30 years before *Comcast* was decided, this Court sitting en banc held that plaintiffs cannot merely "declar[e] that they 'expect' to develop a formula" to compute damages on a classwide basis, especially when, as here, "there are serious problems now appearing" with the determination of classwide damages. *Windham* v. *Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977) (en banc).

Consistent with *Windham*, courts have held since *Comcast* that a plaintiff's damages expert cannot "merely assert[] that he [will] be able to develop a model at some point in the future" to calculate classwide damages. *Ward* v. *Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019); *see Parko* v. *Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) ("[I]f intentions (hopes, in other words) were enough, predominance, as a check on casting lawsuits in the class action mold, would be out the window."); *Newton* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001) ("Plaintiffs maintain their expert can devise a formula for calculating injury and damages that will allay manageability concerns. Yet we are hesitant to rely on a formulaic nostrum given the consequences if it fails to meet expectations.") (citing *Windham*); *see also In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253-254 (6th Cir. 2024) (expert's "bald statement alone" cannot "prove" that Rule 23's requirements "have been met").

3. Plaintiffs here did not offer an actual methodology for calculating classwide damages. Their expert, Mr. Coffman, instead submitted a copied-and-pasted discussion of damages that he uses in every securities-fraud action regardless of the allegations—what he calls his damages "template." JA720-722. In that template, Mr. Coffman simply recites that the out-of-pocket rule

is the legal standard for measuring damages for virtually all Section 10(b) claims. JA589-590. Of course, reciting that general legal standard says nothing about how to calculate the amount that putative class members are supposedly out of pocket in this case due to Boeing's alleged misstatements. When asked at his deposition if any part of his opening report's damages discussion is "specific to this case and different from what you've used in virtually all of the cases in which you've been retained as an expert," Mr. Coffman answered: "No." JA726.

In relieving plaintiffs of their evidentiary burden under *Comcast*, the district court observed that plaintiffs' proposed "out-of-pocket methodology for calculating per-share inflation … fits plaintiffs' theory of liability: that investors were damaged by purchasing Boeing stock at inflated prices due to defendants' fraud." JA1695. Phrased at that level of generality, however, the district court's observation describes *every* securities-fraud case. *See Stafford*, 123 F.4th at 675 (reversing class certification where court "employed an inappropriately high level of generality"). Mr. Coffman's reference to out-of-pocket damages is analogous to saying that "rescissory" damages are the standard measure for Section 12(2) claims, *see Randall* v. *Loftsgaarden*, 478 U.S. 647, 655-656, 662 (1986), or that benefit-of-the-bargain damages are

the standard measure for breach-of-contract claims, *see* Restatement (Second) of Contracts § 347 cmt. a (1981). It is not tied in any way to plaintiffs' theory of liability and the facts of this case.

The district court wrongly believed that Boeing was taking issue with the out-of-pocket damages standard. *See* JA1695. Boeing's point is that *Comcast* requires a methodology for determining what those out-of-pocket damages are—*i.e.*, a methodology for measuring the artificial inflation in Boeing's stock price supposedly created by the alleged misstatements—that is consistent with plaintiffs' liability case. JA1685-1686. A component of plaintiffs' liability theory here is that Boeing's repetition of false statements about safety and quality eventually rendered those general statements material to investors, gradually inflating Boeing's stock price until the Alaska Airlines accident in January 2024. To determine how much investors who purchased Boeing shares at different points during the three-year class period are out of pocket due to the alleged fraud, plaintiffs need a way to calculate how that supposed inflation crept in over time. Mr. Coffman failed to offer such a methodology.

Nor has Boeing ever argued that plaintiffs or Mr. Coffman must "conduct detailed damages modeling to meet Rule 23's predominance

requirement." JA1695. Boeing instead argued that, under *Comcast*, plaintiffs must establish at class certification that they have a *methodology* for measuring the artificial inflation in Boeing's stock price that is consistent with their liability theory. JA1685-1686. *Comcast* would be meaningless if securities plaintiffs could satisfy Rule 23(b)(3) merely by reciting the general out-of-pocket standard that applies in virtually every securities-fraud action. But Boeing has never contended that plaintiffs must actually perform the detailed modeling required to calculate per-share inflation on each day of the class period at the class-certification stage. JA1685-1686.

Contrary to plaintiffs' assertion, Boeing also did not criticize Mr. Coffman's "methodology" merely for being insufficiently detailed. *See* JA1771. The problem here is more fundamental: Mr. Coffman's assertion that he will apply the out-of-pocket rule is not a damages methodology at all. As Boeing's expert explained, the out-of-pocket measure of damages is only a "formula" that "says you need to know the amount of inflation when somebody buys a stock and you need to know the amount of inflation when they sell. That's it. It's pure arithmetic." JA1281-1282; *see* JA1685. What the out-of-pocket measure of damages does *not* "tell you [is] whether the plaintiff[s'] expert has an approach to estimate that artificial inflation that would be

consistent with plaintiffs' liability theory. And so in that sense, it is not a methodology." JA1194-1195; *see* JA1196-1197, JA1685-1686. Mr. Coffman's report is missing an actual methodology for measuring the purported inflation in Boeing's stock price created by the alleged misstatements.

4. *Comcast* itself makes clear that plaintiffs' generalized reliance on the out-of-pocket standard is not enough. In *Comcast*, the plaintiffs claimed that damages could be "determined by comparing" what the "competitive prices would have been if there had been no antitrust violations" with "what the actual prices were during the charged period." 569 U.S. at 36. The Supreme Court rejected that overly general approach, holding that the plaintiffs had to provide a specific methodology that could actually compute the price distortions attributable to Comcast's alleged antitrust violations. *Id.* at 35-36. Anything less, the Court stressed, "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36.

Since *Comcast*, courts in antitrust cases have required plaintiffs to provide an actual methodology to measure the "competitive" price that would have existed absent the antitrust violation. In *Ward*, for example, the Ninth Circuit affirmed the denial of class certification where the plaintiffs' expert merely stated he "would be able to develop a model at some point in the future"

to measure "the impact of Apple's alleged anticompetitive conduct." 784 F. App'x at 540. As the court observed, "plaintiffs here have done even less than the *Comcast* plaintiffs: Instead of providing an imperfect model, they have provided only a promise of a model to come." *Id.* at 541. Likewise, the D.C. Circuit has rejected "unsubstantiated claims" by a plaintiffs' expert, stating that "we have no way of knowing the overcharges the damages model calculates for class members." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253-254 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").

There is no reason to hold securities plaintiffs to a lesser burden under *Comcast* than antitrust plaintiffs. To satisfy Rule 23(b)(3), securities plaintiffs must offer an actual methodology for computing artificial inflation. Without evidence of how plaintiffs intend to measure the alleged inflation in Boeing's stock price during the class period, a court cannot assess whether there is a mismatch between plaintiffs' liability theory and their damages methodology, as *Comcast* requires. That is why "[m]erely gesturing at a model or describing a general method will not suffice." *Lytle* v. *Nutramax Labs., Inc.*, 114 F.4th 1011, 1032 (9th Cir. 2024). Such "unsubstantiated claims cannot be refuted

through *a priori* analysis," and thus do not satisfy *Comcast*'s requirement of evidentiary proof. *In re Rail Freight*, 725 F.3d at 254.

## B. Plaintiffs Cannot Evade *Comcast*'s Requirement Of Evidentiary Proof.

1. In opposing this Court's review, plaintiffs argued that calculating the inflation attributable to Boeing's statements relates to the separate merits element of loss causation, and therefore is irrelevant at the class-certification stage. JA1773. Consistent with that argument, Mr. Coffman's principal response to Dr. Stulz's report was that Dr. Stulz had presented a loss-causation analysis, which is not required at this stage. JA1433, JA1440, JA1444-1445, JA1448-1449. That response conflates two different elements of Section 10(b) claims: loss causation and damages. *See Miller* v. *Asensio & Co.*, 364 F.3d 223, 232-233 (4th Cir. 2004) (describing "the 'important' distinction between 'loss causation' on the one hand and 'proof of damages' on the other") (citation omitted).

The element of loss causation asks whether the plaintiff suffered an economic loss caused by the alleged misstatements when the truth was later revealed and the stock's price declined due to the elimination of the inflation created by the misstatements. To show loss causation, "a plaintiff need only prove defendant's misrepresentation was a *substantial* cause of the loss."

*Miller*, 364 F.3d at 232. The loss-causation inquiry is thus binary: it examines "*whether* an alleged misstatement caused a later economic loss." JA1686; *see Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005).

By contrast, the element of damages asks the different question of *how much* the stock's price was inflated because of the alleged misstatements. *See Miller*, 364 F.3d at 233 (damages relate to "the amount of plaintiff's loss *solely* caused by defendant's fraud"). To calculate damages for each class member that purchased Boeing shares during the class period, plaintiffs must have a reliable methodology to measure the alleged inflation over that three-year period. If they do not, then they may not proceed as a class because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class," thereby defeating predominance under Rule 23(b)(3). *Comcast*, 569 U.S. at 34.

Even assuming that the amount of inflation in Boeing's stock price *also* relates to loss causation, that does not excuse plaintiffs from satisfying their burden under *Comcast* to provide evidence of a methodology for measuring inflation at class certification. *See Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*, 594 U.S. 113, 122 n.2 (2021) (holding that merits and class-certification issues often "overlap" and that a court "may not use the overlap

to refuse to consider the evidence") (quotation omitted). In *Comcast* itself, the Supreme Court rejected the court of appeals' ruling that the plaintiffs should not be required to "'tie each theory of antitrust impact' to a calculation of damages" because that would improperly intrude on the "merits." 569 U.S. at 35. As the Court explained, "[t]hat reasoning flatly contradicts our cases requiring a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim." *Id.*; *see Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 351 (2011) ("Frequently th[e] 'rigorous analysis' [required by Rule 23] will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.").

The Supreme Court's decision in *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804 (2011), is not to the contrary. In *Halliburton*, the Court held that securities plaintiffs need not "prove" loss causation at class certification "as a precondition for invoking [the] rebuttable presumption of reliance." *Id.* at 812-813. But when loss causation overlaps with a disputed class-certification issue like damages, a court cannot refuse to consider evidence relevant to class certification just because it is also relevant to loss causation. *Comcast* is crystal clear on this point: "By refusing to entertain arguments against [plaintiffs'] damages model that bore on the propriety of

class certification, simply because those arguments would also be pertinent to the merits determination, the Court of Appeals ran afoul of our precedents requiring precisely that inquiry." 569 U.S. at 34; *see Goldman Sachs*, 594 U.S. at 124 (requiring on remand that the lower courts "take into account *all* record evidence relevant to [class certification], regardless whether that evidence overlaps with materiality or any other merits issue"); *Speerly* v. *Gen. Motors, LLC*, ___ F.4th ___, 2025 WL 1775640, at *5 (6th Cir. June 27, 2025) (en banc) (Courts must "answer merits questions that bear on Rule 23's demands.").

2.    It also does not matter that, after the class was certified, Mr. Coffman finally stated in his merits report that he intends to measure damages using the "constant percentage" inflation approach. *See* JA1893. To start, "the 'rigorous analysis'" required by Rule 23 "must be performed *before* a class is certified." *In re Marriott Int'l, Inc.*, 78 F.4th 677, 687 (4th Cir. 2023). As this Court has explained, "[u]nder Rule 23, certification is the key moment in class-action litigation:  It is the sharp line of demarcation between an individual action seeking to become a class action and an actual class action." *Id.* at 686 (quotation omitted).  Once a class is certified, "the possible consequences of a judgment to the defendant are so horrendous that these actions are almost always settled, making the class-certification order too

often the main event." *Speerly*, 2025 WL 1775640, at *11 (quotation omitted).

Plaintiffs cannot evade the rigorous analysis required by Rule 23 by hiding the

ball on how they intend to measure inflation until after the class is certified,

which is what plaintiffs did here. Regardless, as explained below,

Mr. Coffman's now-confirmed "constant percentage" inflation approach

flunks *Comcast* because it is inconsistent with plaintiffs' liability theory in this

case.

## II. PLAINTIFFS' APPROACHES TO MEASURING DAMAGES ARE INCONSISTENT WITH THEIR LIABILITY CASE AND DEEPLY FLAWED.

Mr. Coffman's class-certification reports mention two potential

approaches to measuring damages: constant-dollar inflation and constant-

percentage inflation. These approaches suffer from at least three fatal flaws.

First and most fundamentally, these "constant inflation" approaches are

inconsistent with plaintiffs' materiality-through-repetition theory of liability.

Second, these approaches also fail to account for public reports of quality

issues at Boeing during the class period that would have affected the market's

perception of Boeing's general statements about safety and quality. Third,

Mr. Coffman's use of the full price decline following the Alaska Airlines

accident as the measure of the alleged constant inflation again does not match

up with plaintiffs' liability theory, because it does not isolate the amount of the price decline attributable to the correction of the alleged misstatements as opposed to the accident itself.

## A. Mr. Coffman's Constant-Inflation Approaches Are Inconsistent With Plaintiffs' Materiality-Through-Repetition Theory Of Liability.

Plaintiffs' liability theory is that Boeing's general statements about safety and quality became material and inflated Boeing's stock price gradually as the statements were repeated over the years. Mr. Coffman's "constant inflation" approaches are inconsistent with that theory because they assume full inflation from the start of the class period—not gradual inflation as the alleged misstatements were repeated over time.

### 1. Plaintiffs' liability theory is that Boeing's alleged misstatements became material through repetition over the class period.

Plaintiffs' fraud claim is based largely on generic statements about safety, quality, transparency, integrity, and corporate values, such as "[s]afety is a core value at Boeing," "[w]e are navigating this complex landscape by focusing on our core values of safety, quality and integrity," and "we're fostering a culture of trust, one that encourages and recognizes transparency, accountability and integrity." JA260, JA262-263. Plaintiffs thus had a

problem right out of the gate: courts around the country have held that general statements about "commitment[] to transparency and quality—even if false—are immaterial" as a matter of law because "they do not alter a reasonable investor's assessment of the company's prospects." *Emps.' Ret. Sys.* v. *Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018); *see In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (generic statements "regarding a corporate entity's risk management strategy, asset quality, and business practices" were immaterial); *Lloyd* v. *CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (same regarding company's "strong credit culture").

As the Sixth Circuit has observed, "federal courts everywhere have demonstrated a willingness to find" generic statements about safety and quality "immaterial as a matter of law" for two reasons. *City of Monroe Emps.' Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651, 699 (6th Cir. 2005) (quotation omitted). First, such general statements "are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.* at 671; *see Or. Pub. Emps.' Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("subjective" statements about "quality" lack "specificity" and

"provide[] nothing concrete upon which a plaintiff could reasonably rely").

Second, generalized statements about product quality cannot affect a reasonable investor's calculus "for the simple fact that almost every [company] makes these statements" about its products. *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). As a result, it does not matter that the *subject* of safety "is undeniably important"; courts do not "conflate the importance" of a subject "with the materiality of a [company's] statements" about the subject. *Id.*

The problem was even worse for the plaintiffs here because two earlier securities-fraud cases against Boeing dismissed virtually identical safety-related statements as "vague affirmations of safety" that are "immaterial puffery and opinion, nonactionable as a matter of law." *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *9 (N.D. Ill. Aug. 23, 2022); *see id.* at *19 ("[S]tatements about Boeing's 'core values' and similar affirmations of safety are just [the] kind of rosy affirmation that reasonable investors know are meaningless to the total mix of information."); *Coll. Ret. Equities Fund* v. *Boeing Co.*, 2023 WL 6065260, at *7 (N.D. Ill. Sept. 18, 2023) ("Regardless of the falsity of these statements, a reasonable investor could not find them

material. … [T]hese statements are the kind of loosely optimistic statements that are unimportant to [the] total mix of information for investors.").

To get around all of these cases and survive Boeing's motion to dismiss, plaintiffs argued that although "certain statements" at issue in this case, "viewed in isolation, may be mere puffery, *when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors*." JA467 (quotation omitted; emphasis added). Plaintiffs thus distinguished the two prior decisions in the other securities-fraud actions against Boeing that had held that similar "safety" statements were immaterial by contending that "[t]his case, by contrast, concerns Defendants' *years* of representations that Boeing had turned a new page after the crashes by prioritizing safety." JA476. Based on the parties' briefing, the district court incorrectly denied Boeing's motion to dismiss.

In opposing Rule 23(f) review, plaintiffs tried to run from this liability theory. *See* JA1772, JA1785-1786. But plaintiffs' complaint (JA37-40, JA63, JA81, JA83) and their opposition to Boeing's motion to dismiss (JA460, JA466-467, JA475-476) speak for themselves. Plaintiffs staved off dismissal by arguing that otherwise-immaterial statements about safety and quality

became material to investors through their repetition. In support of that argument, plaintiffs relied on district-court decisions endorsing that theory. JA467, JA475 (citing *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*12 (E.D.N.Y. May 20, 2020); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79-80 (S.D.N.Y. 2017)). Absent their materiality-through-repetition theory, plaintiffs would have had no answer to the considerable body of case law holding that generic statements about safety and quality are immaterial as a matter of law. Plaintiffs are bound now by the liability theory they earlier urged to dodge dismissal. *See Comcast*, 569 U.S. at 36-38.

> ## 2. Mr. Coffman's constant-inflation approaches assume full materiality and inflationary effect from the start of the class period.

Mr. Coffman's expert reports at class certification identified only two potential approaches for measuring the alleged inflation in Boeing's stock price: "constant dollar" inflation and "constant percentage" inflation. JA592, JA1439. Both approaches use the decline in Boeing's stock price after the Alaska Airlines accident in 2024 as the proxy for the constant inflation supposedly created by the alleged misstatements. Critically, both approaches assume that this inflation remained constant from the beginning of the class period until the end. JA591-592. Under "constant dollar" inflation, the

inflation is "the same dollar amount" throughout the class period. JA592. Under "constant percentage" inflation, which Mr. Coffman later adopted in his merits report, the inflation is the same "percentage" of Boeing's stock price throughout the class period. JA592.

Plaintiffs' theory that Boeing's statements became material due to their repetition over the years is incompatible with any damages methodology that assumes that the full inflation was baked into Boeing's stock price upon the first alleged misstatement and then remained constant throughout the class period. JA1014. Under plaintiffs' materiality-through-repetition theory, any inflation in Boeing's stock price would have emerged gradually over time as the alleged misstatements were repeated and thus would not have existed in full when the first statement was made and would not have remained constant. *See* JA1014. At his deposition, Mr. Coffman had no answer to this inconsistency, stating only that "[t]hat's something that I would have to consider carefully" and that he had not "thought about that yet in connection with [his] role in this case." JA799-800. And Mr. Coffman's reply report (JA1427) simply ignores the inconsistency.

In the *BP* securities litigation filed after the Deepwater Horizon explosion, the district court denied class certification for this exact reason. As

in this case, the *BP* plaintiffs alleged that the company's CEO repeatedly had made statements falsely "touting" BP's progress in instituting safety improvements. *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 758 (S.D. Tex. 2012). In sustaining the complaint, the court concluded that "[a] repeated utterance, even on a promise of progress, can become misleading" due to the sheer repetition of the statement. *Id.* at 759. That liability theory, however, later proved fatal at class certification, where the plaintiffs also used Mr. Coffman as their expert. In denying class certification, the court found a clear "disconnect[]" between (i) the plaintiffs' liability theory that "the repetition of [the] statements" had a "cumulative inflationary effect" and (ii) Mr. Coffman's assumption that the inflation in BP's stock price remained constant throughout the class period. *BP*, 2013 WL 6388408, at *17.

That same disconnect exists here. As in *BP*, Mr. Coffman's damages approaches here assume constant inflation throughout the class period, which is inconsistent with plaintiffs' liability theory that the repetition of the alleged misstatements had a cumulative inflationary effect. As Dr. Stulz explained, "[w]hat Mr. Coffman has not done is present a methodology that could be used for estimating class-wide damages arising from the repetition of the Alleged Misrepresentations." JA944.

Plaintiffs have suggested (JA1786-1787) that starting the class period in January 2021 rather than in September 2019 as originally alleged somehow "moot[s]" the inconsistency between Mr. Coffman's constant-inflation approaches and their liability theory. But plaintiffs have offered *no* evidence to support that argument. Neither of the reports submitted by Mr. Coffman at class certification suggests that the alleged misstatement that marks the beginning of the class period—the statement by Boeing's CEO in January 2021 that the DPA "is a serious reminder to all of us of how critical our obligation of transparency to regulators is" (JA250-251)—had the full inflationary effect due to Boeing's earlier statements about safety and quality in the years beforehand. Mr. Coffman simply ignored this issue entirely.

Indeed, it would be absurd to conclude, as Mr. Coffman's approaches posit, that Boeing's stock price became inflated by as much as 26.5% ($56.40 per share) in January 2021 because of that unremarkable statement by Boeing's CEO about the DPA, which had nothing to do with safety or quality. JA1977. Such vague statements are "not specific enough to perpetrate a fraud on the market" and do "not inflate[]" the "market price of a share." *Raab*, 4 F.3d at 289-290. Rather, the January 2021 statement is the kind of "vague (if not meaningless) management-speak upon which no reasonable investor

would base a trading decision." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012).

**B.    Mr. Coffman's Constant-Inflation Approaches Are Inconsistent With Public Reports Of Quality Issues During The Class Period.**

Mr. Coffman's "constant inflation" approaches also fail to account for the many public reports of quality issues at Boeing throughout the class period. According to plaintiffs, the alleged inflation in Boeing's stock price resulted "from the market['s] over-valuing Boeing's safety efforts" due to the alleged misstatements. JA942. Plaintiffs allege that the challenged statements falsely assured investors that Boeing had made "improvement[s] in its safety and quality control processes." JA81. To be consistent with that theory, the alleged inflation in Boeing's stock price at any point in time during the class period should reflect the difference between (i) "the market's perception of Boeing's forward-looking plans to improve safety" and (ii) "Boeing's actual progress on those plans." JA942.

Any damages methodology that purports to measure inflation thus must account for the market's assessment of "the perceived likelihood that Boeing would be able to successfully implement" its safety and quality initiatives—an assessment that necessarily would have evolved as the market learned new

information about quality issues at Boeing. JA950. As Dr. Stulz explained, "any inflation caused by the Alleged Misrepresentations would be expected to vary over time and depend on investors' views of the likelihood of success of Boeing's safety plans" based on contemporaneous reports. JA959. The notion that the market would have interpreted Boeing's statements exactly the same way throughout the three years between January 2021 and January 2024, notwithstanding public reports of quality issues at Boeing, defies credulity.

From the beginning of the class period, the market understood that Boeing's safety and quality initiatives would take time to bear fruit. JA950-953, JA957-961. In April 2021, analysts at Bank of America remarked that Boeing "is just beginning to dig its way out of this hole" and that "there will be bumps along the way." JA957. In February 2022, Morgan Stanley analysts similarly commented that "Boeing is still in the process of overcoming its execution issues" and that it is "going to take a while for confidence regarding execution to return." JA957. The implementation challenges discussed by analysts were exacerbated by the supply-chain disruptions and labor shortages caused by the pandemic, which were unprecedented in the industry's history and continued to plague Boeing as it ramped up production in 2021 and 2022. JA992-998.

As the class period progressed, analysts identified a number of quality issues at Boeing that would have affected the market's perception of the company's progress on its safety and quality initiatives. Indeed, Boeing itself publicly disclosed many, if not all, of these issues. For example, in May 2021, Boeing announced that it had halted all deliveries of 787 Dreamliners following the disclosure of previously identified manufacturing issues with the airplane's fuselage. JA979-980. Deliveries of the 787 remained on pause for the next 14 months until the FAA approved Boeing's plan to resume deliveries in July 2022. JA979-980. While deliveries were halted, the FAA announced in February 2022 that Boeing no longer would be permitted to self-certify new 787 Dreamliners in light of the manufacturing issues with the aircraft's fuselage. JA980. Throughout the 14-month delivery halt, analysts commented on the FAA's close oversight and the involved process of gaining the FAA's certification. JA979-980. Analysts also interpreted Boeing's loss of the ability to self-certify the 787 as "show[ing that] the FAA does not have confidence in Boeing to self-certify to the required FAA standards." JA980.

Throughout 2022 and 2023, Boeing disclosed to the market multiple manufacturing-quality issues at the supplier of the 737 MAX's fuselage, Spirit Aerosystems. JA1008-1011. In April 2023, the press reported that Spirit had

notified Boeing of defects in the 737 MAX's tail fittings produced by Spirit. JA1009. Four months later, in August 2023, Boeing publicly identified another widespread manufacturing-quality issue on the 737 MAX stemming from assembly work performed by Spirit. JA1009. Analysts emphasized that Spirit had become the "biggest [source of] issues for Boeing on the 737 MAX" because Spirit quality issues required "time-consuming inspections and some rework." JA1009-1010. As Dr. Stulz explained, "the quality issues Spirit faced … would be expected to affect the market's perception of the likelihood of Boeing successfully implementing its own safety initiatives and thus the stock price impact, if any, of the Alleged Misrepresentations." JA1010-1011.

All these public reports of quality issues at Boeing and Spirit inevitably would have affected the market's perception of Boeing's general statements about safety and quality. Dr. Stulz thus concluded that "[t]he market's perceptions with regard to Boeing's success or lack thereof in implementing the new safety standards and its forward-looking safety statements varied over time and were affected by these events and developments." JA967. Yet Mr. Coffman never explained how his constant-inflation approaches could account for the public reports of various quality issues at Boeing and Spirit throughout the class period. To the contrary, he acknowledged that "another

approach may be necessary … where the artificial inflation has evolved based upon the nature and timing" of information disclosed to the market. JA591-592; *see* JA1439.

Under *Comcast*, plaintiffs cannot make the necessary evidentiary showing simply by punting to a later date all the many difficult factual issues raised in a particular case. *See Jaroslawicz* v. *M&T Bank Corp.*, 2024 WL 2975766, at *9 (D. Del. June 13, 2024) (denying certification where plaintiff's expert did not "provide any methodological options to address … the potential for price impact to vary throughout the class period"). As the Sixth Circuit sitting en banc observed last month, "if the predominance inquiry is to serve its critical function, it cannot be answered by 'maybe,' 'perhaps,' and other 'what ifs' that leave the hard questions for later." *Speerly*, 2025 WL 1775640, at *11. On the current record, plaintiffs have failed to submit evidentiary proof of a classwide damages methodology that is consistent with their theory that the alleged misstatements falsely assured investors that Boeing had made improvements with respect to quality control.

### C. Mr. Coffman's Use Of The Full Price Decline After The Accident As The Measure Of Inflation Is Inconsistent With Plaintiffs' Materialization-Of-The-Risk Theory Of Loss Causation.

Plaintiffs' theory of the case is that following the two tragic accidents involving the 737 MAX in 2018 and 2019, Boeing understated the risk of another safety-related incident by misrepresenting its progress in improving its safety and quality practices. JA37-38. In an attempt to plead loss causation, plaintiffs allege that "truthful information was revealed to the market" when "the previously undisclosed, understated, or misrepresented risks materialized" upon the occurrence of the Alaska Airlines accident. JA370. Although Mr. Coffman insisted in his opening report that the out-of-pocket "formula can easily accommodate any changes due to a determination that an event is partially or fully the result of a materialization of the risk," JA589, his approach to measuring inflation is inconsistent with that theory.

Rather than develop a methodology that attempts to quantify the inflation in Boeing's stock price allegedly created by the challenged statements and the market's resulting underestimation of the risk of an accident, Mr. Coffman relies on the full decline in Boeing's stock price after the Alaska Airlines accident as the measure of constant inflation throughout the class period. JA591-592. That reliance is flawed because it fails to isolate

the amount of the price decline after the accident that is supposedly attributable to the correction of the alleged misstatements as opposed to the accident itself.

As Dr. Stulz explained, Boeing's stock price still would have declined after the Alaska Airlines accident regardless of whether the market was fully informed of the true risk of an accident. JA1022-1024. That is because, when an accident occurs, "the risk of an adverse outcome increases from some lower probability before the event to a 100% certainty after the event." JA1022. "As a matter of economics, therefore, to reliably estimate alleged inflation consistent with the materialization of an understated risk of [an accident], an expert needs to separate the portion of the price decline following the materialization of a risk that would have occurred absent any of the Alleged Misrepresentations." JA1023. Mr. Coffman did not even attempt to do that.

The plaintiffs in *BP* similarly alleged that the defendants' repeated statements about "safety improvements" had "lulled the market into believing that BP was a safer company than it actually was." *BP*, 2014 WL 2112823, at *2. According to the *BP* plaintiffs, these false assurances "understated BP's exposure to catastrophic risk," *id.* at *3, and the "fraud was revealed when the Deepwater Horizon exploded," *id.* at *2. In support of class certification in

*BP*, Mr. Coffman proposed the same "constant inflation" approach that he uses here, which calculated damages based on "the stock price drop from the materialization of [the] risk" after the Deepwater Horizon explosion. *BP*, 2013 WL 6388408, at \*16. The court rejected that approach because it "overcompensates investors for their harm." *Id.* at \*16-17. As the court explained, "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase." *BP*, 2014 WL 2112823, at \*10 (describing first class-certification decision).

After denying class certification, the *BP* court gave the plaintiffs another chance to develop a damages methodology consistent with their liability theory. Mr. Coffman's second report, however, continued to peg class members' losses to the full price decline after the explosion, this time on the theory that the alleged misstatements deprived investors of "the opportunity to avoid the increased risk" by selling their shares before the accident occurred. 2014 WL 2112823, at \*11. The court rejected Mr. Coffman's second effort because it improperly "inject[ed] individualized inquiries into what is supposed to be a classwide model of recovery." *Id.*

In affirming the denial of class certification, the Fifth Circuit noted that the plaintiffs' theory that the misstatements took "away plaintiffs' 'opportunity to decide whether to divest in light of the heightened risk' … hinges on a determination that each plaintiff would not have bought BP stock *at all* were it not for the alleged misrepresentations—a determination not derivable as a common question, but rather one requiring individualized inquiry." *Ludlow* v. *BP, PLC*, 800 F.3d 674, 689-690 (5th Cir. 2015). Because Mr. Coffman's model "lack[ed] the ability" to separate the investors entitled to recover the full decline in BP's stock price upon the materialization of the risk because they would not have purchased the stock at all, the Fifth Circuit held that class certification was properly denied. *Id.*

That same reasoning applies here. As in *BP*, plaintiffs allege that Boeing's statements describing its efforts to improve "safety" inflated the company's stock price by understating the risk of an accident. JA288, JA369-370. And Mr. Coffman similarly proposes to use a "constant inflation" approach that measures inflation based on the full "price reaction to … the Alaska Airlines Incident" in 2024. JA591. As in *BP*, Mr. Coffman offers no methodology to separate (i) the decline in Boeing's stock price based on the correction of the alleged misstatements through the materialization of the

understated risk and (ii) the decline based on the occurrence of the accident itself.

Here, the record strongly suggests that the decline in Boeing's stock price on January 8, 2024—the first trading day after the Alaska Airlines accident—was due to the high-profile nature of the accident itself, not the correction of Boeing's prior general statements about safety and quality. Indeed, similar reports of loose bolts on the 737 MAX in the weeks before the Alaska Airlines accident did not produce anything close to the same adverse stock-price reaction. In December 2023—the month before the accident—the FAA announced "that it was closely monitoring newer deliveries of Boeing 737 MAX aircraft for loose bolts" after "an international operator [] found a missing nut in addition to a loose nut that was not tightened properly." JA1020-1021. On December 28, 2023, securities analysts reported that this announcement was "a reminder to investors that even quality escapes the size of nuts and bolts demonstrate how difficult ramping production in aerospace can be." JA1020-1021. As Dr. Stulz explained, "[s]uch commentary suggests that the market was aware of risks of quality escapes, even as specific as involving loose bolts," before the Alaska Airlines accident. JA1021.

Despite the obvious similarities between the reports of a missing nut and loose bolts in December and the missing bolts that caused the Alaska Airlines accident a month later in January, Boeing's stock price actually *increased* on December 29, the day after the FAA's December 2023 announcement. JA1905. The very different stock-price reaction to the Alaska Airlines accident in January 2024 suggests that Boeing's stock price declined sharply not because of reports of missing bolts, but because of the occurrence of a widely publicized accident in which a door plug "blew off" a 737 MAX 9 after takeoff, leaving "a gaping hole in one side of the plane's cabin mere feet from where passengers were sitting." JA42.

Reports of this terrifying mid-air accident immediately raised concerns among investors and securities analysts that Boeing's commercial aircraft business could suffer from the fallout. *See* JA1027-1029. There was a risk that such a high-profile accident could cause the FAA to investigate Boeing's manufacturing process, increasingly monitor the production line for the 737 MAX 9, and potentially delay certification of the next model of the airplane, the 737 MAX 10. JA1027-1028. There also was concern among investors that class-action lawsuits could be filed and that deliveries of the 737 MAX to customers, particularly Chinese airlines, could be delayed.

JA1027-1029. In view of these risks, investors and securities analysts immediately began to focus after the Alaska Airlines accident on a potential slowdown in production and deliveries of the 737 MAX and the effects such a slowdown could have on Boeing's business. JA1028-1029. By assuming that the full decline in Boeing's stock price after that accident instead was attributable to the correction of Boeing's earlier general statements about safety and quality, Mr. Coffman ignores the potential adverse effects on Boeing's business of an accident that was front-page news around the world.

All this evidence underscores that Mr. Coffman's use of the full stock-price decline after the Alaska Airlines accident as his measure of the alleged inflation introduced years earlier by generic statements about safety and quality "stretches the 'back-end price drop equals front-end inflation' inference beyond its breaking point." *Ark. Teacher Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 100 (2d Cir. 2023). Mr. Coffman's simplistic "constant inflation" approaches thus run afoul of *Comcast*'s mandate that a damages methodology "must be consistent with [plaintiffs'] liability case" and "measure only those damages attributable to that theory." *Comcast*, 569 U.S. at 35.

Mr. Coffman's only response to this flaw in his analysis is to downplay the seriousness of the Alaska Airlines accident, calling it a "relatively benign[] incident" that would not be expected to have any effect on Boeing's stock price absent the alleged misstatements. JA1465. According to Mr. Coffman, the accident, "while frightening, ultimately did not result in a crash or casualties" and thus "was not devastating." JA1464. Mr. Coffman's dismissal of the accident as a "relatively benign" event cannot be reconciled with the market's concern that the accident could lead to investigations and increased oversight by the FAA, delays of long-awaited deliveries of the 737 MAX to Chinese airlines, class-action litigation, and an overall slowdown in 737 MAX production. *See* JA1027-1029.

Mr. Coffman's dismissive view of the accident also is inconsistent with plaintiffs' description of the event in their own complaint:

> [A] Boeing 737 MAX airplane … was forced to make an emergency landing minutes after take-off when a door plug blew off mid-flight, leaving a gaping hole in one side of the plane's cabin mere feet from where passengers were sitting. … The intense depressurization of the aircraft while mid-flight twisted the metal of the seats nearby, and forced passengers' headrests, devices, and even the clothing they were wearing to be sucked out of the plane.

JA42 (quotation omitted). Plaintiffs' own complaint undercuts Mr. Coffman's fantastical assertion that Boeing's stock price declined on January 8, 2024 only because the accident corrected Boeing's prior general safety statements, not because Boeing's business was expected to suffer as a result of the accident wholly apart from any alleged misstatements.

## CONCLUSION

The Court should reverse the district court's certification order and decertify the class.

Respectfully submitted,

Benjamin L. Hatch
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
(757) 640-3727
bhatch@mcguirewoods.com

/s/ Jeffrey B. Wall
Jeffrey B. Wall
Judson O. Littleton
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
(202) 956-7500
wallj@sullcrom.com
littletonj@sullcrom.com

Richard C. Pepperman II
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
peppermanr@sullcrom.com
cohenja@sullcrom.com

*Counsel for Defendants-Appellants The Boeing Company, David L. Calhoun, Dennis A. Muilenburg, Brian J. West, and Gregory D. Smith*

JULY 18, 2025

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,142 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Century Expanded BT font.

/s/ Jeffrey B. Wall
Jeffrey B. Wall

Dated:  July 18, 2025