**NO. 25-1492**

# United States Court of Appeals

*for the*

# Fourth Circuit

———————————◆———————————

STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER, on behalf of The Employees Retirement System of The State of Rhode Island; LOCAL #817 IBT PENSION FUND,

*Plaintiffs-Appellees,*

– v. –

THE BOEING COMPANY; DAVID L. CALHOUN; DENNIS A. MUILENBURG; BRIAN J. WEST; GREGORY D. SMITH,

*Defendants-Appellants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

**BRIEF OF *AMICI CURIAE* FORMER OFFICIALS OF THE U.S. SECURITIES AND EXCHANGE COMMISSION AND LAW PROFESSORS IN SUPPORT OF APPELLANTS AND REVERSAL**

TODD G. COSENZA
BRADY SULLIVAN
AMANDA M. PAYNE
WILLKIE FARR & GALLAGHER LLP
*Attorneys for Amici Curiae*
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
tcosenza@willkie.com
bsullivan@willkie.com
apayne@willkie.com

CP COUNSEL PRESS    (800) 4-APPEAL • (383581)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1492__        Caption: The Boeing Company, et al v. State of Rhode Island Office of the General Treasurer, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Former Officials of the U.S. Securities & Exchange Commission and Law Professors
(name of party/amicus)

who is _____Amici Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2. Does party/amicus have any parent corporations?   ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC                                - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Todd G. Cosenza _____ Date: _____ 7/25/2025 _____

Counsel for: Former Officials of the U.S. Securities & Exchange Commission and Law Professors

- 2 -

[ Print to PDF for Filing ]

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................1

INTEREST OF AMICI CURIAE................................................................................4

ARGUMENT ............................................................................................................5

I.     THE DISTRICT COURT PRACTICALLY IGNORED *COMCAST*'S CLASSWIDE DAMAGES REQUIREMENT.................................................6

II.    THE DISTRICT COURT IGNORED INCONSISTENCIES BETWEEN MR. COFFMAN'S POTENTIAL "CONSTANT INFLATION" METHODOLOGY AND PLAINTIFFS' THEORIES OF LIABILTY ...........................................................................................9

CONCLUSION...................................................................................................16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acuity Brands, Inc. Sec. Litig.*,
 2020 WL 5088092 (N.D. Ga. Aug. 25, 2020) .......................................................9

*In re BP p.l.c. Sec. Litig.*,
 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).................................................14, 15

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
 348 F.R.D. 372 (S.D. Cal. 2024) ........................................................................9

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)..................................................................................*passim*

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
 594 U.S. 113 (2021)...........................................................................................13

*Levy v. Gutierrez*,
 448 F. Supp. 3d 46 (D.N.H. 2019)......................................................................8

*Ludlow v. BP, P.L.C*,
 800 F.3d 674 (5th Cir. 2015) ......................................................................11, 12

*Raab v. Gen. Physics Corp.*,
 4 F.3d 286 (4th Cir. 1993) ................................................................................14

*Ret. Sys. of La. v. Hunter*,
 477 F.3d 162 (4th Cir. 2007) ............................................................................11

*Ret. Sys. v. TreeHouse Foods, Inc.*,
 2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ........................................................8

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
 2025 WL 1243818 (N.D. Cal. Apr. 25, 2025)....................................................9

*Utesch v. Lannett Co.*,
 2021 WL 3560949 (E.D. Pa. Aug. 12, 2021) ......................................................8

*Weston v. DocuSign, Inc.*,
 348 F.R.D. 354 (N.D. Cal. 2024)........................................................................8

**Rules**

Fed. R. App. P. 29 ..............................................................................4, 18

Fed. R. App. P. 32 ...................................................................................18

Fed. R. Civ. P. 23 ..................................................................................6, 9

**Other Authorities**

Cornerstone Research, *Economic Analysis at the Class Certification Stage of Exchange Act Securities Class Actions*, THE NAT'L L. REV. (Oct. 26, 2020), https://natlawreview.com/article/economic-analysis-class-certification-stage-exchange-act-securities-class-actions ......................................................................................................10

Emily Strauss, *Is Everything Securities Fraud?*, 12 UC IRVINE L. REV. 1331 (2022)..........................................................................................13

### **INTRODUCTION**

Few Supreme Court opinions have been as aggressively and unnecessarily misinterpreted and circumscribed as *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ("*Comcast*"). The District Court's opinion here is a case in point: it is a master class in applying techniques that render *Comcast* meaningless. Fidelity to the plain text of the Supreme Court's opinion requires that the District Court's class certification order be reversed and that this Court affirm *Comcast*'s continuing vitality as a real constraint on class certification in securities litigation.

*Comcast* requires that Plaintiffs demonstrate through "evidentiary proof" that "damages are capable of measurement on a classwide basis" using a methodology "consistent with [their] liability case." *Comcast*, 569 U.S. at 33–35. The fundamental question for this appeal is whether the District Court properly determined that Plaintiffs met their burden. *Amici* observe that if Plaintiffs' showing below suffices under *Comcast*, then *Comcast* is meaningless in securities fraud cases. Plaintiffs' expert (Chad Coffman) nowhere specified a *methodology* for measuring damages consistent with Plaintiffs' theory of fraud. He instead merely recited the *definition* of the out-of-pocket damages rule that applies to *all* securities fraud cases: artificial inflation per share at the time of purchase minus the artificial inflation per share at the time of sale. Mr. Coffman then promised to come up with a methodology to actually calculate that inflation at a later date. But this is a

1

tautology, not a methodology. Reciting a damages rule without explaining how it might be applied in this case in a manner consistent with Plaintiffs' liability theory cannot possibly satisfy *Comcast*, which is based on the premise that courts review defined methodologies. In the face of this meaningless tautology, the District Court devoted a single page to *Comcast* and found that Plaintiffs had satisfied it. That cannot be the "rigorous analysis" the Supreme Court mandated in *Comcast*.

To be sure, a growing number of district courts have rubber-stamped Mr. Coffman's "I promise to do it later" approach—which he apparently copy-and-pastes into class certification expert reports in *10-15 securities cases per year*. In a plain-vanilla securities fraud case premised on a financial statement subsequently revealed to be false by a "corrective disclosure," the calculation of per-share artificial inflation may be relatively straightforward. But this is ***not*** that type of case. Here, Plaintiffs advance numerous theories of liability that are inconsistent with the only *potential* methodology for calculating per-share inflation that Mr. Coffman referenced in his reports —*i.e.*, an event study that derives "constant dollar inflation" and/or "constant percentage inflation" based on 100% of the decline in Boeing's stock price following the Alaska Airlines accident. JA592.

In particular, Plaintiffs rely on a "materialization of the risk" theory of loss causation, *not* the traditional corrective disclosure theory. As Defendants' expert Dr. René Stulz correctly explained, damages under a materialization of risk theory

2

cannot be reliably estimated by the type of event study that Mr. Coffman proposes. *Comcast* is especially important in materialization of risk cases such as this one, in which enterprising plaintiffs' attorneys attempt to manufacture a claim for securities fraud from a corporate trauma (such as an airplane accident) by pointing to prior generic statements with no apparent link to the subsequent event.

In addition, Plaintiffs contend that, while many of Boeing's safety-related statements in isolation were immaterial puffery—and therefore caused no inflation at all—the repetition of those statements made them material and inflationary over time. But if Plaintiffs are going to rely on this bespoke theory of cumulative inflation through individually immaterial statements of puffery, they cannot also rely at the class certification stage on a generic damages measure that assumes inflation remains "constant" over the Class Period.

These are exactly the types of inconsistencies that *Comcast* directed district courts to ferret out at the class certification stage. But here, the District Court accepted tautologies as replacements for methodologies and failed to address Defendants' arguments in its opinion. The Court should reverse the District Court's class certification order.

3

# INTEREST OF AMICI CURIAE[1]

*Amici curiae* are individuals with a strong interest in these issues and include: former officials of the U.S. Securities and Exchange Commission and law professors whose scholarship and teaching focus on the federal securities laws.  Although each individual *amicus* might not endorse every statement herein, this brief reflects the *amici's* consensus that (1) this appeal presents an important question regarding application of *Comcast's* classwide damages requirement in securities cases, and (2) the District Court's resolution of that issue here was erroneous.  In alphabetical order, the *amici curiae* are:

- Ronald J. Colombo – Professor of Law at Maurice A. Deane School of Law at Hofstra University;

- Elizabeth Cosenza – Associate Professor of Law at Fordham University's Gabelli School of Business;

- The Honorable Joseph A. Grundfest – William A. Franke Professor of Law and Business at Stanford Law School, and Commissioner of the U.S. Securities and Exchange Commission from 1985 to 1990;

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* affirm that no counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici* or their counsel, contributed money to fund its preparation or submission.  *Amici* state that all parties have been notified of *amici*'s intent to file a brief.

4

- Adam C. Pritchard – The Frances and George Skestos Professor of Law at the University of Michigan Law School; and

- Matthew Turk – Associate Professor of Business Law and Ethics at Indiana University's Kelley School of Business.

## ARGUMENT

Reversal is appropriate for at least two reasons. First, the District Court's decision furthers a troubling pattern in district courts across the country of finding that plaintiffs satisfy *Comcast* in securities cases simply by reciting the tautology that damages are measured using the "out-of-pocket" rule without requiring plaintiffs to put forth a methodology for quantifying per-share inflation throughout the class period. Second, the only methodology Mr. Coffman identified as *potentially* applicable here for calculating per-share inflation is an event study that calculates either constant dollar inflation or constant percentage inflation. (Mr. Coffman has since confirmed in merits discovery that he is using constant percentage inflation.) But that "constant inflation" methodology contradicts Plaintiffs' theories of loss causation and materiality. A tautology that relies on a methodology that contradicts Plaintiffs' theory of liability cannot satisfy the Supreme Court's rigorous analysis requirements established in *Comcast*.

5

## I. THE DISTRICT COURT PRACTICALLY IGNORED *COMCAST*'S CLASSWIDE DAMAGES REQUIREMENT

*Comcast* holds that plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement without "evidentiary proof" of a classwide damages methodology consistent with the plaintiff's theory of liability. *Comcast*, 569 U.S. at 33–35. *See also id*. at 34 (plaintiffs' "model falls far short of establishing that damages are capable of measurement on a classwide basis"). Indeed, "any model supporting a plaintiff's damages case must be consistent with its liability case," and "for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id*. at 35 (citations and quotations omitted). Following *Comcast*, district courts reviewing motions for class certification are obliged to "take a 'close look'" at the connection between a plaintiff's theory of damages and theory of liability. *Id*. at 34.

The District Court here has ignored *Comcast*'s directive. Plaintiffs and Mr. Coffman have simply stated the definition of the "out-of-pocket" measure of damages—*i.e*., "artificial inflation per share at the time of purchase minus the artificial inflation per share at the time of sale"—as a "a well-accepted method for computing damages in Section 10(b) matters such as this." JA589-590. But the out-of-pocket rule is not a methodology. As Boeing's expert Dr. Stulz explains, the out-of-pocket measure of damages is nothing more than "pure arithmetic"; it "says you need to know the amount of inflation when someone buys a stock and you need to know the amount of inflation when they sell. That's it." JA1282. From this

arithmetic, Mr. Coffman simply stated that he will figure out at a later date a methodology to actually calculate the *amount* of per-share inflation throughout the class period in a manner consistent with Plaintiffs' liability theory—which includes *hundreds* of alleged misstatements throughout a three-year period. JA591-592; JA1738 (Mr. Coffman promises to "do the best" he can). Notably, Plaintiffs do not dispute that Mr. Coffman offered no further "proof" to satisfy *Comcast* at the certification stage; they instead maintain that Mr. Coffman's tautology plus a promise to later devise a methodology is sufficient. But *Comcast* requires more in securities cases than a simplistic repetition of the standard measure of damages combined with an undefined promise in securities cases to later present an actual methodology for measuring those damages.

Indeed, *Comcast* itself rejected a similar proffer by the plaintiffs at the class certification stage. Plaintiffs there claimed that damages for their antitrust claims based on allegedly anticompetitive pricing could be "determined by comparing" what the "competitive prices would have been if there had been no antitrust violations" with "what the actual prices were during the charged period." *Comcast*, 569 U.S. at 36. That is all Mr. Coffman has offered here. *Compare* JA589-590 (Mr. Coffman's statement that damages can be calculated based on "artificial inflation per share at the time of purchase minus the artificial inflation per share at the time of the sale"). A generic recitation of the standard formula for damages in a securities

case is just as deficient under *Comcast* as is a generic recitation of the standard formula for damages in an antitrust case, yet that is exactly the approach Plaintiffs ask that this Court endorse.

Remarkably, Mr. Coffman admitted at his deposition that he copied and pasted the discussion of damages in his expert report almost word-for-word from a "template" he uses for all his class certification reports in securities cases—about 10-15 that he authors *per year*—and that no part of that discussion is "specific to this case." JA718-723, JA726. Mr. Coffman further admitted at deposition that all he does before inserting this "template" into his expert report is check whether plaintiffs' claims are "economically coherent" and whether they allege "an inflated stock price as a result of misrepresentations and omissions," i.e., the same allegations in every securities fraud case. JA720. Unfortunately, other district courts have endorsed Mr. Coffman's conveyor-belt approach, as did the court below.[2] But these

---

[2] *See, e.g.*, *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 368 (N.D. Cal. 2024) ("Coffman says that the out-of-pocket method is a 'standard and well-accepted method for calculating damages in cases under Section 10(b).'"); *Utesch v. Lannett Co.*, 2021 WL 3560949, at *16 n.12 (E.D. Pa. Aug. 12, 2021) (Coffman's "language describing the out-of-pocket damages methodology . . . doesn't change from report to report."); *Pub. Emps.' Ret. Sys. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 (N.D. Ill. Feb. 26, 2020) ("Defendants complain that Coffman has proposed 'the same nonspecific theory'" in other cases.); *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 64-65 (D.N.H. 2019) ("[T]he 'out-of-pocket' methodology proposed by Coffman satisfies" *Comcast* even though he "merely repeats the same two paragraphs he offers in every case.").

decisions effectively erase Rule 23(b)(3)'s predominance requirement—one of the very concerns underlying the Supreme Court's ruling in *Comcast*.

This Court should use this appeal to clarify that merely referencing the "out-of-pocket" damages rule, as Mr. Coffman did in this case and as he and other plaintiffs' experts have done in many other securities cases, does not pass muster under the "rigorous analysis" and "close look" required by *Comcast*.[3]

## II.    THE DISTRICT COURT IGNORED INCONSISTENCIES BETWEEN MR. COFFMAN'S POTENTIAL "CONSTANT INFLATION" METHODOLOGY AND PLAINTIFFS' THEORIES OF LIABILTY

The District Court also erred because the only *potential* methodology for calculating per-share inflation that Mr. Coffman identified is an event study that would calculate the Boeing-specific stock price decline after the Alaska Airlines

---

[3]    *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at \*7 (N.D. Cal. Apr. 25, 2025) (certifying class where plaintiff's expert stated he would use "financial tools" to "quantify the amount of artificial inflation . . . that existed in Wells Fargo's common stock price on each day of the Class Period"); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 348 F.R.D. 372, 393 (S.D. Cal. 2024) (certifying class where plaintiff's expert stated that "he would use 'the standard array of valuation tools' to 'measure what the price of Acadia's stock would have been but-for the alleged misrepresentations and omissions'"); *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at \*5 (N.D. Ga. Aug. 25, 2020) (certifying class where plaintiff's expert stated "Once share price inflation during the Class Period has been determined, one may compute damages arising from share price inflation for any and all members of the proposed class by calculating the difference between: (a) share price inflation associated with shares purchased at the time they were purchased; and, if necessary, (b) share price inflation associated with shares sold at the time they were sold after one or more Curative Disclosure event").

9

accident in 2024 and then "backcast" that decline as "constant" inflation throughout the entire Class Period.  That methodology contradicts Plaintiffs' (1) theory of loss causation based on an alleged materialization of a concealed risk and (2) theory of materiality based on the repetition of the alleged misstatements over time.

*First*, Mr. Coffman's potential damages methodology contradicts Plaintiffs' loss causation theory.  In a typical securities class action, a "corrective disclosure" corrects a previous false statement and causes a stock price drop.  For example, if a public company announces that its prior year-end financials were inaccurate and the stock price declines (20%, hypothetically), that announcement is considered a corrective disclosure:  it corrects the previous false statement about the company's financials.  In such a straightforward securities fraud action, plaintiffs would hire an expert to perform an "event study" that analyzes how much of the 20% decline is attributable to company-specific information as opposed to other market- or industry-wide factors (*e.g.*, a decline in the S&P 500 that day).  Assuming for simplicity that there were no confounding factors, the expert could look at the 20% decline on the day the corrective information was disclosed and reasonably "backcast" that decline as the measure of inflation during the Class Period.[4]  In other

---

[4]    The practice of applying the price decline at the time of the corrective disclosure as the measure of inflation throughout the entire class period is known as "backcasting."    Cornerstone Research, *Economic Analysis at the Class Certification Stage of Exchange Act Securities Class Actions*, THE NAT'L L. REV.

words, the expert could reasonably conclude that, once the company issued its inaccurate year-end financials, the company's stock price was "inflated" by 20% and remained inflated by that amount until the corrective disclosure. That inflation—in this hypothetical, "constant percentage inflation"—could be used to calculate damages under the out-of-pocket rule.

In this case, Plaintiffs instead rely on a "materialized risk" theory of loss causation, which is a distinct theory of liability. *Tchrs.' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 187 n.3 (4th Cir. 2007). The materialization of the risk theory looks to adverse *events*, not corrective disclosures. Under that theory, a false statement artificially inflates the stock price by concealing or understating a known risk—for example, statements about a company's commitment to safety that understate the true risk of an accident—and then the stock price declines when that risk materializes. *See Ludlow v. BP, P.L.C*, 800 F.3d 674, 680 (5th Cir. 2015). In this scenario, the fact that the stock price declines by, say, 40% on the day of an accident that supposedly represents the materialization of the risk cannot possibly mean that per-share inflation is equal to 40%. Instead, per-share inflation is the difference between what investors were willing to pay for the stock based on the false assurances of safety, minus what they would have been willing to pay had the *risk*

---

(Oct. 26, 2020), https://natlawreview.com/article/economic-analysis-class-certification-stage-exchange-act-securities-class-actions.

of an accident been truthfully disclosed.  Accordingly, any event study that looks solely at the price decline upon the occurrence of an accident tells us essentially nothing about the amount of inflation resulting from the failure to accurately disclose the underlying risk of the accident.  That event study approach can only overstate damages, assuming that any exist.

The Fifth Circuit in *Ludlow* addressed a similar fact pattern.  Plaintiffs there alleged materialization of the risk based on the Deepwater Horizon explosion and oil spill and subsequent stock price drop.  The Fifth Circuit affirmed the lower court's denial of class certification, finding that the event study and backcasting methodology proffered by plaintiffs' expert—also Mr. Coffman—failed to satisfy *Comcast* in the context of a materialization of the risk claim.  *Ludlow*, 800 F.3d at 690-91.

As in *Ludlow*, Plaintiffs' proposal to deploy an event study to calculate per-share inflation based on the decline in Boeing's stock price on the date of "materialization"—*i.e.*, when the door plug blew out on an Alaska Airlines flight in 2024—contradicts Plaintiffs' materialization of the risk theory.[5]  Calculating per-share inflation based on the entire stock price drop on the date of the Alaska Airlines

---

[5]  We agree with Dr. Stulz that an event study based on the stock price drop after an accident does not help answer the question of per-share inflation where the theory of liability is that previous statements understated the risk of an accident. JA1220-1221.

accident would surely overcompensate Plaintiffs and other stockholders because the stock price decline caused by an accident *actually occurring* must exceed the inflation caused by an alleged understatement of the *risk, or probability* of an accident occurring—and the latter is all that Plaintiffs are entitled to recover. But Mr. Coffman offers no methodology to account for this distinction.

*Comcast's* "rigorous analysis" is especially important in cases like this where stockholders sue shortly after an adverse event or other corporate trauma—accidents, oil spills, product recalls, data breaches, C-suite scandals—and then manufacture a theory of securities fraud based on prior, generic statements concerning the same general subject matter. *See* Emily Strauss, *Is Everything Securities Fraud?*, 12 UC IRVINE L. REV. 1331, 1333–34 (2022). These cases are becoming increasingly common, and often generate a "mismatch" between the challenged statements and the adverse events. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021). In these cases, it is not reasonable to infer (as Mr. Coffman does) that the stock price drop following news of the adverse event equals the dissipation of inflation owing to prior, generic statements that vaguely touch on the subject matter of the event (as opposed to the market reacting to the event itself). In fact, the Fourth Circuit has recognized that vague and generic statements that are "not specific enough to perpetrate a fraud on the market" do "not

13

inflate[]" the "market price of a share" in the first place. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289–90 (4th Cir. 1993).

*Second*, Mr. Coffman's damages measure contradicts Plaintiffs' theory of materiality. As in *BP*, Plaintiffs have argued that Boeing's "repetition" of general statements about its commitment to safety made the statements material and thus caused them to have a "cumulative inflationary effect," which is another unique theory of liability incompatible with Mr. Coffman's potential "constant inflation" methodology. *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16–17 (S.D. Tex. Dec. 6, 2013) ("*BP I*"). Indeed, in opposing Defendants' motion to dismiss, Plaintiffs conceded that many of the general safety-related statements challenged in this case, standing alone, may be immaterial puffery (and therefore have no inflationary effect), but they contended that, through their "repetition" over time, the statements became material. JA460, JA466-468, JA475; *see BP I*, 2013 WL 6388408 at *16–17. Plaintiffs cannot advance a theory of gradually increasing materiality through the repetition of statements while simultaneously maintaining, as Dr. Coffman said he might, that inflation remained "constant" throughout the Class Period. JA591-592. If the materiality of the allegedly false statements accumulated over time through repetition, then the per-share inflation also accumulated over time and cannot possibly be constant. Repeating the fatal flaw in *BP I*, Mr. Coffman's approach assumes that "inflation remain[ed] constant over the

14

Class Period," which does not "track Plaintiff's theor[y] of liability" that the alleged misstatements became inflationary over time. *BP I*, 2013 WL 6388408 at *17.

Mr. Coffman's constant percentage inflation approach posits that the inflation in Boeing's stock price remained *completely unchanged* from when, on February 1, 2021, the company said, "Safety, quality, and integrity are at the core of how Boeing operates," to when, on September 1, 2021, it said, "Boeing's diverse team is committed to innovating for the future and living the company's core values of safety, quality and integrity," to when, on April 29, 2022, it said, "we are focused on leading with safety, quality, integrity and sustainability," and to when, on April 18, 2023, it said, "we have demonstrated our commitment to safety, quality and transparency." JA257-258, JA281, JA305, JA336. Yet, Plaintiffs' *liability theory* posits that these types of generic statements of corporate optimism only became material only through their repetition. But that means that the inflationary effect of the statement in February 2021 *cannot be the same* as that of the statement in April 2023. That, in turn, means that an investor who purchased in February 2021 *could not,* under Plaintiffs' theory, have suffered the same alleged damages as an investor who purchased in April 2023.

In fact, according to Mr. Coffman's measure, the *very first* statement that marks the beginning of the Class Period—Boeing's remark on January 7, 2021 that the DPA was "a serious reminder to all of us how critical our obligation of

15

transparency to regulators is"—produced 100% of the inflation during the Class Period. That is not only absurd, but also inconsistent with Plaintiffs' theory of cumulative inflation. Plaintiffs and Mr. Coffman have no answer to this fundamental mismatch between their proffered damages measure and their theory of materiality, which violates *Comcast*.

*     *     *

In sum, to the extent that Mr. Coffman advances a damages methodology at all, his "constant inflation" methodology is a tautology that contradicts Plaintiffs' own theories of loss causation and materiality, and therefore cannot satisfy *Comcast*'s requirement of evidentiary proof of a classwide damages methodology that is consistent with the plaintiff's theory of liability. *Comcast*, 569 U.S. at 33–35.

## CONCLUSION

The *amici curiae* urge the Court to reverse the District Court's order certifying the class.

16

Dated: New York, New York
    July 25, 2025

          **WILLKIE FARR & GALLAGHER LLP**
          By: */s/ Todd G. Cosenza*
          Todd G. Cosenza
          Brady M. Sullivan
          Amanda M. Payne
          787 Seventh Avenue
          New York, New York 10019
          (212) 728-8000
          tcosenza@willkie.com
          bsullivan@willkie.com
          apayne@willkie.com

          *Counsel for Amici Curiae*

17

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29 because it contains 3,734 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

Dated:    New York, New York
          July 25, 2025

**WILLKIE FARR & GALLAGHER LLP**
By: */s/ Todd G. Cosenza*
Todd G. Cosenza
Brady M. Sullivan
Amanda M. Payne
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
tcosenza@willkie.com
bsullivan@willkie.com
apayne@willkie.com

*Counsel for Amici Curiae*

18

## CERTIFICATION OF SERVICE

I hereby certify that on this 25th day of July 2025, I caused the foregoing Amicus Curiae Brief of Former SEC Officials and Law Professors in Support of Petitioners to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:    New York, New York
July 25, 2025

WILLKIE FARR & GALLAGHER LLP
By: */s/ Todd G. Cosenza*
Todd G. Cosenza
Brady M. Sullivan
Amanda M. Payne
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
tcosenza@willkie.com
bsullivan@willkie.com
apayne@willkie.com

*Counsel for Amici Curiae*

19