# In the United States Court of Appeals for the Fourth Circuit

---

IN RE: THE BOEING COMPANY

---

STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER,
on behalf of The Employees Retirement System of The State of Rhode Island;
LOCAL #817 IBT PENSION FUND;
*Plaintiffs-Appellees,*

v.

THE BOEING COMPANY; DAVID L. CALHOUN; DENNIS A. MUILENBURG;
BRIAN J. WEST; GREGORY D. SMITH;
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:24-cv-00151-LMB-LRV (The Hon. Leonie M. Brinkema)

---

## BRIEF OF PLAINTIFFS-APPELLEES

---

CAROL C. VILLEGAS
CHRISTINE M. FOX
JAKE EDWARD BISSELL-LINSK
LABATON KELLER SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

DEEPAK GUPTA
GREGORY BECK
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

*(Additional counsel on inside cover)*

October 17, 2025                    *Counsel for Plaintiffs-Appellees*

CHAD JOHNSON
NOAM MANDEL
JONATHAN ZWEIG
DESIREE CUMMINGS
ROBBINS GELLER RUDMAN &
DOWD LLP
420 Lexington Avenue
Suite 1832
New York, NY 10170
(212) 432-5100

DOUGLAS WILENS
ROBBINS GELLER RUDMAN &
DOWD LLP
225 NE Mizner Boulevard
Suite 720
Boca Raton, FL 33432
(561) 750-3000

*Counsel for Plaintiffs-Appellees*

# DISCLOSURE STATEMENT

The plaintiff-appellee State of Rhode Island Office of the General Treasurer, on behalf of The Employees Retirement System of The State of Rhode Island, has no corporate parent and does not issue stock. The plaintiff-appellee Local #817 IBT Pension Fund has no corporate parent and does not issue stock.

# TABLE OF CONTENTS

Disclosure statement ................................................................. i

Table of authorities .................................................................. iii

Introduction .............................................................................. 1

Statement of the issue ............................................................... 6

Statement of the case ................................................................ 6

    A.    Factual background ...................................................... 6

    B.    Procedural background ................................................ 11

Standard of review .................................................................... 16

Summary of argument ............................................................... 16

Argument .................................................................................. 18

    I.    The district court did not abuse its discretion in finding that the plaintiffs satisfied Rule 23(b)(3). .............................. 19

        A.    The plaintiffs' damages model satisfies *Comcast*. ........................ 19

        B.    Boeing's claim that the plaintiffs fail to account for variable inflation is wrong and mischaracterizes the plaintiffs' theory of the case. .................................... 25

        C.    Class certification is warranted even if damages calculations are individualized. ................................. 34

    II.    This Court lacks jurisdiction to review Boeing's additional merits arguments. ......................................... 37

        A.    Disaggregation is a loss-causation exercise not required at class certification. .............................. 38

        B.    Boeing's truth-on-the-market argument goes to materiality and is not properly heard at class certification. ...... 42

        C.    Boeing's puffery arguments were rightly rejected by the district court at the pleadings stage. ......................... 44

Conclusion ................................................................................ 47

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) .................................................................18, 34

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,*
568 U.S. 455 (2013) ...................................................................*passim*

*Baker v. SeaWorld Entertainment, Inc.,*
2017 WL 5885542 (S.D. Cal. 2017) ..................................................25

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)..........................................................3, 13, 43

*Blackie v. Barrack,*
524 F.2d 891 (9th Cir. 1975) ........................................................ 3

*City of Cape Coral Municipal Firefighters' Retirement Plan v. Emergent Biosolutions, Inc.,*
322 F. Supp. 3d 676 (D. Md. 2018) .................................................. 30

*City of Miami General Employees' & Sanitation Employees' Retirement Trust v. RH, Inc.,*
2018 WL 4931543 (N.D. Cal. 2018) .................................................. 32

*College Retirement Equities Fund v. Boeing Co.,*
2023 WL 6065260 (N.D. Ill. 2023) ...................................................45

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013)...................................................................*passim*

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ................................................................. 31

*Ebert v. General Mills, Inc.,*
823 F.3d 472 (8th Cir. 2016)..........................................................35

*EQT Production Co. v. Adair,*
764 F.3d 347 (4th Cir. 2014) .....................................................16, 37, 38

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011)...................................................................39

iii

*Ferris v. Wynn Resorts Ltd.*,
    2023 WL 2337364 (D. Nev. 2023) ...................................................... 33

*FindWhat Investor Group v. FindWhat.com*,
    658 F.3d 1282 (11th. Cir. 2011) ...................................................... 27

*Forsythe v. Teva Pharmaceutical Industries Ltd.*,
    102 F.4th 152 (3d Cir. 2024) ..............................................3, 19, 22, 40

*Glover v. EQT Corp.*,
    151 F.4th 613 (4th Cir. Aug. 20, 2025) ...................................... 16

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
    594 U.S. 113 (2021) ...................................................... 27

*Gomez v. Tyson Foods, Inc.*,
    295 F.R.D. 397 (D. Neb. 2013) ...................................................... 32

*Gomez v. Tyson Foods, Inc.*,
    799 F.3d 1192 (8th Cir. 2015) ...................................................... 32

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ...................................................... 20, 36

*In re Acuity Brands, Inc. Securities Litigation*,
    2020 WL 5088092 (N.D. Ga. 2020) ...................................................... 30

*In re BHP Billiton Ltd. Securities Litigation*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) ...................................................... 26

*In re Boeing Co. Aircraft Securities Litigation*,
    2022 WL 3595058 (N.D. Ill. 2022) ...................................................... 45

*In re BP p.l.c. Securities Litigation (BP I)*,
    2013 WL 6388408 (S.D. Tex. 2013) ...................................................... 24

*In re BP p.l.c. Securities Litigation (BP II)*,
    2014 WL 2112823 (S.D. Tex. 2014)......................................................*passim*

*In re Conduent Inc. Securities Litigation*,
    2022 WL 17406565 (D.N.J. 2022) ...................................................... 23

*In re Dura Pharmaceuticals, Inc. Securities Litigation*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006) ................................................. 42

*In re EQT Corp. Securities Litigation*,
    2022 WL 3293518 (W.D. Pa. 2022) ....................................................... 30

*In re FirstEnergy Corp.*,
    2022 WL 681320 (S.D. Ohio 2022) ........................................................ 42

*In re Hyundai & Kia Fuel Economy Litigation*,
    926 F.3d 539 (9th Cir. 2019) ................................................................. 35

*In re Marriott International, Inc.*,
    78 F.4th 677 (4th Cir. 2023) .......................................................... 16, 30

*In re Marriott International, Inc., Customer Data Security Breach Litigation*,
    341 F.R.D. 128 (D. Md. 2022) ............................................................... 36

*In re Motorola Securities Litigation*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) .................................................... 42

*In re NII Holdings, Inc. Securities Litigation*,
    311 F.R.D. 401 (E.D. Va. 2015) ..................................................... 14, 23

*In re Signet Jewelers Ltd. Securities Litigation*,
    2019 WL 3001084 (S.D.N.Y. 2019) ...................................................... 39

*In re Under Armour Securities Litigation*,
    631 F. Supp. 3d 285 (D. Md. 2022) ...................................................... 36

*In re Virtus Investment Partners, Inc. Securities Litigation*,
    2017 WL 2062985 (S.D.N.Y. 2017) ...................................................... 43

*In re Vivendi, S.A. Securities Litigation*,
    838 F.3d 223 (2d Cir. 2016) ................................................................. 27

*Jaroslawicz v. M&T Bank Corp.*,
    2024 WL 2975766 (D. Del. June 13, 2024) .......................................... 23

*Junge v. Geron Corp.*,
    2022 WL 1002446 (N.D. Cal. 2022) ..................................................... 25

*Karinski v. Stamps.com, Inc.*,
 2020 WL 6572660 (C.D. Cal. 2020) ..................................................43

*KBC Asset Management v. 3D Systems Corp.*,
 2017 WL 4297450 (D.S.C. Sept. 28, 2017) ..................................... 23, 39

*Krakauer v. Dish Network, LLC*,
 925 F.3d 643 (4th Cir. 2019) .......................................................35

*Kurtz v. Costco Wholesale Corp.*,
 818 F. App'x 57 (2d Cir. 2020)......................................................39

*Ludlow v. BP, P.L.C.*,
 800 F.3d 674 (5th Cir. 2015) .................................................*passim*

*Lytle v. Nutramax Laboratories, Inc.*,
 114 F.4th 1011 (9th Cir. 2024) .....................................................36

*Monroe County Employees' Retirement System v. Southern Co.*,
 332 F.R.D. 370 (N.D. Ga. 2019).................................................... 30

*Public Employees' Retirement System of Mississippi v. TreeHouse Foods, Inc.*,
 2020 WL 919249 (N.D. Ill. 2020) ............................................. 33, 39

*Schleicher v. Wendt*,
 618 F.3d 679 (7th Cir. 2010) .................................................*passim*

*Seeks v. Boeing Co.*,
 752 F. Supp. 3d 992 (N.D. Ill. 2024)................................................45

*Shupe v. Rocket Companies*,
 752 F. Supp. 3d 735 (E.D. Mich. 2024) ...........................................33

*Snellink v. Gulf Resources, Inc.*,
 870 F. Supp. 2d 930 (C.D. Cal. 2012)...............................................42

*Speerly v. General Motors, LLC*,
 143 F.4th 306 (6th Cir. 2025)................................................... 23, 24

*Stafford v. Bojangles' Restaurants, Inc*,
 123 F.4th 671 (4th Cir. 2024) ...................................................... 16

*Strougo v. Barclays PLC,*
    312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................ 21

*Tellabs, Inc. v. Makor Issues & Rights,*
    551 U.S. 308 (2007) ............................................................................ 5

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ............................................................................ 36

*Univ. of Puerto Rico Retirement System v. Lannett Co.,*
    2023 WL 2985120 (3d Cir. 2023) ........................................................ 22

*Waggoner v. Barclays PLC,*
    875 F.3d 79 (2d Cir. 2017) .......................................................... *passim*

*Wallace v. IntraLinks,*
    302 F.R.D. 310 (S.D.N.Y. 2014) ........................................................ 29

*Ward v. Dixie National Life Insurance Co.,*
    595 F.4d 164 (4th Cir. 2010) .............................................................. 16

*Washtenaw County Employees' Retirement System v. Walgreen Co.,*
    2018 WL 1535156 (N.D. Ill. 2018) ............................................ 39, 40, 43

*Windham v. American Brands, Inc.,*
    565 F.2d 59 (4th Cir. 1977) ................................................................ 21

## Rules

Fed. R. Civ. P. 23 ............................................................................ 18, 35

## Other Authorities

ABA Section of Antitrust Law,
    *Proving Antitrust Damages: Legal and Economic Issues* (2d ed. 2010) ............ 19

7 William Rubenstein,
    *Newberg and Rubenstein on Class Actions* §22:81 (6th ed. 2025) .................. 21

7AA *Wright & Miller's Federal Practice & Procedure*
    § 1778 (3d ed. 2005) ........................................................................ 36

# INTRODUCTION

In 2018 and 2019, two crashes of Boeing 737 MAX planes killed hundreds of passengers in accidents that government investigations attributed to alarming safety lapses at Boeing. To avoid criminal prosecution for concealing the issues responsible for the crashes, Boeing entered into a deferred-prosecution agreement with the Justice Department and promised to take "immediate steps" to improve its safety and quality-control practices. JA39–40. In the years following the accidents, Boeing repeatedly reassured nervous investors and analysts that it had complied with those commitments—revamping its corporate culture to prioritize safety over production, eliminate specific unsafe manufacturing practices, and enable employees to raise concerns without fear of retaliation.

But those representations were not true. Even as Boeing continued to tell investors and analysts that its manufacturing systems, safety processes, and compliance culture had been overhauled, internal documents and other evidence showed the opposite. In truth, Boeing continued to prioritize production speed over safety and quality, relying on many of the same dangerous "shortcuts" and "systemic quality-control issues" that it had relied on before the crashes. JA41, JA43. These ongoing safety issues were serious enough, the Justice Department ultimately concluded, that they violated Boeing's deferred-prosecution agreement, exposing the company to criminal liability.

This case is about those long-running misrepresentations—and the predictable correction that followed once the market learned the truth. For an airplane manufacturer, safety is paramount. "Without it," Boeing has acknowledged, "there is no shareholder value." JA40. Thus, when investors became "skeptical of Boeing's ability to manage [its] quality issues" following a midflight near-disaster, the market reacted swiftly and negatively—dragging the price of Boeing stock down 8% in a single day. JA44, JA146. The plaintiffs here—institutional investors harmed by Boeing's false safety claims—filed suit. And the district court, after accepting several of Boeing's arguments for narrowing the class period, did what courts across the country routinely do in these circumstances: It certified a class under Rule 23(b)(3).

In this interlocutory appeal, Boeing contends that the district court abused its discretion in finding that common issues predominate over individualized ones, as required for certification under Rule 23(b)(3). Relying on the Supreme Court's decision in *Comcast Corp. v. Behrend*, Boeing claims that the plaintiffs failed to establish predominance because they provided no "common methodology" for measuring classwide damages. 569 U.S. 27, 30, 33–35 (2013). But the district court found that the plaintiffs did provide a methodology capable of measuring such damages. The plaintiffs proffered the expert opinion of Chad Coffman, a well-respected economist with extensive experience in securities cases, who put forth a damages model based on the plaintiffs' out-of-pocket losses, that is "widely accepted as the traditional

measure of damages" in securities cases. JA1695. As Coffman explained, this model is "straightforward" and perfectly "fits [the] plaintiffs' theory of liability: that investors were damaged by purchasing Boeing stock at inflated prices due to defendants' fraud." JA1434, JA1695.

The district court did not abuse its discretion in finding this well-established methodology sufficient for certification. Far from it: As the court recognized, the "vast majority of courts … have interpreted Rule 23(b)(3) and *Comcast* to permit the standard out-of-pocket method for calculating damages to be used in securities class actions like this one." *Id.* (citing, e.g., *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017)). Indeed, this approach to damages calculation perfectly fits securities cases. In *Basic Inc. v. Levinson*, the Supreme Court held that—because "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price"—a class of investors "may be presumed" to have relied on a misrepresentation that is "reflected in market price" at the time of purchase. 485 U.S. 224, 247 (1988). And because the "amount of price inflation during the [class] period can be charted," the "process of computing individual damages" in such cases will typically "be virtually a mechanical task." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975). Courts have thus "stress[ed] that *Comcast* poses a low bar to class certification" in securities-fraud actions like this one. *Forsythe v. Teva Pharm. Indus. Ltd.*, 102 F.4th 152, 159 (3d Cir. 2024).

Boeing cites no contrary authority from any court. By contrast, the plaintiffs gave the district court a table summarizing dozens of cases where courts rejected defendants' attempts to invoke *Comcast* to disrupt class certification in securities cases. ECF No. 130-1. The district court's conclusion that this case does not pose an unprecedented *Comcast* issue was not abuse of discretion.

Faced with this overwhelming authority, the company attempts to avoid the district court's conclusion by mischaracterizing the plaintiffs' claims. According to Boeing (at 1–2), the plaintiffs' theory of liability is that the company's "repetition of generic statements about safety and quality" during the class period "gradually inflated Boeing's stock"—leaving no way "to determine how much inflation was present at any particular time." But the plaintiffs have never asserted this invented "materiality-through-repetition" theory. Their actual damages theory—backed up by Coffman's expert report—is not that each of Boeing's repeated safety claims increased Boeing's stock price, but that those claims *maintained* the price at inflated levels. Boeing's claims about safety and quality during the class period did not cause jumps in stock price, but they unquestionably kept the stock trading at prices much higher than if Boeing had admitted the truth: that the company was continuing to cut corners on safety in violation of its commitments to the government.

Even if Boeing could establish that the degree of fraud-based inflation varied during the class period, that would not show that the district court abused its

discretion in certifying the class. Almost all securities class actions involve similar arguments that the plaintiffs failed to account for factors affecting a company's stock. But as Coffman's report explains, the out-of-pocket test is more than capable of accounting for variation in the amount of inflation.

And even if Boeing's predictions prove true, and the plaintiffs have difficulty precisely measuring the inflation that they allege, any such difficulty would be common to the class and thus irrelevant to Rule 23(b)(3)'s predominance requirement: The plaintiffs' claims would all fail together. *Comcast* simply requires that the plaintiffs' theory of damages be consistent with their theory of liability—not that they will ultimately succeed in proving fraud-based inflation on the merits.

Boeing's theory on appeal thus amounts to arguing that courts cannot certify a class until plaintiffs conduct a full loss-causation and damages analysis—and do so even before discovery is complete. That would render even run-of-the-mill securities cases virtually uncertifiable, thus ending the "meritorious private action[s]" that Congress and the Supreme Court have long recognized are "an essential supplement" to, and forerunner of, public enforcement. *Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 313 (2007). No court has ever gone that far, and this Court should not be the first. The Court should affirm.

## STATEMENT OF THE ISSUE

Did the district court abuse its discretion in finding that the plaintiffs' expert provided a common methodology capable of establishing classwide damages, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)?

## STATEMENT OF THE CASE

### A.    Factual background

**1.** In 2021, the Department of Justice charged Boeing, one of the world's largest aerospace companies, with conspiracy to defraud the government for concealing defects that caused the devastating crashes of two 737 MAX planes. JA47, JA52–60. To avoid criminal prosecution, the company entered a deferred-prosecution agreement in which it agreed to pay the government $2.5 billion and to institute compliance and reporting programs designed to prevent future concealment of safety issues. JA60–61, JA72–75. The company also paid $200 million to settle SEC charges for "misleading investors about the safety of the 737 MAX." JA61–62, JA119–130.

In the aftermath of the crashes, Boeing investors were intently focused on the company's ability to produce and deliver safe airplanes. JA39. In response to these concerns, Boeing repeatedly claimed a renewed commitment to safety, reassuring investors, the public, and the government that it had meaningfully changed its practices to prioritize safety and quality over production speed and profit. JA81–86. Boeing asserted, for example, that it had made safety its "highest priority" and that

it did "not compromise these values for cost or schedule." JA81–86, JA259, JA318–319, JA323. It also publicly claimed to be adhering to the terms of its deferred-prosecution agreement and other regulatory obligations. JA91–93. Those representations were consistent across the class period, JA196–197, JA201–202, JA207, and highly material to investors, given that the safety of Boeing's airplane manufacturing was the foundation of shareholder value. JA40.

Boeing's representations, however, were false. In fact, Boeing never stopped prioritizing production speed over safety and quality in its manufacturing process. JA93–140. Internal Boeing documents show that corporate executives "kn[e]w" that Boeing was "sacrific[ing] quality for schedule" and was internally "sending the message [that] schedule is more important than quality." JA1586. As Boeing's chief financial officer later admitted: "For years, [the company] prioritized the movement of the airplane through the factory over getting it done right." JA43.

Boeing employees described widespread practices that jeopardized safety, leaving them questioning how "leadership can say quality is a core value." JA1551. A former quality manager for the company described immense pressure to keep production moving, resulting in unsafe manufacturing shortcuts. JA132. Others noted the presence of untrained employees on the production line, JA118–119, and suppliers that Boeing knew were delivering highly defective components, JA107–114. Employees complained of "daily pressure … to not follow [quality] processes,"

JA1566, and being "rushed to complete inspections hastily to support quicker and quicker manufacturing demand," JA1550. And they warned that managers were "cut[ting] corners [to] make it look like" the company doesn't "produce any defects," JA1529—"turn[ing] a blind eye" to critical problems to avoid "interfer[ing] with production schedules" and leaving "no way of knowing … how many defects" were being "covered up," JA1538–1540.

As a consequence, serious safety and quality failures continued to pervade Boeing's manufacturing for years after the crashes. Even as the company's leadership publicly announced a new commitment to safety, executives concluded that Boeing's quality problems were "completely unacceptable" and "going [in] the wrong direction." JA1509, JA1517. According to a Boeing employee, the company's "737 production system" was "a rambling, shambling, disaster waiting to happen," with such an "enormous volume of defects" that "it was inevitable something would slip through." JA113. Beyond the 737 program, a former Boeing engineer testified that production shortcuts and systemic failures to follow industry standards compromised over one thousand additional Boeing planes. JA94–102. In short, Boeing leadership understood, notwithstanding their public statements to the contrary, that there was "something terribly wrong" with the company's "continued" and "significant quality violations." JA1590.

**2.** Notwithstanding Boeing's claim (at 1) that the plaintiffs did not "point to any specific factual representations" that were false, the plaintiffs in fact alleged a number of specific, false representations about the company's safety policies. For example, Boeing falsely represented that it was ending reliance on "traveled work"—the practice of increasing production speed by moving airplanes down the manufacturing line or between factories before critical work has been completed. JA76–78, JA86, JA243, JA275, JA310. Traveled work is "inherently unsafe because the employees charged with finishing" the work are typically "not familiar with the job required of them" and lack "the skillset or knowledge to complete the task correctly." JA103.

The practice, however, remained deeply "embedded and normalized" at Boeing, JA42–43, JA103–04, JA163–64, whose "complete production system culture" was "based on" it. JA1582. Despite the company's public claims that it was eliminating traveled work, the practice remained "absolutely embedded as a norm," and Boeing's managers could not "even imagine" going without it and continued to rely on it "every day" to meet unrealistic production targets—even when doing so "create[d] an unsafe condition." JA1582; *see also* JA105–107. As a consequence, the Justice Department later determined that Boeing had breached the deferred-prosecution agreement because, among other things, its "senior executives prioritized the movement of aircraft through Boeing's factories over reducing

out-of-sequence work [i.e., traveled work] to ensure production quality." Plea Agreement at A-1-6, *United States v. Boeing Co.*, No. 4:21-cr-00005 (N.D. Tex. Jul. 24, 2024), ECF No. 221-1.

The company also claimed that it would not tolerate retaliation against employees and "encourage[d] people to speak up" about safety concerns. JA86–89. But numerous witnesses described a culture of fear, intimidation, and rampant retaliation at Boeing, and many were personally retaliated against for raising safety concerns. JA133–138. Whistleblowers at the company "suffered harassment, isolation, transfers, and even threats of physical violence" for bringing safety risks to light. JA134.

**3.** The truth about Boeing's safety and quality deficiencies began to emerge on January 5, 2024, when Alaska Airlines Flight 1282 suffered a harrowing in-flight failure: The mid-cabin "door plug" panel on the port side violently blew away, tearing a gaping hole in the side of the plane and requiring an emergency landing. JA140–170. As news sources and analysts reported on the incident and investigations mounted, it became clear that Boeing had not complied with its commitments under the deferred-prosecution agreement, that pervasive traveled work contributed to the incident, and that Boeing's statements regarding the safety and quality of its aircraft manufacturing process were false and misleading. *Id.* These revelations caused significant drops in Boeing's stock price. JA140–170.

The Justice Department determined that these lapses breached the terms of Boeing's deferred-prosecution agreement, exposing the company to potential criminal liability. Likewise, the report of an FAA expert panel revealed that Boeing's safety and quality-control deficiencies continued unabated. As a member of the panel told Congress, "there exists a disconnect between the words that are being said by Boeing management, and what is being seen and experienced by the technicians and engineers":

> They hear "safety is our number one priority," but they see that that is only true as long as you meet your production milestones. They hear "speak up if you see anything unsafe," but they see that when they do, there's little feedback, and if they insist, they may find themselves on the short end of the stick next time raises are distributed, or worse.

JA44. The agency required Boeing to submit a comprehensive action plan to address its "systemic quality-control issues" within 90 days. JA158.

## B.    Procedural background

The plaintiffs are institutional investors who filed this suit alleging that Boeing made materially false and misleading statements regarding its aircraft manufacturing process, in violation of sections 10(b) and 20(a) of the Securities Exchange Act. The district court denied Boeing's motion to dismiss. The plaintiffs' amended complaint, the court held, "records and relates tons of information" supporting the claims, including an "extensive amount of detail" supporting the plaintiffs' allegations of

"material misstatements made to the investing public," "a sufficient nexus with the damages," and "a strong inference of scienter." JA518–519.

The plaintiffs moved to certify a class of investors who purchased Boeing common stock and options from September 30, 2019, through May 14, 2024. In support of their motion, they proffered the expert report of Chad Coffman, who opined that "damages in this action can be calculated on a classwide basis using a common methodology that is consistent with plaintiffs' theory of liability" under § 10(b). JA547. Coffman explained that damages could be determined using the "out-of-pocket" methodology—"a standard and well-accepted method for calculating class-wide damages in cases under Section 10(b) of the Exchange Act." JA589. Under this method, Coffman explained, "damages are equal to the artificial inflation per share at the time of purchase minus the artificial inflation per share at the time of sale." JA589–590. Coffman further explained that quantifying artificial inflation per share "requires a detailed loss causation analysis," usually involving an "event study that measures price reactions to disclosures that revealed the relevant truth" about Boeing's misrepresentations. JA590–591. Such a loss-causation analysis utilizes reliable techniques to disaggregate confounding information and to analyze "how inflation per share may have evolved over the class period." JA590–592.

Coffman did not calculate damages by performing the out-of-pocket methodology at the class-certification stage because the requisite loss-causation

analysis is highly factual and "depend[s] on information learned through discovery." *Id.* Nonetheless, Coffman confirmed that, "[r]egardless of the technique used, it is performed on a class-wide basis—in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member." *Id.* "Once the inflation per share has been quantified on each day during the class period," Coffman continued, "the computation of damages for each class member is formulaic based upon information collected in the claims process." JA590.

Boeing opposed class certification, primarily arguing that the plaintiffs could not establish that common issues predominate under Rule 23(b)(3). Relying on its own expert, Boeing argued that Coffman's proposed damages methodology does not comply with the Supreme Court's holding in *Comcast* because it is insufficiently detailed and inconsistent with the plaintiffs' theory of liability. Boeing, however, never claimed that there are significant individualized issues in this case. It did not, for example, dispute the application of the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), meaning that there are no individualized reliance issues relevant to class certification. Nor did it dispute the significance of the common questions at issue, such as whether the statements at issue were false and misleading, whether those statements were material, and whether Boeing acted with the requisite scienter.

In response, the plaintiffs proffered Coffman's expert rebuttal report. As an initial matter, Coffman noted that Boeing did not dispute that the out-of-pocket methodology is an "appropriate measure of damages in this case," is a "standard [methodology] … used in virtually all securities fraud class action matters," and "can be applied on a class-wide basis." JA1432. Coffman explained that Boeing's critiques were "flawed" because, among other things, their expert: (1) "misunderstands" the "flexible nature" of the out-of-pocket methodology, which can measure artificial inflation based on common evidence; (2) "misunderstand[s] … Lead Plaintiffs' price maintenance theory of liability"; and (3) identifies factors that are not "unmanageable" and are "routinely assessed in the context of a loss causation analysis." JA1432–1435.

The district court granted certification. With no objection from Boeing, the court found Rule 23(a)'s four elements and Rule 23(b)(3)'s superiority requirement satisfied, and it found that the plaintiffs had established the fraud-on-the-market presumption of reliance. Turning to predominance under *Comcast*, the court found that the "out-of-pocket methodology for calculating per-share inflation is … 'widely accepted as the traditional measure of damages for Rule 10b-5 actions' and fits plaintiffs' theory of liability: that investors were damaged by purchasing Boeing stock at inflated prices due to defendants' fraud." JA1695 (quoting *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413 (E.D. Va. 2015)). Acknowledging the "vast majority of

courts" holding that the "standard out-of-pocket method for calculating damages" satisfies Rule 23(b)(3) and *Comcast* "in securities class actions like this one," the court concluded that the plaintiffs need not "conduct detailed damages modeling to meet Rule 23's predominance requirement at the class certification stage." *Id.*

But the district court denied some of the plaintiffs' class-certification requests. It did not allow the plaintiffs to expand the class to include options investors. And it narrowed the class period, establishing a later start date of January 7, 2021 (when Boeing entered into the deferred-prosecution agreement) and an earlier end date of January 8, 2024 (the trading day after the Alaska Airlines incident). JA1696–1697.

With these modifications, the district court appointed the plaintiffs as class representatives, approved their selection of class counsel, and certified the class. JA1698. Boeing petitioned for Rule 23(f) review, which this Court granted. JA1797–1798.

After the district court's class-certification order, the plaintiffs served Coffman's opening merits expert report on Boeing. In that report, Coffman opined that the information concealed by Boeing's alleged misstatements was important to investors; the alleged corrective events caused a statistically significant decline in Boeing's stock price; and the "constant percentage" methodology reasonably models the amount of inflation in Boeing's stock price throughout the relevant period. JA1817–1897. Coffman then calculated damages per share, using the out-of-pocket

methodology, for investors who acquired Boeing stock on each day of the class period. JA1897–1900, JA2073–2095, JA2096–2117.

## STANDARD OF REVIEW

This Court "review[s] the district court's certification of a class under an abuse-of-discretion standard." *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 678 (4th Cir. 2024) (citing *In re Marriott Int'l, Inc.*, 78 F.4th 677, 685 (4th Cir. 2023)). "In this context, abuse of discretion occurs when a district court 'materially misapplies the requirements of Rule 23,'" which "include[s] clear errors in the district court's factual findings or legal errors." *Id.* (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014)). This is a high standard for defendants to overcome, because the Court "give[s] 'substantial deference' to a district court's certification decision, recognizing that a 'district court possesses greater familiarity and expertise than a court of appeals in managing the practical problems of a class action.'" *Glover v. EQT Corp.*, 151 F.4th 613, 618 (4th Cir. 2025) (quoting *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)).

## SUMMARY OF ARGUMENT

In exercising its discretion to certify a class of Boeing investors, the district court properly concluded that the plaintiffs satisfied Rule 23(b)(3)'s predominance requirement, including by providing a damages methodology that can be applied on a classwide basis and that complies with *Comcast*. The defendants contend that

Coffman's widely accepted out-of-pocket methodology is insufficiently detailed and inconsistent with the plaintiffs' theory of liability. But that methodology is fully adequate under *Comcast*, as courts have overwhelmingly held, and the defendants cannot create an inconsistency by twisting the plaintiffs' case into something it is not.

*Comcast* simply requires that a damages methodology be capable of generating classwide results in a manner consistent with the theory of liability. This ensures that a plaintiff cannot artificially meet the predominance requirement of Rule 23(b)(3) by proposing a classwide, yet arbitrary, damages model. Coffman's out-of-pocket methodology satisfies that requirement because it measures only those damages caused by the fraudulent inflation of Boeing's stock price, and thus perfectly tracks the plaintiffs' theory of liability. Moreover, Coffman's methodology employs standard loss-causation techniques to measure the artificial inflation in Boeing's stock price in a manner common to all class members.

In response, the defendants effectively seek to relitigate their failed dismissal motion by mischaracterizing the substance and strength of the plaintiffs' allegations and inventing a "materiality-through-repetition" theory that the plaintiffs never advanced. The defendants also raise standard loss-causation issues, such as whether events during the class period resulted in varying levels of price inflation, and whether potentially confounding information should be disaggregated in assessing loss causation and damages. Courts have made clear that such detail need not be

provided at this stage. And even if class certification were the right time to address these arguments, which it is not, each of the defendants' challenges is wrong on the merits.

While the plaintiffs' factual allegations are unsurprisingly unique to this case, their theory of liability is not. As with nearly all securities-fraud cases, the plaintiffs allege that the defendants artificially maintained inflation in Boeing's stock price through numerous misrepresentations, and that investors suffered damages when such inflation dissipated as truthful information entered the market. The district court correctly concluded that Coffman's out-of-pocket methodology "fits plaintiffs' theory of liability," as required by *Comcast*.

## ARGUMENT

Rule 23(b)(3) authorizes class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance does not require that every question be common, nor does it require plaintiffs to prove their case at the certification stage. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Likewise, the Supreme Court's decision in *Comcast*, 569 U.S. 27, permits only a limited inquiry at class certification. To satisfy predominance, *Comcast* requires just that the plaintiffs' proposed damages methodology align with their theory of liability—meaning that it

measures damages attributable to the alleged wrongdoing and can be applied on a classwide basis. *Id.* at 35.

## I.    The district court did not abuse its discretion in finding that the plaintiffs satisfied Rule 23(b)(3).

### A.    The plaintiffs' damages model satisfies *Comcast*.

**1.** Boeing argues (at 26) that the district court abused its discretion in finding under Rule 23(b)(3) that questions "common to class members predominate over any questions affecting only individual members." Although Rule 23(b)(3)'s predominance requirement does not expressly require a plaintiff to proffer a damages model, the Supreme Court held in *Comcast* that, as part of the predominance inquiry, "any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" 569 U.S. at 35 (quoting ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 57, 62 (2d ed. 2010)). A damages model "purporting to serve as evidence of damages," the Court held, "must measure only those damages attributable to that theory." *Id.* "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

*Comcast* poses a particularly "low bar to class certification" in securities class actions like this one. *Forsythe v. Teva Pharm. Indus. Ltd.*, 102 F.4th 152, 159 (3d Cir. 2024). The Supreme Court has explained that, in such cases, "[t]he reliance element 'ensures that there is a proper connection between a defendant's misrepresentation

and a plaintiff's injury.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013)). Because "the price of stock traded in an efficient market reflects all public, material information—including material misstatements," purchasers of that stock are all damaged by the artificial inflation caused by those misstatements and the corresponding price drop when the fraud is revealed. *Id.* at 263.

Such a damages theory readily satisfies Rule 23(b)(3) because it can be applied on a classwide basis and fits the typical securities fraud theory: that misrepresentations inflated a company's stock price and that investors suffered losses when the truth was revealed. Because plaintiff investors are injured in a common manner by the artificial inflation in a company's stock price, evidence that the price "changed rapidly … in response to new information"—which Boeing doesn't dispute here—will almost always be sufficient to show that common questions of damages predominate over individualized ones. *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010).

That does not suggest, as Boeing claims (at 33), that the district court held "securities plaintiffs to a lesser burden under *Comcast* than antitrust plaintiffs." Although the test is the same, it poses a more significant issue in some types of cases than others. In particular, antitrust cases, unlike securities-fraud cases, typically involve overlapping theories of injury and complex damages methodologies. *See*, *e.g.*,

*Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977) (district court estimated that determining individual damages "could consume ten years of its time"). The damages model in *Comcast*, for example, would have required "permutations involving four theories of liability" that were "nearly endless." 569 U.S. at 37–38.

In contrast, "it is a rare—perhaps even nonexistent—securities case that raises damages issues that are so individualized as to defeat the predominance of the critical common issues in the case." 7 William Rubenstein, *Newberg and Rubenstein on Class Actions* §22:81 (6th ed. 2025); *see also, e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307, 313 (S.D.N.Y. 2016) ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases."). Because individual damages in such a case "usually can be established mechanically, common questions predominate and class certification is routine." *Schleicher*, 618 F.3d at 682. Thus, "securities-fraud litigation regularly proceeds as a class action." *Id.* at 681.

**2.** The district court did not abuse its discretion in finding that the plaintiffs met Rule 23(b)(3)'s predominance requirement. The plaintiffs satisfied *Comcast* by providing a methodology capable of measuring securities-fraud damages on a classwide basis. *See* 569 U.S. at 34. The plaintiffs' expert, Chad Coffman, explained that the out-of-pocket damages methodology can be used to perform a "relatively straightforward loss causation analysis" that can quantify artificial inflation per share. JA1434, JA1447–1455.

Far from abusing its discretion, the district court's decision followed the consensus of other courts in securities-fraud cases like this one. As numerous courts have recognized, the out-of-pocket damages model "complies with *Comcast*" because, "by examining the drop in price that occurred" when the truth was revealed, it "directly measure[s]" the plaintiffs' harm. *Waggoner*, 875 F.3d at 106; *see also, e.g.*, *Forsythe*, 102 F.4th at 159 (denying Rule 23(f) petition in securities-fraud action based, in part, on a *Comcast* challenge); *Univ. of P.R. Ret. Sys. v. Lannett Co.*, 2023 WL 2985120, at *4 (3d Cir. 2023) (holding that "the out-of-pocket method to measure loss is tied to this theory of liability").

Coffman's expert report sets forth how the out-of-pocket methodology works, discusses the techniques available to quantify the artificial inflation in Boeing's stock price, and confirms that such calculations constitute a common methodology for all class members. That methodology, he explained, is "widely accepted" for calculating damages on a class-wide basis and in a manner that "fits plaintiffs' theory of liability: that investors were damaged by purchasing Boeing stock at inflated prices." JA1488; JA1695. *Comcast* requires nothing more.

Boeing criticizes Coffman for using a similar damages "template" in other cases. But the similarities in Coffman's methodology across cases just show how closely that methodology fits the standard theory of securities-fraud liability: that fraud inflated the stock price, and investors lost money when the truth came out and

the price fell. Courts have routinely applied Coffman's methodology to calculate classwide damages in cases presenting this standard liability theory. *See, e.g., Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683–89 (5th Cir. 2015) (approving Coffman's "out-of-pocket losses" methodology); *In re Conduent Inc. Sec. Litig.*, 2022 WL 17406565, at *4 (D.N.J. 2022) (same); *KBC Asset Mgmt. v. 3D Sys. Corp.*, 2017 WL 4297450, at *7 (D.S.C. Sept. 28, 2017) (same); *In re NII Holdings*, 311 F.R.D. at 413 (same). Boeing's complaint just highlights the methodology's broad acceptance.[1]

In the face of these overwhelming adverse authorities, Boeing relies on other, non-securities cases that involved more complex liability theories. *Jaroslawicz v. M&T Bank Corp.* involved claims under section 14 of the Securities Exchange Act. 2024 WL 2975766 (D. Del. 2024). The court distinguished the damages methodology there from the "well-established out-of-pocket damages methodology for Section 10(b) cases." *Id.* at *7–8. The Sixth Circuit's decision in *Speerly v. General Motors, LLC* is even more far afield. 143 F.4th 306 (6th Cir. 2025). That was a product-defect case involving

---

[1] In another effort to impugn Coffman, Boeing cites snippets from Coffman's deposition testimony where he said that he would "do [his] best" and "consider carefully" certain issues raised by defense counsel. Boeing Br. at 19–20, 44. But Coffman was responding to hypothetical questions that assumed the truth of *Boeing's* version of the plaintiffs' allegations. JA799 ("If [materiality-through-repetition] is plaintiffs' theory of liability…."); JA800 ("If you did agree with [the materiality-through-repetition theory], then do you agree…."); JA812–13 ("[H]ad plaintiffs' counsel asked you to do what you call a detailed loss causation analysis…."). These statements cast no doubt on Coffman's *own* understanding of the plaintiffs' case.

"nearly 60 causes of action across 26 states," with "two theories of defect, each with multiple moving parts." *Id.* at 320–24. Neither decision casts doubt on the consensus of courts in securities-fraud cases that *Comcast*, at least in that context, is easily satisfied.

Boeing also cites securities-fraud decisions arising from the BP oil spill, but they support the plaintiffs' position. Those cases involved two distinct classes asserting distinct damages methodologies: a post-spill class and a pre-spill class. Boeing relies on analysis of the pre-spill class, but the damages model for that class was atypical for a securities-fraud case; it did not "model inflation in the traditional sense" based "on the distortion allegedly created by Defendants' misstatements." *In re BP p.l.c. Sec. Litig. (BP II)*, 2014 WL 2112823, at *4 (S.D. Tex. 2014), *aff'd sub nom. Ludlow*, 800 F.3d 674. Rather, plaintiffs had to show that, but for the alleged fraud, they "would not have bought BP stock *at all*." *Ludlow*, 800 F.3d. at 690. Because that question required individualized inquiries, the Fifth Circuit held, the district court did not abuse its discretion in determining that it "was not capable of class-wide determination." *Id.*[2]

---

[2] The district court in the *BP* litigation also relied on the fact that the plaintiffs "tacitly concede[d] that they [had] no plans to address" the defendants' arguments about the cumulative effect of repeating misrepresentations. *In re BP p.l.c. Sec. Litig. (BP I)*, 2013 WL 6388408, at *16–17 (S.D. Tex. 2013). The plaintiffs have made no such concession here.

The pre-spill model, however, has no application in a case like this one, where the plaintiffs "do not seek consequential damages or argue that investors would have refused to purchase [company] stock had they known the truth." *Junge v. Geron Corp.*, 2022 WL 1002446, at *9 (N.D. Cal. 2022). Such cases are instead more "analogous to the post-spill class," *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *14 (S.D. Cal. 2017), for which both the district court and the Fifth Circuit concluded that the out-of-pocket methodology satisfies *Comcast* because "it attempts to quantify the injury caused by Defendants' alleged wrongful conduct, and it can be deployed on a classwide basis." *BP II*, 2014 WL 2112823, at *12–14; *see Ludlow*, 800 F.3d at 684–89. Like virtually every other securities-fraud case, *BP* thus contradicts Boeing's position.

## B. Boeing's claim that the plaintiffs fail to account for variable inflation is wrong and mischaracterizes the plaintiffs' theory of the case.

Boeing cannot dispute the district court's conclusion that Coffman's out-of-pocket methodology is the standard and "widely accepted" method for calculating damages in securities-fraud cases. JA1695. Instead, it argues that this is the rare securities case that doesn't fit the usual damages framework. According to Boeing, one "component" of the plaintiffs' liability theory is that the company's "repetition of false statements about safety and quality eventually rendered those general statements material to investors, gradually inflating Boeing's stock price" over the course of the class period. Boeing Br. 30. But because Coffman has no "way to

calculate how that supposed inflation crept in over time," the company concludes, there is no way to accurately measure an individual investor's losses due to its alleged misstatements. *Id.* Boeing is wrong for several independent reasons.

**1.** For starters, Boeing's argument depends on a misstatement of the plaintiffs' liability theory. Contrary to Boeing's characterizations, the plaintiffs never argued that the materiality of the company's misstatements varied across the class period. Although the plaintiffs explained in their opposition to Boeing's motion to dismiss that the company's persistent repetition of its false safety claims "underscores" the claims' materiality, JA475, they have not suggested that the materiality of those statements varied depending on how many times Boeing repeated them. Nor have they asserted, as Boeing claims (at 4), that the repetition caused a "gradual and cumulative effect on Boeing's stock price." The district court likewise did not perceive Boeing's "materiality-by-repetition" theory in the plaintiffs' claims. Given that the court denied Boeing's motion to dismiss in full, including as to the very first misrepresentation, it could not have believed that the misrepresentations only became material over time through repetition.[3]

---

[3] Boeing (at 42) wrongly attributes to the plaintiffs a quotation from a district-court case that they cited below. *See* JA467, JA475 (citing *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017)). But contrary to Boeing's claim, the plaintiffs have never suggested that statements "at issue in this case" only became material through repetition. And the district court in *BHP Billiton* did not hold that materiality changes over time.

Instead, the plaintiffs have consistently argued (at the pleadings stage and at class certification) that the drumbeat of false safety claims coming from Boeing artificially *maintained* the company's stock price at an inflated level. *See* JA370–372, JA376–377. That common theory of liability, known as the "price-maintenance" theory, holds that securities fraud can affect a stock's price by artificially "maintaining" that price rather than artificially increasing it. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 257 (2d Cir. 2016). In other words, "a misrepresentation causes a stock price 'to *remain* inflated by preventing *preexisting* inflation from dissipating from the stock price.'" *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 119–20 (2021) (second emphasis added) (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1315 (11th. Cir. 2011)).

The price-maintenance theory ensures that companies are not "'free to knowingly and intentionally reinforce material misconceptions by repeating falsehoods with impunity.'" *In re Vivendi*, 838 F.3d at 259 (quoting *FindWhat*, 658 F.3d at 1317). The theory, in other words, targets precisely the kind of misrepresentations that Boeing engaged in here when it repeatedly assured investors that it was prioritizing safety but in fact was not. Whether or not Boeing is right that those are generic statements, or that such statements would not have increased its stock price, the company cannot dispute that the stock price would have decreased (indeed, likely plummeted) if, rather than continuing to falsely repeat its safety claims, the company

had admitted that it was continuing to take safety shortcuts in its pursuit of faster production speed.

Boeing misses the point when it argues (at 46) that its statements on the first day of the class period (January 7, 2021) were insufficient in themselves to fully inflate Boeing's stock price. Boeing Br. at 46. It is true that Boeing's public commitments on that date to the Justice Department's deferred-prosecution agreement were materially misleading, given known deficiencies in Boeing's compliance and internal controls. JA251. But the price-maintenance theory doesn't require Coffman to attribute all of Boeing's price inflation to a single large event. Rather, the plaintiffs' theory is that Boeing's misstatements during the class period, rather than causing additional price spikes, maintained inflation at existing levels. *See* JA370–372, JA376–377.

**2.** Even if Boeing were correct that the materiality of its safety claims varied over time, that would not suggest an abuse of discretion by the district court here. Boeing's argument assumes that Coffman's damages model is unable to account for varying inflation across the class period. But, as Coffman explained when Boeing made this same argument in the district court, his proposed damages methodology can straightforwardly accommodate any factual conclusion that inflation varied throughout the class period. JA1437–1447.

Contrary to Boeing's claims, there's nothing "unique" about how Coffman would measure damages in this case. Almost all securities class actions, like this one, involve more than a single misrepresentation, because most important subjects are addressed by corporate executives more than once. "Approximating damages in *any* case is an imperfect science—particularly when an alleged fraud is perpetrated over a multi-year period, with a near-continuous series of alleged misstatements." *BP II*, 2014 WL 2112823, at *10. But although "calculating the proper damages based on the date of purchase and sale may be complicated," the use of event studies is a "workable methodology of determining damages on a class-wide basis" that aligns the theory of damages with liability in standard securities cases and can be completed without "excessive individual inquiry." *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014).

That's what Coffman proposed here. He explained that quantifying artificial inflation per share "requires a detailed loss causation analysis" using reliable techniques, such as an "event study that measures price reactions to disclosures," to disaggregate confounding information and to analyze "how inflation per share may have evolved over the class period." JA590–592. Coffman didn't perform that methodology to calculate damages at the class certification stage because the requisite loss-causation analysis is highly factual and "depend[s] on information learned through discovery." *Id.* But he confirmed that, "[o]nce the inflation per share

has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process." JA590.

This is consistent with the guidance of the "vast majority of courts" applying *Comcast*, which have held that plaintiffs need not "conduct detailed damages modeling to meet Rule 23's predominance requirement." JA1695. Although plaintiffs must demonstrate "a common, classwide *method* for determining individual damages," those damages "need not be *calculated* on a classwide basis" at the class-certification stage. *In re Marriott Int'l*, 78 F.4th at 683. The same holds true in securities-fraud cases like this one. *See* ECF No. 130-1 (chart of 59 federal cases certifying securities-fraud class actions based on out-of-pocket damages methodology).[4]

In any event, any variance in price inflation over the class period, as Coffman explained, likely would not affect damage calculations. That's because, under the

---

[4] *See, e.g.*, *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *28 (W.D. Pa. 2022) ("Plaintiffs are not required to produce a detailed damages model."); *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at *6 (N.D. Ga. 2020) ("*Comcast* requires a sound methodology, not certainty." (quoting *Ludlow*, 800 F.3d at 685)); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 399 (N.D. Ga. 2019) ("[S]uch specification [of tools] is not required at this stage."); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 691 (D. Md. 2018) (demand for more specific details "lacks merit" where the expert "discloses that the exact calculations cannot be done until the close of discovery").

Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, the plaintiffs' damages are capped by the amount that the stock price declined when the truth was revealed—even if that is less than the full amount that the stock was artificially inflated at the time of purchase. 544 U.S. 336 (2005). Here, Coffman wrote, the drop in Boeing's stock price was likely "blunted by" the company's repeated claims that it was "prioritizing safety." JA1452–1453. If Boeing had instead publicly admitted the truth that it was *not*, in fact, prioritizing safety, the impact on its stock would have been far greater. The plaintiffs thus may never need to compute the true level of price inflation at the time of purchase because, as Coffman explained, the price drop at the back end provides a "conservative" alternative. JA1454.

**3.** Regardless, Boeing's argument isn't really about *Comcast*. The damages model in *Comcast* failed to satisfy Rule 23 because it "identifie[d] damages that [were] not the result of the wrong." *Comcast*, 569 U.S. at 37–38. The plaintiffs there alleged four antitrust-injury theories, but only one was capable of classwide proof. *Id.* at 31. And their damages model "failed to measure damages resulting from the particular antitrust injury on which" liability was premised. *Id.* at 36. It instead "assumed the validity of all four theories of antitrust impact." *Id.*

Unlike *Comcast*, this "is not a case where a plaintiff's damages model does not track his theory of liability." *Waggoner*, 875 F.3d at 106. Securities cases typically involve a single liability theory (the defendant's public misrepresentations) that

causes a single harm (artificial inflation of stock price). There is thus no risk of a mismatch between the two. *See Gomez v. Tyson Foods, Inc.*, 295 F.R.D. 397, 402 (D. Neb. 2013) (holding *Comcast* inapplicable where the plaintiffs proceeded on only one theory of recovery and damages were attributable to that theory), *rev'd on other grounds*, 799 F.3d 1192 (8th Cir. 2015). Unlike the plaintiffs in *Comcast*, the plaintiffs here have only one liability theory, and their damages model is consistent with it.

Indeed, Boeing isn't really arguing that the plaintiffs' damages methodology is "arbitrary" or disconnected from their theory of liability, as *Comcast* requires. 569 U.S. at 36. Nor could it, given that "securities fraud cases fit Rule 23 'like a glove.'" *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. 2018).

Instead, Boeing's point is simply that damages under the plaintiffs' theory may be difficult to measure. But that's an issue for the merits, not class certification. According to Boeing, Coffman's damages model is an "imperfect means of allocating [the plaintiffs'] losses over the relevant time period." *BP II*, 2014 WL 2112823, at *10. *Comcast*, however, doesn't require "proof of stock price impact on each day" that Boeing made a public statement related to safety or quality. *Id.* "Approximating damages in *any* case is an imperfect science—particularly when an alleged fraud is perpetrated over a multi-year period, with a near-continuous series of alleged

misstatements." *Id.* But a "damages model need not be perfect" to support certification. *Id.*

Courts have thus rejected arguments "that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation over time." *Waggoner*, 875 F.3d at 106. For example, the district court in *Shupe v. Rocket Companies*, another case where Coffman appeared as an expert, declined to address the defendants' argument that he "did not explain precisely how the proposed artificial inflation variable would account for shifting uncertainty and risk" during the class period. 752 F. Supp. 3d 735, 784 (E.D. Mich. 2024). That was a merits argument, the court held, and was "premature and insufficient to defeat predominance." *Id.*; *see also*, *e.g.*, *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *12 (D. Nev. 2023) (rejecting the argument that "inflation is not necessarily constant over the entire class period" as "premature" at class certification); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *10 (N.D. Ill. 2020) ("Defendants … do not cite a single case where class certification was denied because of limitations in the proposed inflation formula."). "*Comcast* does not suggest that damage calculations must be so precise at this juncture." *Waggoner*, 875 F.3d at 106. Even if a "methodology contains … flaws," it survives *Comcast* if "it is not wholly arbitrary." *BP II*, 2014 WL 2112823, at *10.

Boeing insists (at 30–31) that it is not "criticiz[ing] Mr. Coffman's 'methodology' merely for being insufficiently detailed," nor suggesting that Coffman "must actually perform the detailed modeling" required under the out-of-pocket methodology. But that is precisely what it is doing. Boeing's argument simply identifies factors that might impact damages calculations and insists that those impacts must be accounted for *before* certifying the class. If that were correct, however, every dispute about damages model specifications and assumptions would have to be resolved at class certification (and presumably a second time on the merits). The purpose of Rule 23(b)(3), however, is to ensure that the class is "sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623—not to demand proof that the plaintiff will ultimately prevail on the merits of her claims.[5]

## C. Class certification is warranted even if damages calculations are individualized.

Rule 23(b)(3) does not require that every issue in a case be common to the class, but only that common questions "*predominate* over any questions affecting only

---

[5] As Coffman promised in his certification-stage reports, his merits report provides all the tools a factfinder might need to assign specific amounts of inflation (or no inflation at all) to purchases made on each day of the class period. *See* JA2073–2095; JA2096–2117. If a jury finds that Boeing's statements during the first year of the class period were immaterial, for example, Coffman's analysis allows it to assign no damages for that year. *See* JA1445–1446 (explaining similar examples).

individual [class] members." Fed. R. Civ. P. 23(b)(3) (emphasis added). Indeed, "[t]he entire notion of predominance implies that the plaintiffs' claims need not be identical." *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 658 (4th Cir. 2019). Thus, even if the plaintiffs' damages model requires some individualized inquiries, that would not defeat predominance. Because that inquiry is "qualitative rather than quantitative," *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016), it permits certification "even if just one common question predominates," *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557–58 (9th Cir. 2019) (en banc).

Almost all securities-fraud class actions involve at least some "person-specific issues." *Schleicher*, 618 F.3d at 681. For example, the "[t]iming of each person's transactions" in the case, "in relation to the timing of the supposedly false statements, determines how much a given investor lost (or gained) as a result of the fraud." *Id.* But even where timing poses an individualized issue, class certification virtually always remains warranted because the questions in the case remain overwhelmingly common. *See id.* The district court here relied on several such common issues that it concluded satisfy the predominance requirement: (1) that the class's claims "are based on the same alleged misstatements and omissions by defendants"; (2) that the claims involve "the same sort of monetary damages resulting from a decline in Boeing's stock price from an allegedly inflated level"; and (3) "the 'fraud on the market' presumption … obviates the need for individualized proof of reliance." JA1694.

Because all of these "central issues in the action are common to the class and can be said to predominate," the district court didn't abuse its discretion in finding predominance satisfied even if "other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 7AA *Wright & Miller's Federal Practice & Procedure* § 1778 (3d ed. 2005)); *see, e.g.*, *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1027 (9th Cir. 2024) ("[E]ven after *Comcast*, we have repeatedly reaffirmed that class treatment may be appropriate even where damages must be assessed on an individualized basis."). Even if there are individualized questions about class members' injuries, that matters for certification only if there is "reason to think that these questions will overwhelm common ones." *Halliburton*, 573 U.S. at 276; *see, e.g.*, *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022) (certifying class in securities-fraud case based on out-of-pocket methodology and holding, "[t]he possibility of individualized damages calculations does not vitiate predominance" if there is "'a common, classwide *method* for determining individual damages.'" (quoting *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 161 (D. Md. 2022))).

Boeing, however, latches onto the issue of inflation while ignoring all other common issues of law and fact in this case, including whether the company's statements were false and whether it acted with scienter. Boeing cannot possibly

show that the district court abused its discretion in finding predominance without even acknowledging the important common questions at issue, identifying any individualized questions, or comparing their relative significance. *Schleicher*, 618 F.3d at 681.

## II. This Court lacks jurisdiction to review Boeing's additional merits arguments.

Boeing's remaining arguments attempt to undermine Coffman's damages model by pointing out various factors that, the company claims, the model fails to address. In particular, Boeing insists that Coffman's model cannot disaggregate the drop in the company's stock price attributable to public concern over the incident on Alaska Airlines Flight 1282 from the amount attributable to revelations of the company's fraud. Boeing further contends that Coffman has not adequately taken into account disclosures made during the class period that, Boeing asserts, revealed the truth in whole or in part. Like the inflation issue discussed above, these merits questions do not go to the propriety of class certification.

These arguments are not only baseless, but this Court lacks jurisdiction to consider them. On a Rule 23(f) appeal, the only question before the Court is whether the district court abused its discretion by "misappl[ying] the requirements of Rule 23." *EQT Prod. Co.*, 764 F.3d at 357. In carrying out that review, the Court may consider the merits "to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Id.* at 358 (quoting *Amgen*,

568 U.S. at 466). But Rule 23 does not give courts a "license to engage in free-ranging merits inquiries at the certification stage."' *Amgen*, 568 U.S. at 466.

## A.  Disaggregation is a loss-causation exercise not required at class certification.

**1.** Boeing's primary criticism of Coffman's damages methodology (at 52–53) is that it fails to disaggregate the effects of the Alaska Airlines incident from the overall drop in the company's stock price. Boeing complains that the model attributes the entire price drop to public revelations about the company's safety practices, without first attempting to sort out how much is instead attributable to fallout from the incident itself—such as operational disruptions, reputational harm, and anticipated litigation costs.

Boeing's argument, however, is a *merits* issue that would be inappropriate for this Court to resolve on Rule 23(f) review. Although Boeing treats the argument (at 34–37) as a predominance question, it has nothing to do with predominance: No matter how much of the price drop is ultimately attributed to Boeing's fraud, that answer will be the same for every member of the class. The issue is thus perfectly suited for class treatment; the class's claims will rise and fall together. *See Schleicher*, 618 F.3d at 685. Even if Boeing were right that the problem of disaggregation makes damages calculations impossible (and, as explained below, it does not), certification would still be appropriate. "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win." *Id.* at 686.

Disaggregation, in fact, is not an issue of predominance, but "of loss causation." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2018 WL 1535156, at *3 (N.D. Ill. 2018); *see also BP II*, 2014 WL 2112823, at *6 (noting that the argument is "regarding loss causation"). And loss causation—because it is based on evidence common to the class—need not be proved "as a condition of obtaining class certification." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011); *see also, e.g.*, *Ludlow*, 800 F.3d at 688 (Plaintiffs "do not need to prove [loss causation] at the certification stage."). Rather, *Comcast* is satisfied by a damages model that "purports to measure the price premium attributable" to the plaintiffs' theory, even if the model "may fail to account for other possible sources of a price premium." *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020).[6]

Boeing appears to assume that, to obtain class certification, the plaintiffs must establish that their damages model will fully account for the impact of other disclosures and confounding information that might affect the company's stock. But

_____

[6] *See also, e.g.*, *TreeHouse Foods*, 2020 WL 919249, at *9 ("[A]ll the putative class members' claims will live or die by their ability to disaggregate potentially confounding news, making the question 'common' to all of the members."); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. 2019) ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate."); *KBC*, 2017 WL 4297450, at *7 ("As to Defendants' contentions [that] Coffman's methodology fails to make an allowance for any damages caused by things other than Defendants' alleged fraud, such is not required at the class certification stage of the proceedings.").

nothing "requir[es] this burdensome showing" on class certification. *Walgreen Co.*, 2018 WL 1535156, at *3. Because loss-causation issues have no bearing on predominance, any "questions of loss causation or the disaggregation of confounding factors to prove economic loss need not be determined at the class certification stage." *Forsythe*, 102 F.4th at 159; *see Waggoner*, 875 F.3d at 106 (holding that the plaintiffs' "failure to disaggregate the action and fines did not preclude class certification").

**2.** In any case, Coffman's report identified ways in which a disaggregation analysis could work at the merits stage, including by using "a comparative approach that analyzes stock price reactions following similar incidents." JA1441. Indeed, Coffman has since completed his merits report and successfully applied exactly that analysis to perform the disaggregation. Using a National Transportation Safety Board database to "examine[] reasonably comparable negative incidents involving commercial aircraft," Coffman determined that incidents in the same category as the Alaska Airlines incident "do not generally cause the market price of the airplane manufacturer to decline." JA1854–1855. He also noted that "analyst commentary surrounding" the Alaska Airlines event did not "suggest that the market was focused on the … costs" of the incident, but rather on the broader implications for safety issues at Boeing. JA1854.

Coffman concluded that the market's reaction to the Alaska Airlines incident did not simply reflect a "materialization of the risk," as Boeing claims. JA1854. The drop in Boeing's stock price, he explained, was "not the result of the incident itself"—which, while frightening, was not catastrophic—but of the market's interpretation of the incident as a "signal of systemic quality control and safety issues at Boeing." JA1854, JA1857. And Coffman also explained how out-of-pocket damages could be calculated even if, contrary to his analysis, a jury determined that the mere occurrence of the Alaska Airlines incident, as opposed to what it revealed about safety issues at Boeing, was at least partly responsible for the stock-price drop. JA1858; *see also* JA1467. Boeing ignores all this analysis when it claims, confusingly, that Coffman's *merits* expert report somehow "flunks *Comcast.*" Boeing Br. at 38.

Finally, as Coffman explains, there are other stock declines tied to Boeing's misrepresentations that the company does not claim pose the same disaggregation issue. The Alaska Airlines incident was just the first of several events in which Boeing's stock price fell as the public learned more of the truth about Boeing's safety practices. *See* JA1858–1890. Two months later, for example, the public learned that Boeing had failed thirty-three FAA audits in the aftermath of the Alaska Airlines incident—a revelation that resulted in a severe stock-price drop. JA160–161. Then, two months after that, the Department of Justice announced its finding that the company had violated the terms of its deferred-prosecution agreement, causing the

stock price to fall again. JA167–170. As Coffman explains, class certification would still be appropriate based on these separate events, none of which faces the same disaggregation issue.[7]

## B. Boeing's truth-on-the-market argument goes to materiality and is not properly heard at class certification.

Boeing next contends that its own public statements about quality issues during the class period caused variations in the price of its stock. But again, Boeing's assertion that the "truth" had already been sufficiently disclosed to the market has no bearing on predominance or class certification; it's just another way of saying that the alleged misstatements are no longer material to investors and no longer reflected in the stock's price. *See Amgen*, 568 U.S. at 466. Since *Amgen*, courts across the country have overwhelmingly recognized that this kind of "truth-on-the-market" defense is premature at the certification stage. Showing when the truth "credibly entered the

---

[7] Boeing convinced the district court to end the class period on January 8, 2024—the next trading day after the Alaska Airlines incident. JA1697. Investors who purchased Boeing stock after that date are therefore not part of the class. Nevertheless, because loss causation and damages are merits issues rather than certification issues, *see supra* at 38–39, the market's reactions to corrective disclosures remain relevant for calculating damages even if those disclosures come after the end of the class period. *See, e.g.*, *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (holding that disclosures after class period may cause recoverable losses); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 560–61 (N.D. Ill. 2007) ("Defendants articulate no rationale, and the court can see none, for requiring that any 'corrective disclosure' be within the Class Period."); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) (same); *In re FirstEnergy Corp.*, 2022 WL 681320, at *29 (S.D. Ohio 2022) (same).

market and dissipated the effects of [prior] misstatements" is "a matter for trial." *Id.* (alteration in original) (quoting *Basic*, 485 U.S. at 248–49). For example, if the jury were to determine that, as Boeing contends, the truth was fully revealed to investors at some point during the class period, it could simply assign no damages to purchasers of Boeing stock from that date forward.[8]

In any event, Boeing is wrong on the merits. As explained above, courts have rejected arguments "that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation over time." *Waggoner*, 875 F.3d at 106. The issue can be handled on the merits using event studies and other tools. Moreover, as also noted above, the artificial inflation in Boeing's stock price from its misleading safety claims likely far exceeded any recoverable damages. Thus, changes in inflation are unlikely to have a significant impact on damage calculations.

While Coffman appropriately did not commit to the details of his merits-based loss-causation analysis at class certification, when it came time for his opening merits report, he robustly defended his decision to apply a classwide "constant percentage"

---

[8] *See also Karinski v. Stamps.com, Inc.*, 2020 WL 6572660, at *7 (C.D. Cal. 2020) ("This argument amounts to a truth-on-the-market defense and is not properly considered at the class certification stage because materiality is assumed."); *Walgreen*, 2018 WL 1535156, at *4 (same); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *5 (S.D.N.Y. 2017) (same).

inflation model due to the "clear economic link between Boeing's market price and the market's perception of how quickly it could produce and grow its production of safe airplanes." JA1893. He further explained how the "constant percentage" model accounts for economic and regulatory changes throughout the class period, thus resolving many of the issues the defendants' expert had raised. JA1892, JA1894. Coffman also explained that his "constant percentage" model is conservative in comparison to a more typical "constant dollar" model. JA1895. The defendants may disagree with Coffman's analysis on the merits, but that should be assessed at the merits stage.[9]

## C. Boeing's puffery arguments were rightly rejected by the district court at the pleadings stage.

Finally, Boeing argues (at 43) that the company's public statements about safety and quality were meaningless puffery and "immaterial as a matter of law." The Supreme Court in *Amgen*, however, held that materiality is a classwide issue inappropriate for review at class certification. *Amgen*, 568 U.S. at 474. Thus, once again, the Court should leave the issue for resolution on the merits. Indeed, Boeing

---

[9] Although not yet in the record, Coffman's reply report on the merits examines Boeing's public statements during the class period that are highlighted in Boeing's expert's report, and explains why none revealed the truth that Boeing was prioritizing production speed over safety and quality. The fact that Boeing's argument turns on facts not yet in the record highlights how premature its argument is.

unsuccessfully made the same merits argument below in its motion to dismiss. *See* ECF No. 51 at 2. Class certification is not an occasion to relitigate previously rejected merits arguments.[10]

In any event, the district court was right to reject Boeing's argument. In opposing Boeing's motion, the plaintiffs cited voluminous case law making clear that safety-related misstatements can be highly material for companies facing significant safety risks. JA474–475. Boeing publicly emphasized that its reassurances about safety and quality were meant to convey real substance—not mere puffery. JA473–474. For example, David Calhoun, in describing Boeing's "safety culture," said: "It's more than just a desire to be safe. It's more than just a commitment to put safety ahead of operational goals. It is a set of organizing principles that is real work. It is real engineering. It is real program management, real systems management." JA306.

---

[10] Boeing (at 41–42) points out "two earlier securities-fraud cases" against it, in which district courts rejected claims that were based on the company's safety-related statements. Boeing Br. at 41–42 (citing *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *9 (N.D. Ill. 2022) and *Coll. Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260, at *7 (N.D. Ill. 2023)). Boeing fails to mention, however, that both courts upheld other claims based on statements issued in the aftermath of the 2018 and 2019 crashes. *See In re Boeing*, 2022 WL 3595058, at *30 (11 actionable misstatements); *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *26 (16 actionable misstatements). And it further omits the fact that, after discovery, the court in *In re Boeing Co. Aircraft Securities Litigation* allowed the plaintiffs to reinstate many of the previously dismissed safety-related statements—rejecting in the process the same argument that Boeing makes here. *Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1017, 1024 (N.D. Ill. 2024).

Calhoun did not just assert that "[s]afety dominates Boeing," but cited "proof points about how serious we are on safety and quality." JA318–319.

Boeing's argument that its safety-related misrepresentations were originally immaterial puffery is also wrong, and the district court was right to reject it at the motion-to-dismiss stage. The marketplace, after all, didn't dismiss Boeing's misrepresentations as puffery. Near the beginning of the class period, for example, a securities analyst observed:

> Over the last two years the language in [Boeing's] proxy has shifted dramatically to emphasize Boeing's renewed focus on safety, indicating to us that the company clearly wants shareholders to know its Board is again laser-focused on this. The 2021 proxy even states 'Safety is, simply put, our highest priority.'

JA84, JA261–262. The analyst and the investing public were thus led to believe that "Boeing returned to a safety-focused culture in 2020." *Id.* Boeing's public statements about safety and quality were misleading, not meaningless.[11]

Both the plaintiffs' liability theory and their evidence make clear that Boeing's false and misleading statements were material to investors *throughout* the class period, from beginning to end. This again disproves Boeing's claim that the plaintiffs' case turns on a "materiality-by-repetition" theory, in which the company's earlier

---

[11] The plaintiffs have obtained much more evidence of materiality in discovery, which is summarized in Coffman's merits expert report, JA1817–1841, but per *Amgen*, 568 U.S. at 474, they were not required to present that evidence at class certification.

statements were somehow immaterial. As Boeing's CEO, David Calhoun, emphasized shortly before the start of the class period: "If ever there was a moment to emphasize safety as … the most important part of shareholder value, it's now …. Safety first. Without it, there is no shareholder value." JA82. And in its opening brief (at 41), Boeing concedes that the subject of safety was "undeniably important" to its investors. Boeing never explains why its statements about airplane safety might have been immaterial to Boeing investors at any time during the class period.

## CONCLUSION

This Court should affirm the district court's order granting class certification.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
GREGORY BECK
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

CAROL C. VILLEGAS
CHRISTINE M. FOX
JAKE EDWARD BISSELL-LINSK
LABATON KELLER SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

CHAD JOHNSON
NOAM MANDEL
JONATHAN ZWEIG
DESIREE CUMMINGS
ROBBINS GELLER RUDMAN &
DOWD LLP
420 Lexington Avenue
Suite 1832
New York, NY 10170
(212) 432-5100

DOUGLAS WILENS
ROBBINS GELLER RUDMAN &
DOWD LLP
225 NE Mizner Boulevard
Suite 720
Boca Raton, FL 33432
(561) 750-3000

October 17, 2025

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,231 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

October 17, 2025

*/s/ Deepak Gupta*
Deepak Gupta

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta