## No. 25-1492

# In the United States Court of Appeals
# for the Fourth Circuit

STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER, ON BEHALF OF THE EMPLOYEES RETIREMENT SYSTEM OF THE STATE OF RHODE ISLAND; LOCAL #817 IBT PENSION FUND,

*Plaintiffs-Appellees,*

V.

THE BOEING COMPANY; DAVID L. CALHOUN; DENNIS A. MUILENBURG; BRIAN J. WEST; GREGORY D. SMITH,

*Defendants-Appellants.*

On Appeal from the U.S. District Court
for the Eastern District of Virginia, Alexandria Division
No. 1:24-cv-151 (Hon. Leonie M. Brinkema)

## REPLY BRIEF OF APPELLANTS

| | |
|---|---|
| Benjamin L. Hatch | Jeffrey B. Wall |
| MCGUIREWOODS LLP | Judson O. Littleton |
| 888 16th Street, N.W. | SULLIVAN & CROMWELL LLP |
| Suite 500 | 1700 New York Avenue, N.W. |
| Black Lives Matter Plaza | Suite 700 |
| Washington, DC 20006 | Washington, DC 20006 |
| (757) 640-3727 | (202) 956-7500 |
| | |
| | Richard C. Pepperman II |
| | Jacob E. Cohen |
| | SULLIVAN & CROMWELL LLP |
| | 125 Broad Street |
| | New York, NY 10004 |
| | (212) 558-4000 |

*Counsel for Defendants-Appellants The Boeing Company, David L. Calhoun, Dennis A. Muilenburg, Brian J. West, and Gregory D. Smith*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................4

I. PLAINTIFFS FAILED TO PROVIDE THE DAMAGES
METHODOLOGY THAT *COMCAST* REQUIRES...............................4

    A. Plaintiffs Cannot Satisfy *Comcast* Simply By Reciting
The Legal Standard For Damages In Securities Cases ................4

    B. Plaintiffs Cannot Avoid *Comcast*'s Requirement Of A
Damages Methodology ........................................................9

II. PLAINTIFFS' CONSTANT-INFLATION APPROACH IS
INCONSISTENT WITH THEIR LIABILITY CASE .......................13

    A. Assuming Constant Inflation Is Inconsistent With
Plaintiffs' Materiality-Through-Repetition Liability
Theory ...............................................................................14

    B. Assuming Constant Inflation Is Also Inconsistent With
Public Reports Of Quality Issues During The Class
Period.................................................................................23

    C. Using The Full Price Decline After The Accident To
Measure Inflation Is Inconsistent With Plaintiffs' Loss-
Causation Theory.............................................................25

CONCLUSION....................................................................................31

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Allen* v. *Ollie's Bargain Outlet, Inc.*,
  37 F.4th 890 (3d Cir. 2022)................................................................12

*Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013).................................................................14, 23

*Bell* v. *PNC Bank, N.A.*,
  800 F.3d 360 (7th Cir. 2015)..........................................................20

*In re Boeing Co. Aircraft Sec. Litig.*,
  2022 WL 3595058 (N.D. Ill. Aug. 23, 2022)....................................17

*In re BP p.l.c. Sec. Litig.*,
  2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).............................22, 26

*In re BP p.l.c. Sec. Litig.*,
  2014 WL 2112823 (S.D. Tex. May 20, 2014)..........................*passim*

*Carvelli* v. *Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019).......................................................18

*College Ret. Equities Fund* v. *Boeing Co.*,
  2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ..................................17

*Comcast Corp.* v. *Behrend*,
  569 U.S. 27 (2013)...........................................................*passim*

*Conn. Ret. Plans & Trust Funds* v. *Amgen Inc.*,
  660 F.3d 1170 (9th Cir. 2011).........................................................23

*Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005).........................................................................28

*ECA* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ............................................................18

*EQT Prod. Co.* v. *Adair*,
764 F.3d 347 (4th Cir. 2014) ................................................................14

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025) ...............................................................7

*Forsythe* v. *Teva Pharm. Indus. Ltd.*,
102 F.4th 152 (3d Cir. 2024) ................................................................9

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ........................................................................14, 19

*In re Kirschner Med. Corp. Sec. Litig.*,
139 F.R.D. 74 (D. Md. 1991) ...............................................................30

*Ludlow* v. *BP, PLC*,
800 F.3d 674 (5th Cir. 2015) ..............................................................26

*In re Marriott Int'l, Inc.*,
78 F.4th 677 (4th Cir. 2023) ...............................................................13

*Retail Wholesale & Dep't Store Union* v. *Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ............................................................18

*Speerly* v. *Gen. Motors, LLC*,
143 F.4th 306 (6th Cir. 2025) .........................................................6, 24

*Stafford* v. *Bojangles' Rest., Inc.*,
123 F.4th 671 (4th Cir. 2024) .............................................................20

*Strougo* v. *Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015) ...................................................8

*Univ. of P.R. Ret. Sys.* v. *Lannett Co.*,
2023 WL 2985120 (3d Cir. Apr. 18, 2023) ..........................................9

*Waggoner* v. *Barclays PLC*,
875 F.3d 79 (2017) ..........................................................................8, 9

*Wal-Mart Stores, Inc.* v. *Dukes*,
564 U.S. 338 (2011) ............................................................................14

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    7 F.4th 227 (4th Cir. 2021) ...............................................................................11

**OTHER AUTHORITIES**

1 Joseph M. McLaughlin, MCLAUGHLIN ON CLASS ACTIONS:
    LAW AND PRACTICE § 4:3 (21st ed. 2024) .......................................................31

Merritt Fox & Joshua Mitts, *Event-Driven Suits and the
    Rethinking of Securities Litigation*, 78 BUS. LAW. 1 (2023).................27, 28

## INTRODUCTION

The parties agree on one thing: the district court's ruling enables securities plaintiffs to satisfy their evidentiary burden under *Comcast* simply by stating that they intend to calculate "out-of-pocket damages," the legal standard for damages in securities-fraud cases. Indeed, plaintiffs argue (at 32) that the playbook their expert followed here—a copy-and-paste damages discussion that he uses in 10 to 15 class-certification reports per year—"fit[s] Rule 23 'like a glove'" and should lead to automatic certification in every securities case. But *Comcast* requires more than merely repeating the formula for calculating out-of-pocket damages. It requires plaintiffs to offer a methodology for measuring the alleged inflation in Boeing's stock price that is consistent with their liability theory.

Plaintiffs' expert, Chad Coffman, did not even try. Contrary to plaintiffs' suggestion, Mr. Coffman did not offer "a damages *model* based on the plaintiffs' out-of-pocket losses." Br. 2 (emphasis added). Mr. Coffman simply recited the legal standard for out-of-pocket damages (*i.e.*, inflation-at-purchase minus inflation-at-sale) and then mentioned various "techniques available to quantify the artificial inflation in Boeing's stock price." Br. 22. At class certification, Mr. Coffman refused to commit to a particular methodology for

measuring artificial inflation—the critical input for out-of-pocket damages—let alone offer an actual model that purports to calculate that inflation. Plaintiffs' failure to proffer a damages methodology that satisfies *Comcast* is the most straightforward way to resolve this appeal.

Recognizing as much, plaintiffs revert to a "no harm, no foul" argument. They contend (at 19) that developing a methodology for measuring inflation is an easy exercise in most securities-fraud cases, so why even bother. But plaintiffs must bother for the reasons the Supreme Court gave in *Comcast*. At class certification, "courts must conduct a 'rigorous analysis' to determine whether" the plaintiff actually has a methodology for calculating damages on a classwide basis that is "consistent with its liability case." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35 (2013). Absent such a methodology, the plaintiff "cannot show Rule 23(b)(3) predominance" because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 34.

Holding plaintiffs to their evidentiary burden under *Comcast* is particularly important in this case because plaintiffs' claim is far from typical. Plaintiffs challenge *hundreds* of different statements by Boeing spread over three years, most of which are general statements about safety and quality that

standing alone are immaterial. During the same period, there were also numerous public reports of quality issues at Boeing that inevitably would have affected the market's perception of Boeing's general statements. And plaintiffs seek billions of dollars in damages based on the *full* decline in Boeing's stock price following an accident that was front-page news. *Comcast* required plaintiffs to offer a methodology for measuring inflation that matches this liability case. They did not do so.

Although he refused to commit to a particular methodology, Mr. Coffman pointed to approaches that assume that the inflation was fully baked into Boeing's stock price on the first day of the class period, remained constant for three years, and can be measured based on the full decline in Boeing's stock price after the Alaska Airlines accident. Such an approach flunks *Comcast* because it is inconsistent with (i) plaintiffs' theory that Boeing's general statements about safety and quality became material through their repetition over time; (ii) the evidence showing that any inflation in Boeing's stock price could not have remained constant from 2021 through 2024 given the repeated reports of quality issues at the company; and (iii) the obvious reality that at least some of the price decline after the Alaska Airlines accident was the result of the accident itself and had nothing to do with Boeing's prior statements.

*Comcast* forbids these types of mismatches, and plaintiffs cannot avoid them by disavowing the liability theory they advanced to avoid dismissal and pointing to conclusory allegations in their complaint.

## ARGUMENT

### I. PLAINTIFFS FAILED TO PROVIDE THE DAMAGES METHODOLOGY THAT *COMCAST* REQUIRES.

Plaintiffs concede (at 18) that *Comcast* requires them to present a "proposed damages methodology" that "align[s] with their theory of liability." And they acknowledge (at 22) that measuring damages here means "quantify[ing] the artificial inflation in Boeing's stock price." Yet plaintiffs' expert failed to offer *any* methodology for measuring artificial inflation, much less one that aligns with plaintiffs' liability case. That failure required the denial of class certification under *Comcast*.

#### A. Plaintiffs Cannot Satisfy *Comcast* Simply By Reciting The Legal Standard For Damages In Securities Cases.

Plaintiffs' position makes a mockery of *Comcast*'s requirement of "evidentiary proof" that "damages are capable of measurement on a classwide basis." 569 U.S. at 33-34. Plaintiffs insist that their expert satisfied *Comcast* by repeating the general formula for calculating out-of-pocket damages in securities cases, which they say (at 20) is consistent with their theory that "misrepresentations inflated [Boeing's] stock price." In plaintiffs' view, they

4

need only parrot the liability theory (misstatements inflated the stock price) and legal standard for damages (out-of-pocket damages) that apply in *every* securities-fraud case.  At class certification, plaintiffs admittedly said nothing about damages that is specific to this case.  If all securities plaintiffs must do is repeat black-letter law with no case-specific analysis, then *Comcast* is meaningless in securities cases.

1.  Plaintiffs' defense of their showing proceeds on the assumption that Mr. Coffman presented an actual "damages model" at class certification. Br. 2, 3, 13, 19, 22, 28, 32, 37, 38.  He did not.  Mr. Coffman himself testified that he had not yet built a "model" or even determined "how [he] would go about quantifying the amount of inflation per share in Boeing stock."  JA759-760. Instead, Mr. Coffman simply recited the legal standard for damages in securities cases:  "damages are equal to the artificial inflation per share at the time of purchase minus the artificial inflation per share at the time of sale." JA589-590.  That sentence says nothing about how plaintiffs intend to measure inflation—the key input for out-of-pocket damages—in a manner consistent with their liability case.  As Boeing's expert, Dr. René Stulz, testified, "[i]f somebody tells me, I'm going to use the out-of-pocket formula, I have

absolutely no idea as to how those damages will be computed because I don't know how the inputs to the formula are going to be estimated." JA1196-1197.

Plaintiffs defend their expert's failure to conduct *any* case-specific damages analysis by claiming that computing damages is mechanical. "Once the inflation per share has been quantified on each day during the class period," plaintiffs say, "the computation of damages for each class member is formulaic." Br. 29-30 (quoting Mr. Coffman's report). But that is the rub. The computation of damages becomes formulaic only *after* an expert devises a methodology to measure per-share inflation throughout the class period. Mr. Coffman offered no such methodology here. He instead testified to *potential* techniques for measuring inflation, but Rule 23(b)(3)'s predominance requirement "cannot be answered by 'maybe,' 'perhaps,' and other 'what ifs' that leave the hard questions for later." *Speerly* v. *Gen. Motors, LLC*, 143 F.4th 306, 324 (6th Cir. 2025) (en banc).

Plaintiffs say (at 28) that the out-of-pocket formula can accommodate any variation in inflation during the class period. That is both true and irrelevant. Investors can be out a little money or a lot, depending on how the alleged inflation changes over time. The key question is *how much* the stock price was inflated on each day of the class period, and determining that is the central task

6

in calculating classwide damages in securities cases. *Comcast* requires plaintiffs to provide evidentiary proof that they have a methodology for measuring inflation on a classwide basis. Mr. Coffman never offered such a methodology, let alone one backed by evidence showing that it aligns with plaintiffs' liability case. For that reason alone, class certification should be reversed here.

2. Courts in antitrust cases do not allow plaintiffs at class certification simply to recite the general formula for antitrust damages—the price paid by consumers minus the price that would have existed but for the anticompetitive conduct. *See* Opening Br. 32-34. Plaintiffs say (at 20) that antitrust cases are different because they "typically involve overlapping theories of injury and complex damages methodologies." Of course, at the level of generality plaintiffs offer here, every antitrust case also could be said to involve a single theory of injury: defendants' conduct produced supracompetitive prices and consumers were injured when they paid the resulting overcharge. Plaintiffs cannot get away with reciting truisms in antitrust cases, and the answer should be no different in securities cases. *See, e.g., In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 620 (6th Cir. 2025) (courts "appl[y] *Comcast* outside the context of antitrust cases").

But even taking plaintiffs' argument at face value, calculating damages in securities cases also can be complex and require "a lot of work," as Mr. Coffman himself acknowledged. JA791-792. That is certainly true in this case, which involves hundreds of different statements (most of which were aspirational statements about safety and quality) that were repeated over a three-year period and that allegedly concealed a safety risk at Boeing that later materialized with the Alaska Airlines accident. Plaintiffs need a methodology to determine whether and how much those statements inflated Boeing's stock price on each trading day during that three-year period. Whether that task is hard or easy, plaintiffs simply did not do it.

A comparison between this case and the Second Circuit decision plaintiffs repeatedly cite (at 3, 22, 31, 33, 40, 43), *Waggoner* v. *Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), highlights why this is not a run-of-the-mill securities action. There, the district court dismissed all claims based on general statements about Barclays' "business practices and risk controls," including its commitment to "rebuilding [] trust" after prior scandals. *Strougo* v. *Barclays PLC*, 105 F. Supp. 3d 330, 343-344 (S.D.N.Y. 2015). Unlike here, the *Waggoner* plaintiffs thus did not need a damages methodology at class certification that purported to calculate the inflationary effect of such general statements. The

8

*Waggoner* plaintiffs also did not need a methodology that matched a materialization-of-the-risk theory of loss causation. They argued instead that the inflation introduced by a small number of statements about a particular trading platform could be measured based on the price decline that occurred when the government alleged that those same statements were false. *Waggoner*, 875 F.3d at 87-88. Because there was a tight fit between the statements and the corrective information, inflation could be "directly measured" by the price decline that occurred when the statements were "shown to be false." *Id.* at 106. This case is nothing like *Waggoner*.[1]

**B. Plaintiffs Cannot Avoid *Comcast*'s Requirement Of A Damages Methodology.**

Plaintiffs offer various reasons why their failure at class certification to offer a methodology for calculating inflation should not matter. None of these excuses passes muster under *Comcast*.

1. Plaintiffs first try to water down *Comcast*. They argue (at 19-20) that *Comcast* is a "low bar to class certification" in securities cases because

---

[1] The other two appellate decisions plaintiffs cite (at 22)—an order denying Rule 23(f) review and a nonprecedential unpublished decision—do not address the *Comcast* issue presented here in any detail. *See Forsythe* v. *Teva Pharm. Indus. Ltd.*, 102 F.4th 152 (3d Cir. 2024); *Univ. of P.R. Ret. Sys.* v. *Lannett Co.*, 2023 WL 2985120 (3d Cir. Apr. 18, 2023).

investors "are all damaged by the artificial inflation caused by th[e] misstatements." But that argument avoids the real issue. Plaintiffs agree (at 18) that *Comcast* requires a "proposed damages methodology." The only question is whether reciting that investors are entitled to recover out-of-pocket losses suffices. Plaintiffs say (at 22) that "*Comcast* requires nothing more"; Boeing says that *Comcast* requires plaintiffs to offer an actual methodology for measuring artificial inflation. If Boeing is right, the class-certification decision should be reversed because plaintiffs simply repeated black-letter law about out-of-pocket damages and offered no methodology to calculate per-share inflation.

2.     Plaintiffs next point (at 19-20) to common questions like whether class members were all injured by price inflation. But this case is not about commonality—it is about predominance. As *Comcast* explains, without "establishing that damages are capable of measurement on a classwide basis," plaintiffs cannot show "Rule 23(b)(3) predominance." 569 U.S. at 34. Plaintiffs argue (at 21) that individualized damages issues rarely defeat predominance in securities cases, but that argument is misleading. To be sure, when securities plaintiffs have an acceptable classwide damages *methodology*, there still can be individualized damages issues that may not defeat predominance. But

securities plaintiffs cannot certify a class under *Comcast* without a classwide damages methodology.

Plaintiffs double down on this argument later in their brief (at 34-37), arguing that certification was appropriate because of other common issues like falsity and scienter, notwithstanding individualized damages questions. That argument cannot be squared with *Comcast*, which held that, without a methodology to calculate damages on a classwide basis, plaintiffs "cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." 569 U.S. at 34. This Court also has said the same, quoting *Comcast*. *See In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 237 (2021). Plaintiffs effectively ask this Court to ignore those decisions.

3.    Plaintiffs argue (at 29) that it is not feasible at class certification to develop a methodology to measure inflation because that "highly factual" analysis "depend[s] on information learned through discovery." In requiring "evidentiary proof" of a classwide damages methodology at class certification, *Comcast* held otherwise. 569 U.S. at 33. If plaintiffs required more discovery to satisfy that burden, they should have pursued that discovery before moving for class certification.

The truth is that plaintiffs did not ask for additional discovery because they did not believe they needed it. Mr. Coffman's merits report—submitted six days after a class was certified—purports to calculate inflation using a constant-percentage approach without citing a single document produced in discovery in the relevant sections of his report. JA1841-1901. Mr. Coffman instead relies on publicly available documents, which is unsurprising given that "the relevant issue is how the market perceived and priced *public* information." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at \*7 n.6 (S.D. Tex. May 20, 2014).

4. Relatedly, plaintiffs suggest (at 40) that Mr. Coffman's failure to offer a methodology for calculating inflation at class certification no longer matters because Mr. Coffman later submitted a merits report. Of course, Mr. Coffman's merits report only confirms his commitment to a flawed constant-inflation approach. But the point here is that Mr. Coffman's belated disclosure flunks *Comcast*, which does not permit plaintiffs to hide the ball on a damages methodology until after a class is certified. Congress amended Rule 23 in "2003 to abrogate th[is] certify-first-ask-questions-later practice." *Allen* v. *Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 907 (3d Cir. 2022) (Porter, J., concurring). And for good reason: "As a practical matter, the certification decision is typically a game-changer, often the whole ballgame." *Id.* at 908

(quotation omitted). Because "certification is the key moment in class-action litigation," a "'rigorous analysis' [] must be performed *before* a class is certified." *In re Marriott Int'l, Inc.*, 78 F.4th 677, 686-687 (4th Cir. 2023) (quotation omitted).

5.      Lastly, plaintiffs argue (at 30) that they "need not conduct detailed damages modeling" at class certification. Boeing agrees. *See* Opening Br. 31. To satisfy Rule 23(b)(3)'s predominance requirement, however, *Comcast* requires plaintiffs to offer a *methodology* for calculating per-share inflation on a classwide basis. 569 U.S. at 34. Otherwise, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* That is the situation here: at class certification, plaintiffs failed to carry their burden under Rule 23(b)(3) and *Comcast*.

## II.    PLAINTIFFS' CONSTANT-INFLATION APPROACH IS INCONSISTENT WITH THEIR LIABILITY CASE.

Plaintiffs' failure to provide the necessary evidentiary proof of an actual damages methodology at class certification was not merely a technical violation of *Comcast*. Had plaintiffs been held to their evidentiary burden under *Comcast*, no class could have been certified here. That is because plaintiffs' constant-inflation approach to damages—the only specific approach

Mr. Coffman mentioned at class certification—is inconsistent with plaintiffs' liability case for at least three reasons.

In an attempt to avoid these mismatches, plaintiffs contend (at 37) that the flaws in Mr. Coffman's constant-inflation approach are "merits questions" that "this Court lacks jurisdiction to consider." That is incorrect. A court must "consider merits questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *EQT Prod. Co.* v. *Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (quoting *Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)). The Supreme Court has repeatedly said the same. *See Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 n.2 (2021); *Comcast*, 569 U.S. at 34; *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 351 (2011). Plaintiffs cannot sweep under the rug the mismatches between Mr. Coffman's constant-inflation approach and their liability case.

### A. Assuming Constant Inflation Is Inconsistent With Plaintiffs' Materiality-Through-Repetition Liability Theory.

Plaintiffs concede (at 18) that *Comcast* requires that their "proposed damages methodology align with their theory of liability." Yet plaintiffs have never explained how Mr. Coffman's assumption of full inflation from the start

of the class period aligns with their theory that Boeing's general statements about safety and quality became material as they were repeated over time.

1.     Plaintiffs' main move is to run away from this liability theory. They accuse Boeing of "inventing a 'materiality-through-repetition' theory that the plaintiffs never advanced." Br. 17. That is not true. In responding to Boeing's motion to dismiss, plaintiffs had to tackle Boeing's argument that the safety and quality statements at issue here are nonactionable puffery. Here is what plaintiffs said: "While certain statements, 'viewed in isolation, may be mere puffery,' *when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors*." JA467 (emphasis in original) (quoting *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017)). Simply put, plaintiffs avoided a fatal puffery problem at the outset of the case by arguing that Boeing's otherwise nonactionable statements "bec[a]me material" over time. But that left them with an equally fatal problem at class certification: Mr. Coffman's constant-inflation approach to damages does not align with that liability theory.

To be clear, plaintiffs are wrong (at 44-45) that Boeing seeks to relitigate the district court's motion-to-dismiss decision. Plaintiffs miss the point. To

avoid dismissal, plaintiffs had to contend with well-established precedent holding that general statements like Boeing's are immaterial as a matter of law. They tried to dodge that case law by relying on a materiality-through-repetition theory. *See* Opening Br. 10-11, 39-43. Having avoided dismissal on that basis, plaintiffs now want to run from their "repetition" theory because it creates challenges at class certification. Plaintiffs cannot abandon the liability theory on which they relied to avoid dismissal simply because that theory is now inconvenient.

In an attempt to distance themselves from their own theory, plaintiffs quote (at 26) a single sentence in their motion-to-dismiss opposition stating that Boeing's "repetition of safety-related statements underscores their materiality." JA475. But that sentence is not helpful to them, especially when taken in context. Plaintiffs' argument was that Boeing's repeated statements lulled investors into believing that the company had turned the page on safety, when it supposedly had not. *See* JA474-475. In that context, plaintiffs argued that, "even if some of the statements are general enough that, had they been made in isolation, they might not be actionable," Boeing's repetition of the statements rendered them material. JA475 (quoting *BHP Billiton*, 276 F. Supp. 3d at 80). That is a materiality-through-repetition theory.

Nor is that one sentence all plaintiffs said on the issue. In two previous decisions, courts rejected as immaterial similarly general statements by Boeing about safety. *See College Ret. Equities Fund* v. *Boeing Co.*, 2023 WL 6065260, at *7 (N.D. Ill. Sept. 18, 2023); *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *9 (N.D. Ill. Aug. 23, 2022). Plaintiffs distinguished those decisions by arguing that "[t]his case, by contrast, concerns Defendants' *years* of representations that Boeing had turned a new page after the crashes by prioritizing safety." JA476 (emphasis in original). And plaintiffs relied on cases that adopted a materiality-through-repetition approach. JA475 (citing *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020); *BHP Billiton*, 276 F. Supp. 3d at 80).

Even on appeal, plaintiffs emphasize that Boeing's safety claims were made "repeatedly" throughout the class period. Br. 1, 4, 6, 27, 31. The plaintiffs in *BP* also relied on "the 'drumbeat' of process safety reform which featured so prominently in Defendants' public relation materials." *BP*, 2014 WL 2112823, at *10 n.11. Plaintiffs here use the exact same language to describe their liability case, referencing (at 27) "the drumbeat of false safety claims" in Boeing's public statements. If it was the "drumbeat" over the class period that made the statements material, as a matter of basic logic, the statements had a

"gradual and cumulative effect on Boeing's stock price," Br. 26, and any inflation could not have been constant.

Before this Court, plaintiffs carefully avoid any mention of the sheer volume of alleged misstatements in this case or their generic nature. Even though the complaint challenges literally hundreds of different statements, plaintiffs discuss only a handful in their brief. *See* Br. 9-10, 45.[2] Plaintiffs also observe (at 46-47) that the *subject* of safety was important during the class period. The subject of safety is undeniably important to Boeing's business, but courts do not "conflate the importance" of a subject "with the materiality of a [company's] statements" about that subject. *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). That is why plaintiffs were forced to resort to their "repetition" theory at the motion-to-dismiss stage.

2. Plaintiffs advance a different liability theory now. They claim (at 27) that Boeing's safety statements "artificially *maintained* the company's

---

2 Plaintiffs highlight (at 9-10, 45) a small number of statements describing Boeing's goal of eliminating traveled work and its code of conduct prohibiting employee retaliation. These statements also cannot support a viable fraud claim. *See Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (11th Cir. 2019) (statements that company was "making 'progress' toward compliance" inactionable); *Retail Wholesale & Dep't Store Union* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (code-of-conduct statement inactionable).

stock price at an inflated level" under a "'price-maintenance' theory."  As their sole support, plaintiffs cite two conclusory sentences from their 345-page complaint generally alleging that the statements "artificially inflated and/or artificially maintained" Boeing's stock price.  JA370-372, JA376-377.  While Plaintiffs' newfound reliance on a price-maintenance theory does not reduce their *Comcast* burden or make the challenged statements material, such general allegations do not suffice at class certification, and plaintiffs offered no evidence that a price-maintenance theory fits here.

A price-maintenance theory posits that "a misrepresentation causes a stock price to remain inflated by preventing preexisting inflation from dissipating from the stock price."  *Goldman*, 594 U.S. at 119-120 (quotation omitted).  Plaintiffs never explain how safety statements made in the aftermath of two 737 MAX crashes in 2018 and 2019 (JA1100) and the global grounding of the MAX in 2019 and 2020 (JA943) *maintained* preexisting safety-related inflation in Boeing's stock price.  On the contrary, plaintiffs' theory is that Boeing's repeated statements about safety persuaded the market that "it had turned a new page and repaired its safety culture."  JA38.

Indeed, plaintiffs emphasize (at 1) that on the first day of the class period, Boeing announced that it had "entered into a deferred-prosecution agreement

with the Justice Department and promised to take 'immediate steps' to improve its safety." That statement did not "reinforce material misconceptions" about Boeing's safety culture, Br. 27, but rather assured the market that Boeing was becoming a safer company by "improv[ing] its safety and quality-control practices," Br. 1. Under that theory, Boeing's statements would be expected to increase (not maintain) the company's stock price. For his part, Mr. Coffman never opined that a price-maintenance theory makes economic sense here; he instead stated that he was instructed to make that assumption. JA1434.

More fundamentally, a class cannot be certified based on plaintiffs' general *allegation* that statements "artificially inflated and/or artificially maintained" Boeing's stock price. JA370-372, JA376-377. Only "concrete evidence," not "allegations" or "conclusory assertions," can tip the scales at class certification. *Stafford* v. *Bojangles' Rest., Inc.*, 123 F.4th 671, 680 (4th Cir. 2024). "The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Bell* v. *PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). Plaintiffs offered no evidence that the full amount of the inflation assumed by Mr. Coffman's constant-inflation approach was already embedded in Boeing's stock price before the first alleged misstatement in January 2021.

The evidence plaintiffs later offered makes plain why this cannot be a price-maintenance case. Under Mr. Coffman's constant-percentage approach, the first alleged misstatement—the January 7, 2021 statement by Boeing's CEO that the deferred prosecution agreement was "a serious reminder to all of us of how critical our obligation of transparency to regulators is"—was responsible for maintaining *$56.40* in preexisting inflation in Boeing's stock price. JA250-251, JA1977. The notion that this innocuous statement accounted for 26.51% of Boeing's stock price at the time is absurd. Under *Comcast*, plaintiffs should have been required to articulate this deeply flawed theory and damages methodology—and Boeing should have been given an opportunity to challenge them—*before* a massive class was certified.

3. Plaintiffs observe that the district court in *BP* recognized that "a damages model need not be perfect." Br. 33 (quoting *BP*, 2014 WL 2112823, at *10). But *BP* only underscores the mismatch between plaintiffs' liability theory and Mr. Coffman's constant-inflation approach. As in this case, the *BP* plaintiffs alleged that "Defendants repeatedly and falsely assured the market that process safety improvements … were being rolled out throughout the organization." 2014 WL 2112823, at *2. The plaintiffs alleged that these statements "lulled the market into believing that BP was a safer company than

21

it actually was" and that the truth "was revealed when the Deepwater Horizon exploded." *Id.* Given this liability theory—which is also plaintiffs' theory here—the *BP* court concluded that Mr. Coffman's assumption that "[t]he amount of inflation remain[ed] constant over the Class Period" was inconsistent with the plaintiffs' liability theory based on "the repetition of certain statements." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013).

In the second round of class-certification briefing, Mr. Coffman offered a different methodology based on what he called "Bayesian Updating" that better fit the *BP* plaintiffs' theory. Rather than assuming constant inflation, Mr. Coffman's new methodology began with $0 of inflation on the date of the first alleged misstatement and ended with the full inflation ($18.53) on the date of the last statement. *BP*, 2014 WL 2112823, at *3. According to Mr. Coffman, this methodology measured the "incremental" inflation "attributable to each alleged misrepresentation." *Id.* The court rejected the defendants' complaint that Mr. Coffman's new approach was an "imperfect means" of allocating inflation, holding that his methodology adequately fit the plaintiffs' theory that the "fraud [was] perpetrated over a multi-year period, with a near-continuous series of alleged misstatements." *Id.* at *10. Unlike in *BP*, Mr. Coffman did

not even attempt to offer a damages methodology here that fits plaintiffs' similar theory, insisting instead on the same constant-inflation approach rejected in *BP*.

## B. Assuming Constant Inflation Is Also Inconsistent With Public Reports Of Quality Issues During The Class Period.

Plaintiffs also failed to counter Boeing's evidence showing that any inflation in Boeing's stock price could not have remained constant from 2021 until 2024 given the repeated reports of quality issues at Boeing during that period. *See* Opening Br. 47-51.

1. Plaintiffs start (at 42) by mischaracterizing Boeing's argument as a "truth-on-the-market defense." That defense challenges statements' materiality by arguing that the "truth" behind each alleged misstatement "had already entered the market by the time the misstatements were made." *Conn. Ret. Plans & Trust Funds* v. *Amgen Inc.*, 660 F.3d 1170, 1174 (9th Cir. 2011). In *Amgen*, the Supreme Court held that this defense was not a basis to deny class certification because the materiality of the alleged misstatements was a common question. *Amgen*, 568 U.S. at 481. But Boeing is not arguing here that class certification should be denied because its statements were immaterial. Boeing's point is different. As Dr. Stulz explained, any inflation in Boeing's stock price could not have been constant due to reports of quality

issues throughout the class period. JA950-960. That argument goes to *Comcast*'s requirement that a damages methodology must "measure only those damages attributable to th[e] [liability] theory." 569 U.S. at 35. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

2. Without citing any evidence, plaintiffs argue (at 43) that this "issue can be handled on the merits using event studies and other tools," but that is no justification for Mr. Coffman's reliance on a flawed constant-inflation approach. Even Mr. Coffman acknowledged at class certification that "[i]t is not unusual to utilize another approach when there is reason to believe that the amount of artificial inflation varied over time." JA1439. In fact, he asserted that Boeing's "argument rests on a flawed claim that I would assume a constant inflation methodology when I have made no such assumption." JA1445. After a class was certified, however, Mr. Coffman made that exact assumption, using a constant-inflation methodology to calculate damages. JA1893. This bait-and-switch is why courts, in certifying a class, should not "leave the hard questions for later." *Speerly*, 143 F.4th at 324.

**C.** **Using The Full Price Decline After The Accident To Measure Inflation Is Inconsistent With Plaintiffs' Loss-Causation Theory.**

Mr. Coffman's use of the full decline in Boeing's stock price after the Alaska Airlines accident as the measure of inflation supposedly created by the alleged misstatements would confer an impermissible windfall on most, if not all, class members. As the *BP* court explained, "when the corrective event is the materialization of an understated risk," as plaintiffs allege here, "the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase." 2014 WL 2112823, at *10. This is another mismatch between plaintiffs' liability theory and Mr. Coffman's damages approach.

1.      At the outset, plaintiffs try to confuse the issue (at 24-25) by pointing to the *BP* court's certification of a different subclass asserting claims that did not rely on a materialization-of-the-risk theory. The *BP* case involved two subclasses:  (i) investors that bought BP stock before the Deepwater Horizon explosion, and (ii) investors that bought BP stock after the explosion. Whereas the pre-explosion subclass alleged, like plaintiffs here, that BP's safety statements "understated BP's exposure to catastrophic risk" and that the truth "was revealed when the Deepwater Horizon exploded," 2014 WL

25

2112823, at \*2-3, the post-explosion subclass asserted a more typical claim—that BP had misrepresented the rate at which oil was flowing into the Gulf of Mexico after the explosion and that those misrepresentations were corrected when the true flow rate was disclosed, *id.* at \*4. As the Fifth Circuit explained, unlike in a materialization-of-the-risk case, the stock-price decline after the disclosure of the true flow rate was a proxy for the "theoretical price that the BP stock would have traded for had" BP disclosed the correct flow rate earlier. *Ludlow* v. *BP, PLC*, 800 F.3d 674, 683 (5th Cir. 2015).

Plaintiffs' liability theory here mirrors the *pre*-explosion subclass's theory: plaintiffs allege that Boeing's safety statements inflated the company's stock price by understating the risk of an accident and that the "truth" was revealed when an accident occurred. JA288, JA369-370. In *BP*, the court rejected Mr. Coffman's proposal to use "the full value of the stock price drop from the materialization of [a] risk" as the measure of inflation created by safety statements because it would "overcompensate[] investors for their harm." 2013 WL 6388408, at \*16. When a risk materializes, "the impact on share price of the fact that the company has suffered [a] setback is likely to be overwhelmingly larger than the amount, if any, by which the misstatement[s] had previously inflated price by leading the market to underestimate the risk."

Merritt Fox & Joshua Mitts, *Event-Driven Suits and the Rethinking of Securities Litigation*, 78 BUS. LAW. 1, 44 (2023).

The evidence in the record bears that out in this case. Similar reports of loose bolts on the 737 MAX before the Alaska Airlines accident did not produce anything close to the same adverse stock-price reaction. *See* Opening Br. 56-58. This evidence—which plaintiffs never address—reinforces that Boeing's stock price later declined sharply not because the Alaska Airlines accident corrected Boeing's earlier statements about safety and quality, but because Boeing had suffered a widely publicized accident that was expected to adversely affect its business. At the very least, it is farcical to say that the decline in Boeing's stock price owed *nothing* to the effect the accident was expected to have on Boeing through increased regulatory actions and reduced customer orders, and *everything* to the effect it had in correcting prior general statements about safety and quality.

2. Plaintiffs contend (at 38) that the issue that doomed class certification in *BP* "is a *merits* issue that would be inappropriate for this Court to resolve on Rule 23(f) review." To be clear, Boeing is not contending that class certification should be denied because plaintiffs failed to prove loss causation. Rather, Boeing is raising the same *Comcast* issue that was raised in

*BP*: there is an obvious mismatch between Mr. Coffman's use of the full price decline after the Alaska Airlines accident as his measure of inflation and plaintiffs' reliance on a materialization-of-the-risk theory.

3.      Plaintiffs suggest (at 25) that the overcompensation problem discussed in *BP* arises only when the plaintiff "seek[s] consequential damages" or "argue[s] that investors would have refused to purchase [company] stock had they known the truth." That is incorrect. The problem is inherent in all materialization-of-the-risk cases because a major accident like the Alaska Airlines accident will cause a company's stock price to decline even if the company had made *no* previous statements about safety. When a highly publicized accident occurs, the "price drop is almost never a reasonable measure of the misstatement's share price inflation" because much or all of the price drop is due to *the accident itself*, not a dissipation of inflation in the stock price due to the market's underestimation of the risk. *Event-Driven Suits*, 78 BUS. LAW. at 4.

4.      Plaintiffs next retreat (at 31) to the argument that they "may never need to compute the true level of price inflation at the time of purchase because … the price drop" after the accident is a "conservative" estimate of inflation. By "conservative," plaintiffs mean that under *Dura Pharmaceuticals, Inc.* v.

*Broudo*, 544 U.S. 336 (2005), "damages are capped by the amount that the stock price declined when the truth was revealed," even though, in plaintiffs' view, the supposed inflation in Boeing's stock price was "far greater" than the price drop after the Alaska Airlines accident. Br. 31. That argument is astonishing. There is nothing "conservative" about plaintiffs' claim that the class "suffered billions of dollars in losses" (JA45) by using the full price decline after a highly publicized accident as the measure of inflation introduced years earlier by generic statements about safety.

Mr. Coffman's merits report underscores the absurdity of plaintiffs' position. Using a government database, Mr. Coffman characterizes the Alaska Airlines accident as a "minor" event because "there were no fatalities, no serious injuries, and no destruction of the aircraft." JA1855-1856. He then asserts that such "incidents do not generally cause the market price of the airplane manufacturer to decline," JA1855, which leads him to conclude that the drop in Boeing's stock price after the accident was "not the result of the incident itself," JA1857, but rather the correction of Boeing's general safety statements. Mr. Coffman's determination that the Alaska Airlines accident was a "minor" event cannot be reconciled with plaintiffs' own description of the incident: "a Boeing 737 MAX airplane … was forced to make an emergency

29

landing minutes after take-off when a door plug blew off mid-flight, leaving a gaping hole in one side of the plane's cabin mere feet from where passengers were sitting." JA42. That description bears no resemblance to the other minor events described in the database, such as an incident when the "[r]everse thrust on number one engine was inoperative, but there were no other significant deferred defects and the aircraft departed Luton on schedule." JA2032.

5. Finally, plaintiffs argue (at 41) that "[t]he Alaska Airlines incident was just the first of several events in which Boeing's stock price fell as the public learned more of the truth." But the district court rejected this argument. In ending the class period on January 8, 2024, the district court held that those later events are *not* corrective disclosures because they "reflected the consequences of, and reactions to, the Alaska Airlines incident *as opposed to the correction of prior misstatements*." JA1763 (emphasis added). As the court explained, "[b]y January 8, 2024, it was clear that the Alaska Airlines incident resulted from the materialization of safety-related risks at Boeing." JA1763. This ruling reflects the rule that "the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market." *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 82 (D. Md. 1991).

Although they did not cross-appeal the district court's ruling, plaintiffs argue in a footnote (at 42 n.7) that the "market's reactions" to the events after January 8 "remain relevant for calculating damages even if those disclosures come after the end of class period." But the class period "end[s] when the market was 'cured' of prior misrepresentations or omissions, *i.e.*, received the full truth and absorbed it into the market price of the security." 1 Joseph M. McLaughlin, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 4:3 (21st ed. 2024). The district court held that this occurred on January 8, 2024. Plaintiffs' contention (at 41-42) that Boeing's stock price remained inflated for another four months after the Alaska Airlines accident means that the district court excluded from the class investors that paid an inflated price for Boeing's stock during that four-month period. That contention makes no sense. This Court should make clear that plaintiffs cannot rely for damages purposes on supposed corrective disclosures after the end of the class period.

## CONCLUSION

The Court should reverse the certification order and decertify the class.

Respectfully submitted,

Benjamin L. Hatch
MCGUIREWOODS LLP
888 16th Street, N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(757) 640-3727
bhatch@mcguirewoods.com

/s/ *Jeffrey B. Wall*
Jeffrey B. Wall
Judson O. Littleton
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com
littletonj@sullcrom.com

Richard C. Pepperman II
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
peppermanr@sullcrom.com
cohenja@sullcrom.com

*Counsel for Defendants-Appellants The Boeing Company, David L. Calhoun, Dennis A. Muilenburg, Brian J. West, and Gregory D. Smith*

NOVEMBER 21, 2025

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Century Expanded BT font.

/s/ *Jeffrey B. Wall*
Jeffrey B. Wall

Dated: November 21, 2025