No. 25-1492

# In the United States Court of Appeals for the Fourth Circuit

IN RE: THE BOEING COMPANY

STATE OF RHODE ISLAND OFFICE OF THE GENERAL TREASURER, on behalf of The Employees Retirement System of The State of Rhode Island; LOCAL #817 IBT PENSION FUND;
*Plaintiffs-Appellees,*

v.

THE BOEING COMPANY; DAVID L. CALHOUN; DENNIS A. MUILENBURG; BRIAN J. WEST; AND GREGORY D. SMITH;
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:24-cv-00151-LMB-LRV (The Hon. Leonie M. Brinkema)

## BRIEF OF FINANCIAL ECONOMISTS AND SECURITIES LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES' PETITION FOR REHEARING EN BANC

JOSHUA MITTS
COLUMBIA LAW SCHOOL
435 WEST 116TH STREET
NEW YORK, NY 10027
(212) 854-7797
JMITTS@LAW.COLUMBIA.EDU

WILLIAM TINKLER
TINKLER LAW FIRM LLC
POST OFFICE BOX 31813
CHARLESTON, SC 29417-1813
(843) 853-5203
WILLIAM@TINKLERLAW.COM

(*Additional counsel on inside cover*)

NASCAT
National Association of
Securities and Consumer
Attorneys
818 Connecticut Avenue, NW
Suite 1100
Washington, DC 20006

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**


INTEREST OF AMICI CURIAE .......................................................................... 1

SUMMARY OF THE ARGUMENT ........................................................................ 3

ARGUMENT ........................................................................................................ 4

A. Investor losses in a securities class action under Rule 10b-5 are inherently amenable to class-wide proof. ......................................................... 4

B. The phased approach to expert analysis allows for considering all available evidence upon the close of fact discovery. ...................................... 8

C. The panel leaves experts adrift and invites unnecessary rounds of wasteful and duplicative expert analysis. ...................................................... 10

CONCLUSION ................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................*passim*

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................6

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....................11, 12

*Office of Gen. Treasurer on behalf of Emps.' Ret. Sys. v. Boeing Co.*,
182 F.4th 422 (4th Cir. 2026)....................*passim*

*Spurlock v. Wexford Health Sources, Inc.*,
175 F.4th 232 (4th Cir. 2026)....................10

*Spurlock v. Wexford Health Sources, Inc.*,
2025 WL 2085053 (S.D. W. Va. Jul. 24, 2025)....................10

**Other Authorities**

Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 Am. L. & Econ. Rev. 141 (2002)....................7

John H. Cochrane, *Asset Pricing: Revised Edition* (2005)....................5

Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990)....................8

Federal Judicial Center, *Reference Manual on Scientific Evidence* (4th ed. 2025)....................5, 6, 10

Allen Ferrell & Atanu Saha, *Forward-Casting 10b-5 Damages: A Comparison to Other Methods*, 37 J. Corp. L. 365 (2012)....................8, 9, 11

Sagar P. Kothari & Jerold B. Warner, *Econometrics of Event Studies*, *in the Handbook of Empirical Corporate Finance* 3 (2007)................................7

A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13 (1997)..........................................................................................7

## **INTEREST OF AMICI CURIAE**[1]

*Amici curiae* are financial economists who use statistical methods, including event studies, to determine the impact of publicly disclosed information on stock prices, and law professors whose scholarship focuses on the federal securities laws. Although each individual *amicus* might not endorse every statement herein, this brief reflects the *amici's* consensus that (1) this appeal presents an important question regarding application of *Comcast's* class-wide damages requirement in securities cases, and (2) the Panel's resolution of that issue here was erroneous. In alphabetical order, the *amici curiae* are:

Sanjai Bhagat
Professor of Finance
Leeds School of Business
University of Colorado

Terrence Blackburne
Shirley E. Droschkey Associate Professor in Accounting
Oregon State University

Zahn Bozanic
William Hillison Professor of Accounting
Herbert Wertheim College of Business
Florida State University

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than amici or their counsel made a monetary contribution intended to fund the brief's preparation or submission. This brief is accompanied by a motion for leave to file.

James D. Cox
Brainerd Currie Professor of Law
Duke University

Steven Feinstein
Associate Professor of Finance
Babson College

Merritt Fox
Arthur Levitt Professor of Law
Columbia University

Jonathan Klick
Charles A. Heimbold, Jr. Professor of Law
University of Pennsylvania

Donald Langevoort
Thomas Aquinas Reynolds Professor of Law
Georgetown University

Joseph R. Mason
Fellow
Wharton School of Business
University of Pennsylvania

Joshua Mitts
David J. Greenwald Professor of Law
Columbia University

Tavy Ronen
Professor, Finance and Economics
Rutgers Business School

Nejat Seyhun
Jerome B. and Eileen M. York Professor of Business Administration
Professor of Finance
University of Michigan

## SUMMARY OF THE ARGUMENT

We submit this amicus to explain the role economic experts have historically played in securities class actions at various stages of the litigation, and to urge this Court to clarify the role that economic experts can and should play at the class certification stage.

Historically, prior to and following the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), at class certification, economic experts were asked to identify a damages methodology that can be implemented on a class-wide basis that was consistent with the proposed class's alleged theory or theories of liability. At the merits stage, economic experts then applied that methodology to form an opinion regarding the quantification of per share damages to investors who purchased the subject security during the class period. To implement the identified damages methodology and arrive at that merits opinion, experts make practical methodological choices, applying professional judgment based on an evaluation of all the evidence made available upon the completion of fact discovery. All these methodological choices, the damages model and the implementation details, are amenable to class-wide evaluation, and none require an inquiry into the facts and circumstances of individual class members.

The panel opinion, *Office of Gen. Treasurer on behalf of Emps.' Ret. Sys. v. Boeing Co.*, 182 F.4th 422 (4th Cir. 2026), leaves experts adrift by suggesting some

new additional analysis, historically reserved for after the completion of fact discovery, is required at class certification, without clearly specifying what that analysis is or how it can be accomplished without a full discovery record. Given that the factual record is not yet fully developed at class certification, it would be premature for experts to reach a final determination regarding complex methodological choices, and experts might be forced to revise those conclusions at the merits stage, inviting unnecessary motion practice upon the conclusion of fact discovery. And while the panel suggests that an expert should "settl[e] on a theory of liability," an expert is not a fact-finder. Rather, expert opinion as to price inflation is considered by the trier of fact at summary judgment or trial.

## ARGUMENT

### A. Investor losses in a securities class action under Rule 10b-5 are inherently amenable to class-wide proof.

*Comcast* was an antitrust case involving claims that different groups of consumers from different regions were overcharged for a variety of reasons, such as the elimination of satellite competition. Because some of these reasons were unrelated to overbuilding, the only form of alleged anticompetitive behavior upheld by the lower court, the Supreme Court found that "the model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised." 569 U.S. at 36.

By contrast, in securities class actions, "damages experts are usually required

to estimate per-share damages. Class-wide damages are typically calculated in a subsequent claims process where individual shareholders submit claims, along with evidence of their trades in the securities at issue." FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Fourth Edition, vol. 1, at 804 (2025). While prices in consumer markets may be influenced by regionally varying factors, securities markets are nationally integrated. There is thus generally a single market price for a security at any point in time, putting aside transaction costs and ephemeral pricing dislocations that are trivial in magnitude. Otherwise, one could engage in "arbitrage" by simultaneously buying the security at the lower price and selling it at the higher price, which would drive the two prices together. JOHN H. COCHRANE, ASSET PRICING: REVISED EDITION 61, 64 (2005).

The individualized pricing concerns identified in *Comcast* are not applicable to a securities class action where damages are based on "the 'out-of-pocket' measure" of investor losses, "calculated as the difference between inflation at the time of purchase and inflation at the time of sale." "Inflation at a given point in time is the difference between (1) the actual price at which the stock then traded and (2) the but-for price that would have existed in the absence of the misrepresentations (also known as the 'true' value)." FEDERAL JUDICIAL CENTER, at 811. While there are other methodologies for computing securities fraud damages aside from the out-of-pocket damages methodology, these other methodologies, which may consider

consequential damages and opportunity costs, may not be feasible on a class-wide basis and may not be fully consistent with plaintiffs' theory of liability. Because the out-of-pocket damages methodology is based on market data, market-wide economic effects, and ultimately the artificial inflation in the stock's market price, it is amenable to class-wide implementation and is consistent with the class-wide theory of liability pled in almost all securities fraud class cases.

Stock price inflation does not depend on any individual characteristics of the purchasers of that stock. Given that actual stock prices are widely known, a damages expert seeks to estimate the "but-for price that would have existed in the absence of the misrepresentations." This requires "identification of instances when new corrective information was revealed to the market." *Id.* at 812. In this loss-causation analysis, the expert adjusts for "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" which could have accounted for the decline in the issuer's stock price upon revelation of the truth. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 343 (2005). And while the panel criticized the plaintiff's expert for not saying "how he would" "cull[] out declines in share price not caused by the alleged misrepresentations," *Boeing*, 182 F.4th at 442, the Supreme Court has held that "securities fraud plaintiffs should not be required to prove loss causation in order to … achieve class certification." *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 813 (2011).

The methodology typically employed by experts to make loss-causation adjustments is an event study, which estimates how much of a stock price change is attributable to confounding market and industry-wide factors. *See, e.g.*, Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 Am. L. & Econ. Rev. 141 (2002); A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13 (1997); Sagar P. Kothari & Jerold B. Warner, *Econometrics of Event Studies*, *in the Handbook of Empirical Corporate Finance* 3, 9-14 (2007). An event is a news item that impacts the level or riskiness of the cash flows of a company. Experts routinely make methodological choices when employing an event study, such as which market and industry-wide factors to include and how to account for the relationship between those factors and the issuer's stock price. But none of these choices turn on individualized characteristics of the plaintiffs. The event study methodology is used extensively in finance research and securities litigation; and, importantly, there is only one event study methodology.

In contrast to the consumer overcharging in *Comcast* which involved "nearly endless" pricing "permutations" which could implicate different theories of liability for "2 million subscribers located in 16 counties," 569 U.S. at 37-38, a securities class action involves a single security trading at a common market price at each point in time. While a price change may be driven by confounding information, it is not

possible for some members of the proposed class to overpay due to one confounding factor while other members overpay due to a different confounding factor at the same time. The methodological choices made by an expert employing an event study in a securities class action thus do not present individualized issues.

### B. The phased approach to expert analysis allows for considering all available evidence upon the close of fact discovery.

Under well-recognized principles of financial economics in the peer-reviewed literature, the methodological choices in connection with event studies should be informed by a consideration of all the available evidence upon the close of fact discovery. For example, discovery might indicate how market participants interpreted various misrepresentations.

While we take no position on the specific analysis by plaintiffs' expert in this matter, the panel criticized the expert's conclusion that he could measure price inflation by either the "constant dollar" or "constant percentage" method, the two methodologies regularly used by plaintiffs in securities cases. *Boeing*, 182 F.4th at 444. Both methods are recognized in the academic literature, which discusses the complex methodological considerations underlying the choice between them. *See, e.g.*, Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990); Allen Ferrell & Atanu Saha, *Forward-Casting 10b-5 Damages: A Comparison to Other Methods*, 37 J. CORP. L. 365, 369-70 (2012). As the Petition explains, both methodologies

are also routinely approved by courts throughout the country post-*Comcast*.

Under the constant-dollar method, inflation at the time of a sale during the class period is identical to inflation at the time of purchase, which produces zero damages for so-called "in-and-out" traders who sold prior to the first corrective disclosure. Ferrell & Saha, 37 J. CORP. L. at 370. However, the constant-dollar method assumes that "the implications for the firm's stock price of the information contained in the corrective disclosure is not a function of the market's view of the current circumstances of the company," *i.e.*, that the inflation over the class period is exactly equal to the abnormal price decline, in dollars, on the date of the corrective disclosure. *Id.* By contrast, the constant-percentage method implies that inflation "at time of sale will be lower than inflation at time of purchase if the stock price at the time of sale was lower than the stock price at the time of purchase." *Id*. at 371 n.21.

Given these complex tradeoffs in deciding between the constant-dollar and constant-percentage methods, it would be premature for an expert to commit to a choice at the class certification stage. For example, forming an opinion on what might have been known by the firm or the market on a given date, shaping the but-for disclosure, requires a careful analysis of information revealed in discovery over the class period, including evidence obtained in discovery such as news, disclosures and analyst reports released during that period.

The panel further concluded, "A list of possible methodologies, described in

general terms, isn't a methodology, even if it is carried out in more pages." *Boeing*, 182 F.4th at 444. But the panel gives little guidance on what distinguishes a "methodology" from "methodologies." Consider the choice whether to include a particular industry factor in an event study. That choice is not a "menu of options that the party will decide on later," *id.* at 440, but a professional judgment over which qualified experts may disagree based on evidence adduced during discovery. FEDERAL JUDICIAL CENTER, at 814. It would put the cart before the horse for an expert to make that judgment before all the evidence is available through fact discovery.

### C. The panel leaves experts adrift and invites unnecessary rounds of wasteful and duplicative expert analysis.

The panel's approach would lead to significant uncertainty as to the precise degree of analysis required at class certification. The panel writes that experts "have to tell the district court what their actual methodology is and how it resolves the predominance inquiry." *Boeing*, 182 F.4th at 440. But the panel is unclear on what exactly that means. The only example directly cited in the body of the panel opinion is *Spurlock v. Wexford Health Sources, Inc.*, where this Court found that a damages model satisfied Comcast when it was based on "the number of days a class member was denied adequate medical treatment." 175 F.4th 232, 249 (4th Cir. 2026). But that was only one of the "possible mechanisms" for setting damages identified by the district court, which held that it "need not identify the proper mechanism for

setting damages at this stage." *Spurlock v. Wexford Health Sources, Inc.*, 2025 WL 2085053, at *18 (S.D. W. Va. Jul. 24, 2025).

In addition to leaving experts confused as to whether they must specify model inputs, conduct partial empirical tests or effectively perform much of the merits-stage analysis in advance, the panel opinion likely will invite unnecessary rounds of motion practice. Suppose an expert were to conclude at class certification that the constant-dollar method was appropriate based on plaintiff's allegations in the complaint. After class certification, the evidence revealed in discovery indicated to the expert that "the market's view of the current circumstances of the company" over the class period rendered some other method more appropriate. *See, e.g.*, Ferrell & Saha, 37 J. CORP. L. at 371. Defendants might move to decertify the class, potentially requiring yet another round of briefing which could have been avoided.

The panel faults plaintiffs for "offer[ing] alternative theories of liability—inflation or maintenance" and notes that plaintiff's expert "seemed to be settling on a theory that the alleged misrepresentations maintained artificially high prices." *Boeing*, 182 F.4th at 443. But a damages expert is not a fact-finder and cannot "settl[e] on a theory" of liability, as that would improperly invade the province of the trier of fact. The expert offers an opinion regarding losses caused by the alleged misstatements if the plaintiff succeeds in establishing the elements of the cause of action under Rule 10b-5. The finding of price inflation is made by the fact finder at

summary judgment or trial. *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016).

The panel reasons that it is necessary for the expert to identify a theory of liability because "to conduct a comparison [between liability and damages], you need to provide the necessary information about both comparators." 182 F.4th at 443. But each theory of liability can be compared to the damages methodology chosen by the expert at the merits stage. *See, e.g.*, *Vivendi*, 838 F.3d at 255 (considering how expert's model "approximate[s] the inflation trajectory over the relevant period").

## **CONCLUSION**

This Court should grant rehearing.

September 9, 2026

Respectfully submitted,

By: */s/ William Tinkler*

William Tinkler
*Counsel of Record*
Tinkler Law Firm LLC
Post Office Box 31813
Charleston, SC 29417-1813
(843) 853-5203
william@tinklerlaw.com

Joshua Mitts
Columbia Law School
435 West 116th Street
New York, NY 10027
(212) 854-7797
Jmitts@law.columbia.edu

NASCAT
National Association of
Securities and Consumer Attorneys
818 Connecticut Avenue, NW
Suite 1100
Washington, DC 20006

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE AND SERVICE**

I hereby certify that:

1. The foregoing brief is in 14-point Times New Roman proportional font and contains 2,590 words, excluding the parts exempted by Fed. R. App. P. 32(f), and thus complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the typestyle requirements of Fed. R. App. P. 32(a)(6), and the type-volume limit of Fed. R. App. P. 29(b)(4).

2. On September 9, 2026, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

Dated: September 9, 2026

/s/ William Tinkler
William Tinkler
*Counsel for Amici Curiae*